Irving J. Hayutin and Sima B. Hayutin, et al. 1 v. Commissioner. Hayutin v. CommissionerDocket Nos. 4623-64, 4628-64, 5415-65, 5428-65, 5432-65, 5433-65, 5434-65, 5524-65, 4720-67, 4759-67, 4760-67, 4761-67, 4763-67, 4765-67, 4770-67, 4771-67, 4784-67.United States Tax CourtT.C. Memo 1972-127; 1972 Tax Ct. Memo LEXIS 128; 31 T.C.M. (CCH) 509; T.C.M. (RIA) 720127; June 12, 1972. *128 1. Six land transactions occurred involving several of the petitioners herein. The first was the transfer of the Barnes and Shaw tract to the petitioners, Irving, Arthur, and Shaw. The next three transactions involved portions of that tract which Irving, Arthur, and Shaw conveyed to corporate petitioner, Builders. The first transaction concerned the acquisition of the Wyse tract by Irving, Arthur, and Shaw and the transfer of that tract to Builders. The sixth transaction involved the acquisition of the Keller tract by Irving, Arthur, and Shaw and the conveyance of that tract to Builders. In the case of all of these transactions, contracts of sale were executed calling for long-term payouts. Held, based on the evidence of record -- (a) the five land transfers to Builders were contributions to capital; (b) the aggregate basis to Builders in the Barnes and Shaw tract is $42,000, the fair market value of that tract when it was received by Irving, Arthur, and Shaw; (c) the basis to Builders in the Wyse tract is $60,000, and the basis to Builders in the Keller tract is $150,000, the transferors' bases in the two tracts; (d) the interest deductions claimed by Builders relating to the *129 land contracts are not allowable; and (e) the receipts of Irving, Arthur, and Shaw relating to the land contracts are dividends. 2. Petitioners, Irving and Arthur, set up several trusts for the benefit of their respective wives and children. Irving was appointed trustee of the trusts created by Arthur, and Arthur was appointed trustee of the trusts created by Irving. Subsequently, Irving and Arthur executed an agreement in which (1) each declared his ownership in a 1/3 undivided interest in a designated parcel of land, and (2) each agreed to hold 2/3 of the other's 1/3 interest as trustee of the trusts described above. Irving and Arthur further stated in their agreement that they would remain record owners of their 1/3 interests, and no needs were executed transferring title in the land to the trustees. Held, the interests of Irving and Arthur in the parcel of land were never transferred to the trusts, and income from notes relating to purchases of the land (including interest) is properly taxable to Irving and Arthur. 3. Corporate petitioner, Northwest, a water company, required building contractors to go through the motions of purchasing Northwest stock in order for the contractors *130 to acquire water taps and obtain water service from the water company. The contractors simultaneously agreed to resell the Northwest stock at a nominal price to a partnership owned by the promoters of the water company. Northwest would not provide water taps and service unless these "stock purchases" were made. The contractors were not altruistically motivated to finance the water company; they made the "stock purchases" merely to obtain the desired services. Held, no purchases of stock and no nonshareholder capital contributions to Northwest ever took place. The payments made by the contractors were part of Northwest's price for water taps and service, and the payments constitute ordinary income to Northwest under section 61 of the 1954 Code. Held, further, amounts paid by corporate petitioner, Winston, for Northwest stock were not payments for water taps and service. Winston became a permanent stockholder in Northwest. Held, further, Northwest had additional ordinary income in its taxable year 1961 in the amount of $46,085.22 as a result of the installation by one contractor of water mains, laterals, and hydrants, which the contractor turned over at no cost to Northwest in payment *131 for water taps and service. 4. In order to assure water service from corporate petitioner, Northwest, it was necessary for purchasers of land from corporate petitioner, Builders, to pay amounts to Builders ostensibly to buy stock in Northwest. Builders kept the money it received from such purchasers in order to reimburse itself for advances it had made to Northwest, and Northwest issued stock directly to the purchasers. The advances Builders had made to Northwest were designated a stock "subscription" by Builders although no purchase of stock by Builders was ever contemplated; instead, the advances were intended merely as a loan. Held, Builders was an agent or conduit in making the sales in question for Northwest, and Builders realized no gain or loss therefrom. Held, further, the record does not support Builders' contention that the amounts it received in connection with the sales constituted commission income and unreimbursed expense of a broker. 5. Investment, the equal partnership of petitioners, Irving, Arthur, and Shaw, owned 25 percent of the capital stock of Curve Tavern, a corporation, such stock having been acquired in 1951. During August of 1956, Investment purchased *132 the remaining 75 percent of the capital stock from the owners thereof. Immediately thereafter, Investment sold all of the stock for $40,000 to a third party. Investment reported no gain from the sale of this stock in its information return for the fiscal year ending March 31, 1957, and Irving, Arthur, and Shaw reported no gain in their respective income tax returns for the year 1957. Held, owing to the petitioners' failure to carry their burden of proof, we uphold the respondent's determination that Investment had (1) a long-term capital gain resulting from its sale (for $10,000) of the 25 percent interest in Curve Tavern stock acquired in 1951, and (2) a short-term capital gain resulting from its sale (for $30,000) of the 75 percent interest in Curve Tavern stock acquired in 1956. Each partner is properly taxable in 1957 on his proportionate share of these short-term and long-term capital gains. 6. In 1955, petitioner, Irving, suffered $26,000 in damages to his residence when an employee of a plumbing company negligently broke a pipe, causing flooding and heaving of the entire house. Held, Irving suffered a deductible casualty loss under section 165(c)(3) of the 1954 Code, and *133 the amount of $7,346.40 is deductible by Irving in 1962, the year in which litigation against the plumbing company was concluded. 7. Petitioner, Shaw, contributed a note in the face amount of $27,012.22 to Investment, the equal partnership of petitioners, Irving, Arthur, and Shaw. Shaw had received the note from York Co., reflecting the unpaid balance of a loan which Shaw had made to York Co. The note became worthless during Investment's fiscal year ending March 31, 1958. Held, Investment's basis in the note was $27,012.22, and, in accordance with the stipulation of the parties, Investment properly deducted that amount as a bad debt on its partnership return for the fiscal year ending March 31, 1958. 8. Purchasers who bought houses from corporate petitioners, Winston and Princeton, and who could afford to make only a 10 percent down payment, were frequently provided by lenders with 90 percent of the purchase price. However, when a 90 percent loan was involved, a portion of the loan was placed by the lender in a savings account in the name of Winston or Princeton, and then the disignated corporation would pledge the account as collateral security in the event the purchaser defaulted *134 on the loan. A "collateral certificate" would be issued to the designated corporation, indicating that the savings account had been established. Both Winston and Princeton employed the accrual method of accounting. Held, the full face amount of each "collateral certificate" account is includable in the gross income of the designated corporation in the year the account was established. Western Oaks Building Corp., 49 T.C. 365 (1968), followed. Held, further, Winston and Princeton are not permitted deductions for additions to their reserves for bad debts. 9. In its Federal income tax return for the fiscal year ending February 29, 1956, corporate petitioner, Builders, omitted $13,700 in sales income. Held, this $13,700 amount is includable in Builders income for the year at issue, and no reduction for offsetting cost deductions is permissible. 10. H and W were divorced in 1961. In 1962, pursuant to a "Stipulation and Agreement," executed by H and W, H transferred certain of his property to W and W transferred certain of her property to H. In addition, H made certain installment payments to W. These payments were made under the provisions of the "Stipulation and Agreement" which *135 called for H to pay W $163,000 in installments over a period of more than 18 years. Held, of the $4,900 total installment payments paid by H to W in 1962, $3,500 was intended by H and W as support, and as such, is deductible by H under section 215 of the 1954 Code and includable in W's income under section 71 of the 1954 Code. The remainder of the installment payments in 1962, in addition to the property transferred by H to W, was intended by H and W to be in part payment for the property which W transferred to H and, as such, is neither deductible by H nor includable in W's income. Stanley L. Drexler and Leslie H. Wald, 1107 Tower Bldg., U.S. Nat'l Center, Denver, Colo., for the petitioners (except in Docket No. 4720-67). Martin P. Miller, 288 Clayton St., Denver, Colo., for the petitioner in Docket No. 4720-67. Arthur B. Bleecher, for the respondent. HOYTMemorandum Findings of Fact and Opinion HOYT, Judge: The respondent determined deficiencies in the petitioners' income tax for the years and in the amounts shown in the schedule below: DeficienciesTotal PerTotal PerPetitioner(s)Dkt. No.YearPer YearDocket No.PetitionerIrving J. Hayutin,4623-641955$13,356.84et ux.19563,303.6719573,530.75$20,191.265433-6519584,503.7619597,938.4719603,806.8616,249.094760-671961560.1119623,216.133,776.24$40,216.59Arthur B. Hayutin,4624-6419553,931.84et ux. *19562,054.3919572,802.608,788.83(A. B. Hayutin only)5434-6519585,213.60(Sylvia C. Harrison)* 5524-6519599,606.2319604,917.2119,737.04(A. B. Hayutin only)4759-6719611,754.39196216,531.1918,285.5846,811.45Eugene E. Shaw4625-6419553,462.641956372.8819571,824.065,659.585428-6519588,120.79195910,071.64196010,484.1128,676.544771-671961835.38835.38Eugene E. Shaw,4761-6719622,027.402,027.4037,198.90ex ux.Honeymoon Manor,4626-6419553,061.50Inc.19563.092.5119573,044.709,198.719,198.71Northwest Water4627-641955$6,967.52Corp.19562,294.67$9,262.195432-65195814,037.66195928,305.80196010,969.9419618,638.2561,951.654770-67196252,056.5752,056.57$123,270.41S & H Builders,4628-642/28/549,359.57Inc.2/29/5630,813.692/28/5727,941.7468,115.005415-652/28/5833,751.612/28/5932,275.922/29/6038,531.312/28/6144,013.17148,572.014784-672/28/6225,377.972/28/6337,004.3962,382.36279,069.37Winston Construc-4763-677/31/60609.74tion Company7/31/621,720.417/31/6310,330.0612,660.2112,660.21Princeton, Ltd.4765-673/31/6140,610.613/31/6217,236.263/31/6317,244.2675,091.1375,091.13Sylvia C. Harri-4720-671961315.00son (formerly19626,510.346,825.346,825.34Sylvia C. Hayutin) **GRAND TOTAL$630,342.11*136 Various issues in these cases were conceded prior to trial and others were conceded on brief. The issues remaining for our decision are as follows: 1. Whether five transfers of land to S & H Builders, Inc., were contributions to capital or bona fide sales; whether S & H Builders, Inc., acquired the transferors' basis in the land or a stepped-up basis; whether S & H Builders, Inc., is entitled to interest deductions for amounts paid pursuant to the land contracts; whether amounts received by Arthur Hayutin, Irving Hayutin, *137 and Eugene Shaw were dividends, as opposed to a return of capital and interest. (Docket Nos. 4623-64, 4624-64, 4625-64, 4628-64, 5415-65, 5428-65, 5433-65, 5434-65, 5524-65, 4759-67, 4760-67, 4761-67, 4771-67, 4784-67). 2. Whether the income of several trusts is taxable to the grantors, Arthur and Irving Hayutin. (Docket Nos. 4623-64, 4624-64, 5433-65, 5434-65, 5524-65, 4759-67, 4760-67). 3. Whether the amounts which Northwest Water Corporation received from contractors ostensible for shares of stock in Northwest constituted ordinary income from the sale of water taps or whether these amounts were capital contributions. (Docket Nos. 4627-64, 5428-65, 5432-65, 5433-65, 5434-65, 5524-65, 4770-67). 4. Whether S & H Builders, Inc., was merely an agent or a conduit in the disposition of Northwest Water Corporation's capital stock and whether it thereby sustained neither gain nor loss upon such disposition. (Docket No. 5415-65). 5. Whether the gain from the sale by the partnership, S-H Investment Company, of the capital stock of Curve Tavern, Inc., was (a) entirely a long-term capital gain, or (b) partly a long-term capital gain and partly a short-term capital gain. (Docket Nos. 4623-64, *138 4624-64, 4625-64). 6. Whether Irving Hayutin may take a casualty loss deduction in 1962 in connection with damages sustained to his residence in 1955. (Docket Nos. 4623-64, 4760-67). 7. Whether the partnership, S-H Investment Company, is entitled to deduct in its fiscal year ending March 31, 1958 the amount of $27,012.22 as a business bad debt. (Docket Nos. 5428-65, 5433-65, 5434-65, 5524-65). 8. Whether Winston Construction Company and Princeton, Ltd., must include collateral certificates in income at face value rahter than at 50 percent of face value. (Docket Nos. 4763-67, 4765-67). 9. Whether S & H Builders had additional income during the fiscal year ending February 29, 1956, in the amount of $13,700, which the company omitted from its Federal income tax return for that year. (Docket No. 4628-64). 10. Whether certain amounts paid in 1962 by Arthur Hayutin to his ex-wife pursuant to a stipulation and agreement, dated May 7, 1962, were deductible by Arthur and includable in Sylvia's income. 2*139 (Docket Nos. 4720-67, 4759-67). Findings of Facts General Facts Petitioners Irving J. Hayutin ("Irving") and Sima B. Hayutin are husband and wife, and filed joint Federal income tax returns, Forms 1040, for the calendar years 1955 to 1962, inclusive. When their petitions were filed, they were residents of Colorado. Petitioners Arthur B. Hayutin ("Arthur") and Sylvia C. Harrison ("Sylvia"), formerly Sylvia C. Hayutin, were husband and wife in the years 1955 to 1960, inclusive. For those calendar years they filed joint Federal income tax returns, Forms 1040. Arthur and Sylvia were divorced in 1961. For the calendar years 1961 and 1962, they filed individual Federal income tax returns, Forms 1040. When their petitions were filed, they were residents of Colorado. Petitioners Eugene E. Shaw ("Shaw"), and Nelda B. Isbell (formerly Nelda B. Shaw) were husband and wife in 1962, *140 subsequent to which time they were divorced. They filed a joint Federal income tax return, Form 1040, for 1962. Eugene E. Shaw filed individual Federal income tax returns, Forms 1040, for the calendar years 1955 to 1961, inclusive. When their petitions were filed, Eugene E. Shaw was a resident of Colorado. Petitioner Honeymoon Manor, Inc. ("Honeymoon"), is a corporation organized under the laws of the State of Colorado in 1949 and has always had its principal place of business in Colorado. Until January of 1953, its principal business was land development and subdivision. Up to and including calendar year 1958 it filed its Federal income tax returns using Form 1120. On November 24, 1958, its three equal stockholders filed an election under section 1372 of the Internal Revenue Code of 1954 to have the petitioner treated as a small business corporation. Petitioner Northwest Water Corporation ("Northwest"), was organized under the laws of the State of Colorado in January of 1955. It is a public utility as defined in Chapter 115, Article 1, Section 3, Colorado Revised Statutes, 1963, and is subject to regulation by the Colorado Public Utilities Commission as set forth in said Chapter, *141 as amended. The petitioner's principal place of business was in Colorado when it filed its petitions. It filed Federal income tax returns, Forms 1120, for the taxable years 1955 to 1962, inclusive. Petitioner S and H Builders, Inc. ("Builders"), is a corporation organized under the laws of the State of Colorado and had its principal place of business in Colorado when its petitions were filed. It filed Federal income tax returns, Forms 1120, for the taxable years ended February 28, 1954, to February 28, 1963, inclusive. Petitioner Winston Construction Company ("Winston"), is a Colorado corporation. It filed Federal income tax returns, Forms 1120, for the taxable years ended July 31, 1960, to July 31, 1963, inclusive. Winston's principal place of business was in Colorado when the petition was filed. Petitioner Princeton, Ltd. ("Princeton"), is a Colorado corporation. It filed Federal income tax returns, Forms 1120, for the taxable years ended March 31, 1960, to March 31, 1964, inclusive. Princeton's principal place of business was in Colorado when the petition was filed. S-H Investment Co. ("Investment"), is a partnership having three equal partners, petitioners Eugene E. Shaw, *142 Irving J. Hayutin, and Arthur B. Hayutin. It was organized April 1, 1951, and its principal business activities involved the making of loans and investments. Its principal place of business is in Denver, Colorado, and it filed Federal information returns, Forms 1065, for the fiscal years ended March 31, 1955, to March 31, 1962, inclusive, as well as an amended return for the taxable year ended March 31, 1958. Hayutin and Hayutin is a law partnership organized April 1, 1948. Its partners are petitioners Irving J. Hayutin and Arthur B. Hayutin. Through its fiscal year ended March 31, 1958, Irving J. Hayutin owned a 60 percent interest and Arthur B. Hayutin owned a 40 percent interest. Thereafter, the two partners held equal interests. For its fiscal years ended March 31, 1955, to March 31, 1962, inclusive, it filed Federal information returns, Forms 1065. There were also filed amended returns for the fiscal years ended March 31, 1961, and March 31, 1962. Financial Management, Inc., is a small business corporation. It was organized on June 20, 1962, and its principal business activity is supplying management services. Its two equal stockholders are petitioners Irving J. Hayutin *143 and Arthur B. Hayutin. The corporation's principal place of business is in Colorado, and it filed its first Federal income tax return, Form 1120-S, for the fiscal period June 20, 1962, to May 31, 1963. The Sima B. Hayutin Trust, the Adele Hayutin Trust, the Diane Hayutin Trust, the Marc Ivan Hayutin Trust, and the Randy Hayutin Trust were created on December 17, 1962, petitioner Irving J. Hayutin being the grantor. These trusts were irrevocable, and Irving retained no reversionary interest. Sima is the grantor's wife, and a petitioner; Marc Ivan is their son, and Adele, Diane, and Randy are their daughters. Each person for whom the trust is named is its sole beneficiary. Petitioner Arthur B. Hayutin, trustee of all five trusts and brother of the grantor, was a Colorado resident when the petitions were filed. The trustee filed Federal fiduciary income tax returns, Forms 1041, for each of the trusts for the taxable years ended November 30, 1955, to November 30, 1962, inclusive. The Sylvia C. Hayutin Trust, the Marjorie Ellen Hayutin Trust, and the Robyn Dee Hayutin Trust were created on December 15, 1952, petitioner Arthur B. Hayutin being the grantor. These trusts were irrevocable, *144 and Arthur retained no reversionary interest. Sylvia was the grantor's wife until October 1961, and Marjorie Ellen and Robyn Dee are their daughters. Marjorie Ellen and Robyn Dee are the sole beneficiaries of the trusts bearing their names. Petitioner Sylvia C. Harrison (formerly Sylvia C. Hayutin) was the sole beneficiary of the trust bearing her former name, until May 7, 1962, at which time she gave up any right, title, or interest therein by virtue of an agreement entered into with petitioner Arthur B. Hayutin incident to their divorce. Petitioner Irving J. Hayutin, trustee of these three trusts and brother of the grantor, was a Colorado resident when the petitions were filed. The trustee filed Federal fiduciary income tax returns, Forms 1041, for each of the trusts for the taxable years ended November 30, 1955, to November 30, 1962, inclusive. All trusts discussed above are hereinafter sometimes referred to collectively as the "Trusts." Grantors Irving J. Hayutin and Arthur B. Hayutin filed Federal gift tax returns, Forms 709, for the calendar year 1952, reflecting the transfer of a $1,000 promissory note to each of the said trusts. The notes were those of the respective grantors. *145 All of the Federal tax returns referred to above were filed with the district director of internal revenue at Denver, Colorado. The Land Transfers On or about January 1, 1952, Roy D. Barnes and Shaw conveyed 168.7 acres of unimproved realty to Honeymoon for a contract price of $30,000. Barnes and Shaw, who owned the parcel in equal undivided interests, agreed that each would be paid $3,000 in annual installments with 5 percent interest to accrue on any unpaid balance, the first installment being due one year from date of sale. Barnes received a first deed of trust as security for his interest and Shaw received a second deed of trust for his interest. Other terms provided for partial releases in the event of development. The Barnes and Shaw parcel was located 10 to 12 miles northwest of downtown Denver and 4 to 5 miles from the Denver city line. The eastern edge and part of the southern edge of the parcel as it was then constituted was contiguous to the northern portion of the town (later city) of Westminster, Colorado. At the time the Barnes and Shaw land was acquired in January 1952 by Honeymoon, the capital stock of that corporation was owned one-third each by Irving, Arthur, *146 and Shaw (sometimes hereinafter referred to as the "individuals"). Throughout 1952, Irving, on behalf of Honeymoon, attempted to annex the 168.7 acre Barnes and Shaw tract to Westminster, Colorado, but was unsuccessful. Such annexation would have provided water and other utilities and improvements, including sewers, although there was a separate sanitation district. At time of the purchase of the Barnes and Shaw tract by Honeymoon, the individuals expected annexation by Westminster within a year. They also expected sales to begin within the year to enable them to make payments on the purchase price of the land. Westminster's planning commission had, in 1952, projected plans for expansion of the community to include the land in question, but Honeymoon was unable to obtain approval of the annexation. The individuals continued their negotiations and remained hopeful that annexation would be effected. Also, throughout 1952, attempts were made to sell the Barnes and Shaw tract, but all efforts directed at a profitable sale were unsuccessful. In June of 1952, the individuals acquired an option to buy 112 acres of unimproved land from J.C. and Donna Wyse. The option provided for a purchase *147 price of $60,000. The Wyse tract was contiguous to, and southwest of, the Barnes and Shaw tract. At the time the option was executed, the Wyse tract was not contiguous to the then Town of Westminster. On December 20, 1952, Honeymoon was without the necessary funds to make the January 1953 payment on the Barnes and Shaw land purchase contract. Irving, at a board of directors meeting of Honeymoon in December 1952, announced that if the corporation was unable to meet that obligation, he would do so personally, provided the corporation sold the Barnes and Shaw tract to its three stockholders for $144,000, a price at which the individuals hoped Honeymoon would be able to sell the land to third parties. On January 5, 1953, Irving, Arthur, and Shaw entered into a contract with Honeymoon to purchase the Barnes and Shaw tract for $144,000. The contract provided for the vendees to assume $27,000 of mortgage indebtedness with payments to be made by first canceling $5,560 owing to the vendees, and annual payments thereafter of $6,140 on the first of July, commencing in 1954 (for a period of about 18 years). Interest was to be paid annually at the rate of 4 percent on the unpaid balance. The *148 deed conveying the tract was executed on January 6, 1953, and recorded on January 9, 1953. On May 3, 1954, the contract was modified to provide, commencing May 4, 1954, for payments of $900 per month with interest to be paid after all principal had been paid in continuing monthly installments (a period of about 14 1/2 years). The contract was further modified on January 28, 1957, at which time the principal balance owing was $81,090, and accrued interest to January 5, 1957, amounted to $15,271.84. The January 28, 1957 modification provided (1) that the $900 monthly payments would continue; (2) that $600 would apply to principal, with $300 to apply to current interest, reduced from 4 percent to 3 percent, any excess interest allocation to apply to previously accrued interest; and (3) that, when old interest was liquidated, principal payments would increase to $750, so long as the aggregate monthly payment did not exceed $900 (involving a period of perhaps 11 years). The individuals bought the land because they held the option on the adjoining Wyse land and believed the Barnes and Shaw tract had the potential of being worth $144,000. Rather than advance money to Honeymoon, they preferred *149 to take it out of the corporation by purchase. No deed of trust was given by the individuals to Honeymoon in connection with the purchase of the Barnes and Shaw tract. On January 5, 1953, May 3, 1954, and January 28, 1957, Irving, Arthur, and Shaw each owned one-third of the outstanding capital stock of Honeymoon. On January 6, 1953, Arthur and Irving executed a document entitled "Agreement and Declaration of Trust," purporting to convey in trust, portions of their undivided one-third interests in the Barnes and Shaw tract, to the trusts created for the benefit of their respective wives and children. No additional instruments of conveyance were executed by Arthur and Irving. They involved their trusts in the land arrangement as part of their estate plan to provide for the future of their families. No gift tax returns were ever filed by Arthur and Irving to reflect the purported transfer of portions of their interests in the Barnes and Shaw tract to the trusts benefiting their respective wives and children. Builders was incorporated on March 27, 1953, under the laws of the State of Colorado. Its principal business activity was subdivision, development and building. Its first Federal *150 income tax return for the taxable year ended February 28, 1954, Schedule E, reflects the following information: PercentTimeof CommonOfficerTitleDevotedStock OwnedCompensationEugene E. ShawPresident90%33$15,000Irving J. HayutinVice-president40%1115,000Arthur B. HayutinSec.-Treasurer65%1114,500 Schedule E of Federal income tax returns filed in subsequent years reports percent of common stock ownership of Builders as follows: EugeneIrving J.Arthur B.YearE. ShawHayutinHayutin2-28-553311112-29-563311112-28-573311112-28-582-28-592-29-602-28-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 1/37.47.42-28-6333 1/37.47.4Shares in stock in Builders were delivered to and held by Irving and Arthur as trustees for the various trusts. The capital stock register of Builders reflects ownership of shares in Builders as follows: CertificateNumberSharesIssued toDate1 5Eugene E. Shaw3-27-532 5Irving J. Hayutin3-27-533 *  ** 5Arthur B. Hayutin3-27-534 31Eugene E. Shaw3-28-535 * 16Arthur B. Hayutin, Trustee3-28-53for Sima B. Hayutin Trust6 * 3Arthur B. Hayutin, Trustee3-28-53for Marc Ivan Hayutin Trust7 * 3Arthur B. Hayutin, Trustee3-28-53for Diane Hayutin Trust8 * 3Arthur B. Hayutin, Trustee3-28-53for Randy Hayutin Trust9 * 3Arthur B. Hayutin, Trustee3-28-53for Adele Hayutin Trust10 * ** 3Arthur B. Hayutin3-28-531116Irving J. Hayutin, Trustee3-28-53for Sylvia C. Hayutin Trust126Irving J. Hayutin, Trustee3-28-53for Robyn Dee Hayutin Trust136Irving J. Hayutin, Trustee3-28-53for Marjorie Ellen HayutinTrust143Irving J. Hayutin3-28-53*151 In January 1953, attempts were made by the individuals to sell the Barnes-Shaw land to one Van Schaack at $900 an acre. Attempts were also made to sell to others. On February 16, 1953, the Westminster Town Council indicated its approval of a petition for annexation of land a short distance to the south of the Barnes-Shaw land (i.e., the Barr-Wyse acreage), and this action by the Council was hoped by the individuals to be a breakthrough for further expansion by annexation. Negotiations for annexation of the Barnes and Shaw tract were immediately renewed, and during the early months of 1953, Irving was actively engaged in trying to annex the land to the town of Westminster. Irving's efforts led to the approval by the Planning Commission of an overall plan for annexation, entailing the approval of the annexation of sites in steps. Affirmative actions by the Planning Commission and Town Council in March, April, and May 1953, led to the formal annexation of approximately 54 acres of Barnes-Shaw land in June 1953. At the *152 time Builders was incorporated it was anticipated that Builders would build homes on the acreage to be purchased from the individuals and the Trusts. The capitalization of Builders was in the nominal amount of $108. From its inception, Builders had a surplus deficit since the company had borrowed money from Hayutin and Hayutin, Irving's and Arthur's law partnership, for paid-in capital and other obligations. The individuals were hopeful that the turnover of money flowing in from the sale of houses would generate working capital and that land, offsite improvements, and construction of homes would initially be secured on credit without the need for working capital. Other miscellaneous needs for capital were expected to be minor (i.e., to total no more than $5,000 or $10,000, which the individuals planned to borrow and return to Builders). They did not have funds of their own to contribute to the corporation for offsite improvements and construction. At the time of the incorporation of Builders, a contractor furnished the individuals with a detailed projection of costs pursuant to which Builders would make a profit of between $850 and $900 per house and lot, with a 30-day schedule *153 for starting and finishing a house, working on 30 houses simultaneously, and completing one street at a time. On April 4, 1953, a contract was entered into between Builders, Shaw, Irving, and Arthur to convey about 54 acres (approximately 240 lots) from the eastern end of the Barnes and Shaw tract to the corporation for a contract price of $160,000. The deed conveying this parcel was executed on April 29, 1953 and recorded June 11, 1953. A deed of trust, from the grantee to the grantors was executed and recorded on the same dates. The legal description of the land described in the contract was based on an un filed plat. The contract also provided that there be paid to the vendor one-half of the profits from the sale of lots and improvements, allowing for direct sales expense only, and not salaries or other ordinary operating overhead. The purchase price was to be paid: 10 percent, but not less than $16,000, in or before October 15, 1953 and 5 percent, but not less than $8,000 payable on or before the first of March of each year commencing March 1, 1954. The first payment was to be made without interest, and succeeding payments were to include 3 1/2 percent annual interest on *154 the unpaid minimum purchase price (for a period of 18 years ending in March, 1971). The contract also provided the vendee with an 18-month option to purchase 400 additional sites (about 100 acres) at a price of $725 per site (about $2,900 per acre) plus one-half of the profits from sales, on the same terms and conditions, but with interest at 5 percent. The contract of April 4, 1953, was modified five times, on April 29, 1953; December 12, 1953; February 27, 1954; June 17, 1954; and November 20, 1956, as follows: (a) The April 29, 1953 modification provided that the vendee, Builders, would assume the entire $27,000 balance then due and owing to Roy D. Barnes and Eugene E. Shaw, which was secured by deeds of trust on the same realty, plus $376.59 in interest accrued to date. (b) The December 12, 1953 modification after reciting that the vendee was unable to make the payment shortly due and provided that the vendors agreed to waive same in the amount of $12,400 due as of December 1953; that the said payment should be paid $4,000 on or before June 15, 1954, $4,000 on or before June 15, 1955, and $4,400 on or before June 15, 1956; that the option time be extended to November 15, 1954, *155 with payment due thereon to be reduced from 10 percent to 5 percent; and that the interest rate be increased from 3 1/2 percent to 4 percent. (c) The February 27, 1954 modification after reciting that the vendee was unable to make the deferred payments due March 1, 1954 and June 15, 1954, then provided that the consideration for these changes was $1,350 in hand paid; that $150 cash would be paid per lot, as sold, commencing April 15, 1954, until payments became current, eliminating the due dates in the December 12, 1953 modification; and that interest would be accumulated, but not compounded, with $8,000 annual installments thereon until paid in full. (d) The June 17, 1954 modification recited that, if profit payments were made, it would cause the purchaser to operate at a loss in its first year; that there were difficulties concerning the value of master title policies required so the purchaser could obtain subdivision rates on individual policies; that the purchaser wanted to exercise the option for additional property; and that it was unable to make payments required on the option without seriously impairing its working capital. The June 17, 1954 modification then provided that *156 the profit share due the vendors was waived; that the option for future land purchases was waived; that the purchase price for the proposed second filing would be $172,500, payable $6,900 on or before December 15, 1954, $5,175 on or before May 15, 1955, and $5,175 on November 15th and on May 15th until paid in full, with interest on the unpaid balance starting May 15, 1956, at the rate of 4 percent per annum, said interest, to be accumulated, but not compounded, and to be paid in continuing installments after the principal is liquidated (a period of about 20 1/2 years ending in 1974); and that the warranty deed transferring title (by metes and bounds) would show consideration of $50,000 for title policy purposes with revenue stamps to be based on the actual purchase price and affixed to the deed following receipt, and a deed of trust due on or before 10 years to be executed to secure a note for $170,000, although payments would be governed by the contract. (e) The November 20, 1956 modification after reciting that the named individuals were major stockholders in Northwest, serving water to the same land area which is the subject of the several contracts; that the expense, difficulty, *157 and uncertainty of obtaining a water supply had become a major factor in the development of acreage for subdivision purposes; that the vendee (Builders) had made large financial commitments and advances to Northwest for the purpose of obtaining a permanent source of water supply, thereby seriously reducing the amount of capital available for development and for making payments on the various contracts; that the shortage of water, particularly surface water, had limited the availability of Veterans Administration and Federal Housing Administration approvals for the subject ground areas; and that it had become essential that such approvals be obtained. This modification then provided that there was unpaid a principal balance of $92,625.41 and interest accrued to November 1, 1956, in the sum of $7,581.28; that the payments should thereafter be made in the amount of $3,600 due on the first day of May, 1957 to 1960, inclusive, $6,300 payable on the first day of May, 1961 to 1965, inclusive, $7,200 payable on the first day of May 1966 and annually thereafter until paid in full, with interest to be paid at the rate of 3 percent simple interest per annum on the unpaid balance, payable on *158 the dates specified, interest accrued to November 1, 1956, to be payable one year after final principal payment would be made (a period of 15 years ending in 1971); and that the vendee agreed to execute a note and deed of trust to secure payment of the purchase price with releases to be executed upon request upon the showing of satisfactory cash reserves or sound assets in the form of work in progress, mortgages, contracts of purchase or other securities or assets deemed sound by the vendors. Building of the first home was started in late April 1953. A contract for electric street lighting was entered into on April 25, 1953, and was approved by the Town of Westminster on May 4, 1953. A contract with Westminster concerning details of the subdivision was executed on May 4, 1953. A contract with a sales agent was entered into on May 1, 1953, requiring sale of 15 homes a week. Over 80 homes were contracted to be sold during May 1953, and in other respects the Town of Westminster and the individuals worked together on the subdivision while the individuals awaited formal approval. In connection with the transfer of the 54 acres of Barnes and Shaw land, a note and trust deed were executed *159 by Builders and given to individuals, as the record title transferors of the property. As houses were sold by Builders, there were partial releases of the security. The selling of houses enhanced the value of the remaining Barnes and Shaw land. The individuals estimated that offsite improvements would cost $600-$610 per site. Offsite improvement creditors of Builders had no lien rights in the houses. In its first fiscal year of operation ending February 28, 1954, Builders sold 53 houses and had gross receipts of $655,955. Before payment of salaries, Builders had net income of $39,863.27. After payment of salaries in the amount of $44,500, Builders had a deficit of $4,636.73. On or about June 17, 1954, about 59 acres of land (a second portion of the Barnes and Shaw tract located in the center of said area) were transferred to Builders by the individuals for a contract price of $172,500. The deed conveying the property and the deed of trust given by the grantee to secure the grantors were executed on June 17, 1954, and recorded on July 20, 1954. The terms of payment for the June 17, 1954 conveyance as set forth in the contract of the same date were modified by a subsequent contract *160 dated November 20, 1956, the provisions of which are discussed above. The November 20, 1956 modification, as it referred to the purchase of the second tract only, provided that the balance on the purchase price due on said property was $150,075 with accrued interest to November 15, 1956, totaling $3,005.50; that payments thereafter would be made on principal, $4,500 payable on the 15th of July 1957 to 1960, inclusive, $5,400 payable on the 15th of July, 1961 to 1965, inclusive, $7,200 payable on the 15th day of July, 1966 to 1970, inclusive, $9,000 payable on the 15th of July 1971, and annually thereafter until paid in full, with interest to be paid at the rate of 3 percent simple interest per annum payable on the same dates specified, accrued interest to November 15, 1956, being payable simultaneously with the final payment on principal (a period of 20 years ending in 1976); and that the vendee would execute a note and deed of trust to secure payment of the purchase price with releases to be executed upon request upon the showing of satisfactory cash reserves or sound assets in the form of work in progress, mortgages, contracts of purchase or other securities or assets deemed sound *161 by vendors. The documents relating to the transfer of the second Barnes and Shaw parcel contain no provisions dealing with late payment or default. The Town of Westminster turned down annexation of this acreage of 239 sites shortly after the June 17, 1954 transfer. The town officials believed the water supply to be inadequate. The obtaining of adequate water was a continuing problem in the area, and had a significant bearing on annexation decisions. Ultimately, Westminster accepted 31 sites from the annexation petition, representing houses already built by Builders, when it appeared that water would be available on these sites. There was no adjustment to the sales price to Builders of the 50 acres directly resulting from Westminister's failure to grant full annexation because another adequate source of water for the area was under option. Builders gave a deed of trust in the amount of $170,000 to the individuals, as record title holders of the property. Builders made the following payments in connection with the transfer of the second Barnes and Shaw parcel: DateAmount11/20/54$6,9005/16/555,17511/15/555,1755/15/565,1759/2/58 9,0002/25/592,70010/6/59 1,8007/15/604,500 No action was *162 taken against Builders when payments were not met pursuant to schedule. On or about February 14, 1955, a contract was entered into to transfer 56 acres of land (the third and final portion of the Barnes and Shaw tract) to Builders for a contract price of $126,000. The deed conveying such property was executed on February 18, 1955, and recorded on March 8, 1955. The contract of sale provided that the expense, difficulty and uncertainty of obtaining a water supply had become a major factor in the development of acreage for subdivision purposes; that the prices paid the vendors for the previous tracts had not taken into consideration these complicating factors; that the vendor agreed to sell for the price of $126,000, payable $6,300 on or befoe the 15th of July 1955, and $6,300 on the 15th of July each year thereafter until paid in full, with interest at the rate of 4 percent simple interest per annum to be accrued from and after July 1955 on the unpaid balance, said interest to be payable in four equal annual installments without compounding or accruing any further interest thereon to commence on the 15th day of July next following the date of final payment of the purchase price (a *163 period of 24 years ending July 15, 1978); and that the vendee agreed to execute a note and deed of trust to secure payment of the purchase price, releases to be executed upon request upon showing of satisfactory cash reserves or sound assets in the form of work in progress, mortgages, contracts of purchase, or other securities of assets deemed sound by the vendors. No deed of trust was executed by the grantee nor delivered to the grantors in connection with this transfer. On November 20, 1956, the purchase contract of February 14, 1955, was modified and after reciting that the individuals were major stockholders of Northwest which was engaged in serving water in the area; that the expense, difficulty and uncertainty of obtaining water supply had become a major factor in the development of said acreage; that the vendee (Builders) had made large financial commitments to Northwest for the purpose of obtaining a permanent source of water supply, thereby seriously reducing the amount of capital available for development and making payments on the various contracts; that the shortage of water, particularly surface water, had limited the availability of Veterans Administration and Federal *164 Housing Administration approval of the subject ground; and that it was essential to obtain such approval; it provided that the present unpaid balance on principal was $119,700, accrued interest being $6,384; that payments thereafter would be paid on principal: $3,600 on the 15th day of November, 1957 to 1960, inclusive; $4,500 on the 15th day of November, 1961 to 1964, inclusive; $5,400 on the 15th day of November, 1965 to 1969, inclusive; $7,200 on the 15th day of November 1970 and annually thereafter until paid in full, with interest to be paid at the rate of 3 percent simple interest per annum payable on the dates specified with all earlier accrued interest to November 15, 1956, to be payable one year after final payment of principal (a period of 21 years ending November 15, 1977); and that the vendee agreed to execute a note and deed of trust to secure the payment of the purchase price, releases to be executed upon request upon the showing of satisfactory cash reserves or sound assets in the form of work in progress, mortgages, contracts of purchase or other securities or assets deemed sound by the vendors. No note or deed of trust was executed or delivered in connection with *165 the November 20, 1956 modification. Builders made the following payments in connection with the transfer of the third Barnes and Shaw parcel: DateAmount7/15/55$6,30011/14/587,20011/13/593,60011/15/603,600No action was taken against Builders when payments were not made pursuant to schedule. On or before July 2, 1953, Irving, Arthur, and Shaw exercised the option to purchase the 112-acre tract from J.C. and Donna Wyse. On July 2, 1953, and July 10, 1953, J.C. and Donna Wyse executed deeds transferring the said 112-acre tract (which was contiguous to the Barnes and Shaw land) to G.A.I. Land Company, a nominee entity, acting on behalf of Irving, Arthur, and Shaw, which deeds were recorded on July 27, 1953. The purchase price of the Wyse tract was $60,000. On or about February 18, 1955, the individuals transferred the 112-acre Wyse tract to Builders for a contract price of $225,000. The contract recited that the expense, difficulty, and uncertainty of obtaining a water supply had become a major factor in the development of acreage for subdivision purposes. The contract further provided that the $225,000 purchase price would be payable first by assuming indebtedness on outstanding encumbrances *166 totaling $36,650, with accrued interest and other charges thereon, plus the execution of a note secured by a deed of trust on the same property in the amount of $188,350 for the balance, payable in semiannual installments of $4,708.75, the first being due on or before June 1, 1955, and semiannually thereafter each first of December and first of June until paid, together with simple interest at the rate of 4 percent to be accumulated until the principal had been paid and thereafter to be paid in five equal annual installments on the first of June subsequent to the final payment of principal. The contract further provided that releases would be executed upon substitution of security or upon showing of cash reserves or sound assets likely to appreciate in value, such as work in progress, or required for purposes of improving the property by engineering, platting, and subdividing same. The contract of February 18, 1955, was modified by a subsequent contract dated November 20, 1956. This later contract recited that Irving, Arthur, and Shaw were also major stockholders in Northwest; that the expense, difficulty and uncertainty of obtaining a water supply had become a major factor in the *167 development of this acreage; that the vendee (Builders) had made large financial commitments to Northwest for the purpose of obtaining a permanent source of water supply, thereby seriously reducing the amount of capital available for development and making payments on the various contracts; that the water shortage, particularly surface water, had limited the availability of Veterans Administration and Federal Housing Administration approvals for the subject ground; and that such approval was essential. The contract then provided that the present unpaid balance due was $174,223.75, with interest accrued to November 1, 1956, amounting to $10,155.20; that thereafter principal payments would be made $5,000 on the first day of May, 1958 and 1959; $7,500 on the first of May, 1960 and 1961 and $10,000 on the first of May, 1962 with annual payments in the same amount thereafter until paid in full with interest to be paid at the rate of 3 percent simple interest per annum, payable as accrued with principal payments when due, and earlier acrued interest to November 1, 1956, to be paid one year after the final payment on principal (a period of 21 years ending May 1, 1977); and that the vendee *168 agreed to execute notes and deeds of trust to secure the payment of the purchase price with releases to be executed upon request upon the showing of satisfactory cash reserves or sound assets in the form of work in progress, mortgages, contracts of purchase or other securities or assets deemed sound by the vendors. No deed of trust was executed or delivered by the grantee to the grantors in connection with this transaction. The sale contracts for the last 56 acres of the Barnes and Shaw land and of the 112 acres of the Wyse land provided for the execution by Builders of deeds of trust to secure payment of the purchase price, with releases to be executed upon substitution of security or upon showing of cash reserves or sound assets. However, such deeds of trust were not executed at that time because it was felt that issuing partial releases was cumbersome and because the vendors considered themselves adequately protected. Builders was completing its second fiscal year, and the individuals believed it was fairly well established. Builders made the following payments in connection with the transfer of the Wyse parcel: DateAmount6/2/55 $4,708.7512/1/55 4,708.756/1/56 4,708.754/28/585,000.002/25/595,000.005/13/607,500.005/12/617,500.00No *169 action was taken against Builders when payments were not made pursuant to schedule. At the time of these sales to Builders, negotiations were in progress for sale (with terms) to Russell Daughenbaugh, as a builder, for 135 acres of comparable land (Keller) at $2,500 an acre, the obtaining of water an essential element of the negotiations. On April 14, 1954, Irving, Arthur and Shaw, through their nominee, G.A.I. Land Company, acquired an option from G. E. and Mildred Keller to purchase 296 acres of land for $150,000. The contract provided for a deposit of $2,000 (which amount would be forfeited in the event of failure to exercise the option within 150 days). The contract further provided for payments on the $150,000 principal amount to be made $1,000 on or before May 15, 1954; $1,000 on or before June 15, 1954; $1,000 on or before July 15, 1954, with $25,000 to be paid on or before September 1, 1954; the balance of $120,000 to be evidenced by a note bearing 5 percent interest payable semiannually secured by a first deed of trust on the property with principal thereon to be paid in annual installments of $10,000 or more, there being a privilege of prepayment reserved to the buyer. *170 The contract further provided that releases would be made at the rate of $500 per acre with a minimum of 10 acres to be released at one time with all 10 acres to be contiguous. The contract provided for entire payment to be made in 12 years or less. G.A.I. Land Company exercised the option, and the Kellers conveyed the land to that nominee company by a deed dated August 31, 1954, and recorded September 14, 1954. G.A.I. Land Company in turn executed and delivered a deed of trust securing the balance of $120,000 due to the Kellers, dated September 1, 1954, and recorded September 14, 1954. On April 30, 1954, the individuals, through their partnership, Investment, entered into a contract with H & S Land Company, Inc. (another nominee corporation held by the same three individuals with only de facto existence), which provided that the vendors held an option in the name of G.A.I. Land Company on the Keller tract of 296 acres; that the vendor would pay the first $5,000 on the option and transfer the option to the vendee subject to all the conditions contained therein; that the vendee would pay all the amounts required in the option contract after the first $5,000 had been paid; and that *171 the vendee would agree to make additional payments of $450,000 to the vendors, $9,000 on or before March 1, 1955; $13,500 on or before June 1, 1955; $13,500 on or before October 1, 1955; $27,000 on or before May 1, 1956; $27,000 on or before May 1, 1957; $36,000 on or before May 1, 1958; and the same amount on each May 1 thereafter until paid in full, together with interest at the rate of 3 percent per annum until maturity, said interest to be accumulated and payable in five equal installments, commencing one year after the principal had been paid in full (a period of 19 years ending May 1, 1977). On August 18, 1954, Builders entered into an agreement with H & S Land Company, Inc., to purchase the subject Keller option and assume all payments thereon, as well as payments required by the contract of April 30, 1954. The option was exercised on or about August 31, 1954. By a deed dated September 14, 1954, G.A.I. Land Company conveyed the Keller tract to Builders, and the deed was recorded on December 7, 1954. No deed of trust was given by Builders to the vendors in connection with the acquisition of the Keller tract of 296 acres. The contracts of April 30, 1954, and August 18, 1954, *172 were modified by yet another contract dated November 20, 1956. The November 20, 1956 modification recited that the individuals were major stockholders of Northwest, that the expense, difficulty and uncertainty of obtaining a water supply had become a major factor in the development of the said acreage; that the vendee (Builders) had made large financial commitments to Northwest for the purpose of obtaining a permanent source of water supply, thereby seriously reducing the amount of capital available for development; that the shortage of water, particularly surface water, had limited the availability of Veterans Administration and Federal Housing Administration approvals; and that such approvals were essential. The modification contract of November 20, 1956, further recited that the balance of the purchase price was $426,500 with accrued interest to November 15, 1956, being $53,220.28. It provided that on the 15th of May and November, 1957, only interest would be paid; that thereafter principal payments would be made $5,000 each on the 15th of May, 1958 and 1959; $10,000 on the 15th of May, 1960 to 1965, inclusive; $20,000 on the 15th of May, 1966 to 1970, inclusive; and $25,000 on *173 the 15th of May, 1971 and annually thereafter until paid in full, with interest to be at the rate of 2 1/2 percent simple interest per annum, payable on the dates just specified with earlier accrued interest to November 15, 1956, to be payable one year after final payment on the principal (a period of 20 years ending May 1, 1982); and that the vendee agreed to execute notes and/or deeds of trust to secure payment of the purchase price with releases to be executed upon request upon the showing of satisfactory cash reserves or sound assets in the form of work in progress, mortgages, contracts of purchase, or other securities or assets deemed sound by the vendors. At the time the individuals acquired this option, they intended to make this investment without participation of Builders or of the Trusts (either directly or as majority shareholders of Builders). At the time Builders acquired the land, a decision was made that Builders would not build homes on that acreage but would sell lots, improved or unimproved. At that time, Builders was at the halfway point of its second fiscal year in which 121 houses and 61 sites were sold, involving over $1,500,000 in sales activity. The individuals *174 believed Builders was making reasonable progress. No second mortgage was requested of Builders by the individuals because Builders had no substantial general creditors, and the individuals saw no need at that time to bother with all the paperwork that would have been necessary for partial releases. The Keller land was at that time un-annexed, raw acreage. It was contiguous to the Barnes and Shaw land. Builders was negotiating for sufficient water rights to service the entire Keller tract. Six months after the transfer to Builders, a sale by Builders of 130 acres of the Keller land to an unrelated party at $2,500 an acre, with promise of water, was consummated. Riders extending time of payment of installments due under all five land contracts were simultaneously executed on November 20, 1956, because of delay and expense involved in V. A. and F. H. A. denial of approval of independent water sources and complications incident thereto. Builders, in turn, gave a breathing spell to its purchasers on credit for similar reasons. Builders made the following payments in connection with the transfer of the Keller parcel: DateAmount3/ 2/55$9,0006/ 2/5513,5009/22/551,0004/28/582,50011/14/582,5002/25/595,0004/30/6010,0005/ 1/6110,000No *175 action was taken against Builders when payments were not made pursuant to schedule. On October 10, 1957, a note from Builders for the then balance owed on sales contracts covering the transfer of the three segments of the Barnes and Shaw land, the Wyse land, and the Keller land, totaling $963,124.16, was executed to a nominee for the individuals and the Trusts. The note was secured by a trust deed on all land then owned by Builders, various collateral certificates, stock certificates, and deeds of trust from unrelated parties. Releases of the land covered by the 1957 trust deed from Builders were later executed. In 1961, payments by Builders under the five land contracts were suspended, pending the resolution of issues raised by the Internal Revenue Service. In the Westminster area in the early 1950's, land had a highly speculative market, and it was not uncommon for someone to offer to sell land, on the day of its purchase, at considerably more than the price paid that same day. It was not uncommon for raw acreage to be sold on a credit basis, with nothing down and a long payout. The records of Builders do not reflect that documentary stamps were purchased, affixed to the books, *176 and canceled in respect of the capital stock of Builders, as required by the then effective, but now repealed, sections 1800 and 1802 of the Internal Revenue Code of 1939. The first area of land owned by Builders, which was annexed to the then Town of Westminster, Colorado, was added to that community by virtue of Ordinance No. 164, dated June 15, 1953. The second area of land annexed and adjacent to the first was added by virtue of Ordinance No. 186, dated November 7, 1954, the original petition for which was rejected by the Town Board of Westminster on July 15, 1954.The third and final portion of land owned by Builders, which was annexed was that area described in Ordinance No. 215 of the Town of Westminster enacted on February 2, 1956. The petition which was approved by Ordinance No. 164 was executed on April 6, 1953, but acknowledged before a notary public on May 4, 1953, on which latter date it was filed for approval by the Town Board of Westminster; and formal approval was obtained at a first reading of said ordinance on June 1, 1953. In 1953, the Town of Westminster would not sell water to any person who owned land outside of the city limits with the exception of four homes *177 to the south, the wells on which went dry; and this policy was not changed until 1967. On January 14, 1955, Northwest filed an application with the Public Utilities Commission for the State of Colorado for a certificate of convenience and necessity for the distribution and sale of water suitable for domestic use. By its decision No. 44661, the Public Utilities Commission rejected the application. On October 4, 1955, the Public Utilities Commission granted a certificate of convenience and necessity to Northwest in its decision No. 44689, with a maximum limitation of domestic water supply to 300 residences. In that same decision, the Public Utilities Commission ordered Northwest to continue its efforts to obtain surface water and thereby to insure continuity of water supply into the indefinite future. The Public Utilities Commission further ordered that, in the event Northwest failed in its attempts to get water from one source, the company should continue its efforts to obtain surface water from other sources. Northwest acquired the wells on August 1, 1955, and acquired tanks and lines on October 1, 1955. On July 28, 1955, Northwest requested from the Public Utilities Commission*178 an interim certificate authorizing distribution of water, alleging that it had completed six wells, three each to the Fox Hills sands and the Arapahoe sands; that these wells were producing 590 gallons of water per minute; that the applicant then could not say with certainty when additional surface water would be available, and that no other supply was available. No payments were made on land purchase contracts by Builders to Irving, Arthur, and Shaw after May 1, 1961. Payments due to Honeymoon in connection with the Barnes and Shaw tract were made throughout 1961 by the individuals and Trusts after receipt of the payment due to them from Builders. Payments to Honeymoon ceased after 1961. Payments to G. E. and Mildred Keller continued to be paid by Builders until the Keller land was paid for in full. Documentary stamps, which were required by section 3482 of the Internal Revenue Code of 1939 and section 4361 of the Internal Revenue Code of 1954 with respect to the six conveyances -- first by Honeymoon to the individual petitioners, and subsequently the five conveyances to Builders -- were not affixed to the instruments in question. However, it was a frequent practice of the Hayutins *179 at that time to purchase such stamps without affixing them. When lots were transferred to ultimate occupants, whether the homes were built by Builders, or other home builders, partial releases of all security of record were made for the purpose of giving clear security to any lender which would ultimately finance the furnished home for the occupant. Valuation On January 6, 1953, when the Barnes and Shaw tract was transferred to the individuals by Honeymoon, its fair market value was $42,000. On April 29, 1953, when the first 54-acre parcel taken out of the Barnes and Shaw tract was transferred to Builders, the fair market value of this parcel was $13,500. On June 17, 1954, when the second parcel, taken from the center of the Barnes and Shaw tract, was transferred to Builders, the fair market value of this parcel was $14,000. On February 18, 1955, when the third and final parcel taken out of the Barnes and Shaw tract was transferred to Builders, the fair market value of this parcel was $29,500. On February 18, 1955, the date of the transfer to Builders of the 112-acre Wyse tract, that land had a fair market value of $67,000. On September 14, 1954, the date of the transfer to Builders*180 of the 296-acre Keller tract, that land had a fair market value of $148,000. In his statutory notices, the respondent treated the land transfers to Builders as contributions to capital and determined that Builders acquired the individuals' bases in the property (i.e., $30,000 in the Barnes and Shaw tract, $60,000 in the Wyse tract, and $150,000 in the Keller tract). The respondent further determined that the interest deductions claimed by Builders relating to the land contracts are not allowable and that the amounts received by the individuals pursuant to the contracts are dividends. The TrustsIn addition to the $1,000 note given by him to each of the trusts created for his children, Arthur gave notes totaling $1,285 to the Marjorie Ellen Hayutin Trust and notes totaling $2,250 to the Robyn D. Hayutin Trust, both sets of notes representing cash previously held by the donor for the benefit of those beneficiaries. Each of the trust instruments provided that the first $100 of net income was to be accumulated and made a part of the trust corpus. Each of the children's trusts provided (1) that when annual income was in excess of $100 but less than $520 per annum, such excess over $100 *181 was to be paid in semiannual installments to the beneficiary or expended for his or her benefit, and (2) that when net annual income exceeded $520 then such excess was to be accumulated by the trustee and added to the trust corpus. In the trust created for the benefit of Sima B. Hayutin, however, net annual income in excess of $100 but less than $4,900 was to be paid to such beneficiary or expended for her benefit, with any excess to be accumulated and made a part of the trust corpus. In the trust created for the benefit of Sylvia C. Hayutin, annual income in excess of $100 but less than $4,300 was to be paid to her or expended for her benefit, and any excess was to be made a part of trust corpus. In each of the trust instruments, the trustee was empowered to use both income and principal for the preservation of the beneficiary's health or for educational purposes. Each of the eight trust instruments further provided: The Trustee shall have full, complete and absolute discretion to invest, reinvest, buy and sell real and personal property, manage and control the moneys and property of which he may, as Trustee, become from time to time possessed. He may lend money, either with or *182 without security, and at such rate of interest as he may in his sole discretion determine. He shall have the duty, if the Donor shall so request, to lend money from this trust fund to the Donor, but in such event the rate of interest charged shall not be less than 3 1/2 per cent per annum, and shall be payable not less often than annually. Each of the eight trust instruments additionally provided: * * * In the event that in the judgment of the Trustee it shall become necessary or advisable for the protection or preservation of the Donor's estate, the Trustee is expressly authorized to purchase from the legal representative of such estate any property or securities comprising a portion thereof, and to make secured or unsecured loans to such legal representatives, and the Trustee shall incur no liability for loss resulting from any such purchase or loan. The agreement and declaration of trust executed by Arthur and Irving on January 6, 1953, recited that Arthur and Irving each owned 1/3 undivided interests in the Barnes and Shaw tract; that each was the trustee for the trusts benefiting the other's wife and children; and that they were desirous of having their respective wives and children *183 share in the anticipated profits to be made from the sale of said realty. The instrument provided: Therefore in consideration of the mutual covenants herein contained Arthur B. Hayutin agrees to hold as trustee in existing trusts identified by the names of the parties listed below, shares of the entire tract above described to be taken from his present holding of an undivided one-third: For Sima B. Hayutin, an undivided one-ninth of said property. For Marc Ivan Hayutin, an undivided one-thirty-sixth of said property. For Diane Hayutin, an undivided one-thirty-sixth of said property. For Randy Hayutin, an undivided one-thirty-sixth of said property. For Adele Hayutin, an undivided one-thirty-sixth of said property. Conditioned, however, that the trusts for which he is acting as trustee assume and pay their proportionate shares of the purchase price of the land to Honeymoon Manor, Inc. Irving J. Hayutin agrees to hold as trustee in existing trusts identified by the names of the parties listed below, shares of the entire tract above described to be taken from his present holding of an undivided one-third: For Sylvia C. Hayutin, an undivided one-ninth of said property. For Robyn Dee *184 Hayutin, an undivided one-eighteenth of said property. For Marjorie Ellen Hayutin, an undivided one-eighteenth of said property. Conditioned, however, that the trusts for which he is acting as trustee assume and pay their proportionate shares of the purchase price of the land to Honeymoon Manor, Inc. The parties hereto, as trustees, are authorized to trade, sell or encumber the property in any manner whatsoever, without consent from the beneficiaries or their legal representatives and to act for said beneficiaries in their place and stead, as fully as if they themselves were to act, and such power shall continue so long as the record title to the above described property or any portion thereof shall remain in the names of Irving J. Hayutin, Arthur B. Hayutin, and Gene E. Shaw. The books of account of the eight trusts created by Arthur and Irving were kept by Arthur or under his supervision. Moneys deposited to the trust were originally kept in separate accounts for each individual trust; later on, however, only two accounts were kept -- fiduciary account No. 1 for the trusts established by Irving and fiduciary account No. 2 for the trusts established by Arthur. In 1959, Arthur, *185 as trustee of the Marc Ivan, Adele, Randy and Diane Hayutin Trusts, lent $750 from each of them to the law partnership of Hayutin and Hayutin and these loans were used to improve a building owned by the law partnership. No security was given for these loans. Another loan was made to the Emanuel Garbers. Emanuel Garber was a certified public accountant who is a lessee in the building which was improved; he did some work for the related entities. Although Garber executed a note, there was no other security. Garber liquidated the debt by paying $1,400. One Fieman, a man in the insurance business who went to law school with Arthur, borrowed money from the trusts in 1956 and repaid the loan in 1957. In 1956 Matthew Raia, an employee of Winston Construction Company and Princeton, Ltd., borrowed $175, and in 1957 he borrowed an additional $150. These amounts were repaid by July of 1958. Although Raia executed a note, no other security was given for these loans. On January 31, 1957, $1,200 was borrowed from the trusts by Northwest, for which loan a note was executed, and this amount was repaid in November of 1959. The trusts had no interest in Northwest, and no security was given for *186 this loan. Jean Kintz, an employee of related entities, and her husband borrowed $1,000 from the trusts in August of 1960 at an interest rate of 12 percent secured by a second deed of trust. Other similar loans were made by the trusts of which Arthur was the grantor and Irving was the trustee. The intestate death of Irving's father-in-law in 1952 precipitated the decision by Irving and Arthur to set up these trusts as part of their respective estate plans. Books and records were maintained for these eight trusts during the period here involved. Originally, there were separate fiduciary bank accounts for each trust. Later the trusts for Irving's wife and children were in one fiduciary account, and the trusts for Arthur's wife and children were in another fiduciary account with subsidiary ledgers for allocations to each of the eight trusts, accounting for all funds. All loans made by the trusts, to both related and unrelated parties, were interest-bearing, reflected by notes, and all repaid with interest. When Irving's oldest child reached 21 years of age in 1966, the trust provisions for pay out at that age were fully complied with. In his statutory notices to the petitioners (Irving, *187 Arthur, and their wives) for the years at issue, the respondent determined that the amounts paid (including interest) to the trusts on the notes relating to the land purchases were not payments to the trusts but were "dividends" to Irving and Arthur from Builders. Corresponding adjustments were made to eliminate from gross income amounts reported as income from the trusts by the wife beneficiaries. Northwest: Ordinary Income v. Capital Contributions The Articles of Incorporation of Northwest were filed with the Secretary of State of the State of Colorado on January 14, 1955 (at which time the company was named Northwest Water Development Corporation). The fourth article of the original Articles as filed provided that the total authorized capital stock of said corporation was to consist of 150,000 shares of common stock without any nominal par value and that such common stock was to be full voting, nonassessable, and when issued was to have the full, exclusive and sole right to vote in stockholders' meetings of the corporation and in the election of the directors and in the management of the affairs of the corporation. On June 10, 1955, the Articles of Incorporation of Northwest Water *188 Development Corporation were amended by first changing the name of the corporation to Northwest Water Corporation. In addition, the FOURTH Article was amended as follows: FOURTH: This corporation is authorized to issue three classes of shares of stock to be designated as classes "A", "B", and "C" respectively; the total authorized capital stock of this corporation shall be 9,940 shares, of which amount 300 shares of the par value of $1.00 each, amounting to $300.00 shall be known as Class "A" stock; 8,700 shares of the par value of $1.00 each, amounting to $8,700.00 shall be known as Class "B" stock; and 940 shares of the par value of $150.00 each, amounting to $141,000.00 shall be known as Class "C" stock. (a) Class "A" stock shall be entitled to dividends from surplus net profits of the corporation as may be determined from time to time by the Board of Directors. (b) Class "B" stock shall be entitled to make one connection or "tap" on the lines of the corporation for each share held. (c) Holders of Class "C" stock shall be entitled to the first right to purchase any additional Class "B" stock which may hereafter be authorized, in a ratio to be determined by dividing the number of *189 outstanding shares of Class "C" stock into the number of shares authorized. This paragraph is by way of an exception to the third paragraph of Article Fourth, and is to be construed strictly as an exception relating to Classes "B" and "C" stock only. (d) The holders of Class "B" and "C" stock shall not, by reason of their holdings thereof, be entitled to vote at meetings of stockholders or to participate in any dividends declared from the profits of the corporation. (e) In the event of any liquidation or dissolution or winding-up, (whether voluntary or involuntary) of the corporation, the holders of Class "B" and "C" stock shall be paid in full the par value of their shares, before any amount shall be paid to the holders of Class "A" stock; and after payment to the holders of Classes "B" and "C" of their par value, the remaining assets and funds shall be divided and paid to the holders of Class "A" stock according to their respective shares. On September 15, 1955, the Articles of Incorporation of Northwest were amended again by adding subparagraph (f) to the fourth article, which amendment recited as follows: FOURTH: (a), (b) (c) (d) (e) -- No change. (f) That the corporation may, *190 at any time subsequent to January 1, 1975, repurchase shares of Class "B" and Class "C" issued prior to January 1, 1965, at a price not in excess of the par value of said shares; the corporation shall repurchase such shares of stock, in the order of its original issuance, at the rate of 10% of such outstanding stock each year, commencing January 1, 1995, at the par value of such stock. on October 3, 1955, the Articles of Incorporation of Northwest were again amended but only with respect to the fourth article, as follows: FOURTH: This corporation is authorized to issue three classes of shares of stock to be designated as Classes "A", "B", and "C", respectively; the total authorized capital stock of this corporation shall be 9,940 shares, of which amount 300 shares of the par value of $1.00 each, amounting to $300.00 shall be known as Class "A" stock; 8,700 shares of the par value of $1.00 each, amounting to $8,700.00 shall be known as Class "B" 6% Preferred stock; and 940 shares of the par value of $150.00 each, amounting to $141,000.00 shall be known as Class "C" 6% Preferred stock. All classes of stock shall be non-assessable and be limited as set forth herein. (a) Class "A" stock *191 shall be entitled to dividends from the surplus net profits of the corporation as may be determined from time to time by the Board of Directors, shall be full voting, and when issued shall have the full exclusive and sole right to vote in stockholders' meetings of the Corporation and in the election of the directors and in the management of the affairs of the Corporation. (b) The holders of Class "B" and "C" stock shall not, by reason of their holdings thereof, be entitled to vote at meetings of stockholders; but shall be entitled to receive non-cumulative annual dividends at the rate of six per cent (6%) per annum on the par value of said stock. Dividends shall be payable on the 31st day following the close of the corporation's fiscal year, from the net profits after income taxes, of such fiscal year. Said dividends shall be payable prior to payment of any dividends on Class "A" common stock or any other common stock hereafter authorized and issued. (c) In the event of any liquidation or dissolution or winding-up (whether voluntary or involuntary) of the corporation, the holders of Class "B" and "C" stock shall be paid in full the par value of their shares, before any amount shall *192 be paid to the holders of Class "A" stock; and after payment to the holders of Classes "B" and "C" of their par value, the remaining assets and funds shall be divided and paid to the holders of Class "A" stock according to their respective shares. (d) That the corporation may, at any time subsequent to January 1, 1975, redeem shares of Class "B" and Class "C" stock in the order of its original issuance, at the par value of such stock. On May 13, 1959, the fourth article of the Articles of Incorporation of Northwest was again amended as follows: FOURTH: The authorized capital stock of this corporation shall be $150,000.00 consisting of 150,000 shares of common stock with a par value of $1.00 per share. Said common stock shall be full-voting, nonassessable, and when issued shall have the full, exclusive and sole right to vote in stockholders' meetings of the corporation and the election of the directors and in the management of the affairs of the corporation; said common stock shall be entitled to dividends from surplus as may be determined from time to time by the Board of Directors. * * * THIRD: The number of shares of the corporation outstanding at the time of such adoption was *193 1091; and the number of shares entitled to vote thereon was 300. FOURTH: The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows: Number ofClassSharesA(Note 1)300FIFTH: The number of shares voted for such amendment was 300; and the number of shares voted against such amendment was None. SIXTH: The number of shares of each class entitled to vote thereon as a class voted for and against such amendment, respectively, was: Number of Shares VotedClassForAgainstA(Note 1)300NoneSEVENTH: The manner, if not set forth in such amendment, in which any exchange, reclassification, or cancellation of issued shares provided for in the amendment shall be effected, is as follows: No change(Note 2)EIGHTH: The manner in which such amendment effects a change in the amount of stated capital, and the amount of stated capital as changed by such amendment, are as follows: No change(Note 2)In its decision No. 44661, dated September 28, 1955, the Public Utilities Commission of Colorado noted that any construction done on the proposed water system was done without complying with the requirements of Colo. Rev. Stat. 115-5-1 (1953). The Commission analyzed *194 the capital stock structure of the company in regard to its classes A, B and C stock, and denied the certificate until the financial structure was altered so as to involve risk capital in the minimum range of 35 percent which, on the date of its decision, was not the case. In its decision No. 44689, dated October 4, 1955, the Public Utilities Commission of Colorado granted Northwest a Certificate of Public Convenience and Necessity to sell water for domestic use, but only to 300 homes. The decision noted that on October 3, 1955, the applicant filed an amendment to its Articles of Incorporation in which the capital structure of the applicant was shown to have been modified to effect a capitalization composed entirely of risk capital, thereby removing the objectionable features of the capital structure on the basis of which the application was denied by the earlier decision. The Commission further noted that the amended Articles of Incorporation expressly reserved to the applicant the right to reclassify the stock as it may from time to time see fit, and the Commission stated that it was not then granting its certificate if the former condition or any conditions similar to it might *195 at some later time be put into effect. Finally, the Commission required that the capitalization as reflected in the amendment to the Articles of Incorporation, dated October 3, 1955, should not be changed or altered without the express permission of the Commission, after a hearing duly had, and that acceptance of the cerfiticate granted on its decision dated October 4, 1955, was subject to that express condition. In its decision No. 61999 dated December 20, 1963, rendered in respect of an application by Northwest to increase its water rates the Public Utilities Commission noted that there were outstanding 5,640.54 shares of the capital stock of Northwest Water Corporation which were owned 500 shares by Shaw, 500 shares by Irving, 500 shares by Arthur, 500 shares by Winston (wholly owned by Eugene E. Shaw), and 3,640.54 shares by Investment. Also, the PUC's decision noted that, in the conduct of its business, the applicant leased certain facilities from Builders, and also from Investment (the partnership composed of Shaw, Irving and Arthur). In addition, the PUC noted that Builders was a corporation with 108 shares outstanding -- 36 shares (33.33%) owned by Shaw, 12 shares (11.11%) *196 owned by Irving, 8 shares (7.41%) owned by Arthur, and 52 shares (48.15%) owned by various family trusts; that 24 shares were held in trusts of which Arthur was trustee; and that 28 shares were held in trusts of which Irving was trustee. In its schedule of rates for water filed with the Public Utilities Commission of Colorado on October 31, 1955, Northwest, by Arthur, its secretary-treasurer, set forth the following recital to be effective on November 20, 1955: 2. Water Main Extensions (a) Free Extensions If a requested extension of the company's water system shall be necessary to serve an applicant or group of applicants, the company on written request for service by such applicant or applicants, shall make the necessary extension at its own expense, provided the length of the entire extension is not greater than that obtained by allowing 100 feet or $100.00 per customer, whichever is the lesser. (b) Extension Above Free Limit If the main extension required in order to furnish service is no longer than the free extension specified in (a) above, such extension will be made under the following conditions: The customer shall advance the cost of the extension over and above the free *197 extension, * * * Capital stock of Northwest was issued and paid for by contractors as reflected in the following schedule. In those cases where the stock was repurchased by Investment for nominal amounts, the dates, number of shares, and amount paid are also reflected. The number of shares involved appears in parenthesis. Per NWWPaymentsMade toCorp. Stat.Payment MadeContractors byYearPayorNoticesBy ContractorsInvestment1955R. Daughenbaugh$26,850(60)5/16/55$9,000(119)7/30/5517,8504/5/56(119)$29.751956R. Daughenbaugh10,200(30)2/18/564,5004/5/56(30)1.50(38)6/1/565,7003/31/57(38)9.501957R. Daughenbaugh3,000(20)3/12/573,0001958H. Von Erinhrook2,090(10)3/11/582,1003/31/58(10)1.00E. E. Shaw6,270(30)4/1/586,300R. Daughenbaugh19,900(100)8/29/5820,0009/58(100)5.00D. H. Simon2,717(13)10/15/582,7303/26/59(13)1.00C. D. McPherson4,180(20)11/1/584,20011/6/58(20)5.00Albert Klarner2,299(11)9/23/582,3109/58(11)1.001959Princeton, Ltd.22,363(107)22,470D. H. Simon3,344(16)10/17/593,3601/18/60(16)1.00E. Cronberg2,290(11)10/16/582,1006/15/59(11)1.00Princeton, Ltd.2,090(10)2,100E. Cronberg209(1)10/16/5821010/21/59(1)1.00Luxury Homes418(2)420Con. Co.R. Daughenbaugh19,900(100)20,0009/9/59(100)100.00S and H9,750(250)Builders, Inc.1960Vogelsang, Inc.13,216(34)10/31/5913,44010/30/59(64)10.00R. Daughenbaugh9,950(50)10,000Princeton, Ltd.2,5801961W. J. Suitts15,450(50)15,500*198 The stock record book of Northwest reflects the issuance of old Class "C" preferred stock and commencing April 16, 1959, and thereafter, the issuance of new Class "A" stock per the Public Utilities Commission order of April 16, 1959, as follows: STOCK RECORD BOOK NORTHWEST WATER CORP. CLASS "C" PREFERRED - OLD SHARES CTFE.NO.SHARESISSUED TODATEC-1100J. Doe-C-1119R. Daughenbaugh2-18-56C-238R. Daughenbaugh6-1-56C-320C. O. McPherson11-1-581 100E. A. Cronberg4-17-592 15Luxury Homes Con. Co.9-1-593 2000R. Daughenbaugh9-10-594 2,410.54S-H Inv. Co.10-17-595 50S & H Builders, Inc.10-17-596 16D. H. Simon10-17-597 640Princeton, Ltd.10-17-598 500A. B. Hayutin10-17-599 500I. J. Hayutin10-17-5910500E. E. Shaw10-17-5911640E. A. Cronberg10-21-5912640S-H Inv. Co.10-26-5913224Vogelsang, Inc.10-31-5914224S-H Inv. Co.10-31-591516S-H Inv. Co.1-18-6016100Princeton, Ltd.4-20-6017200Princeton, Ltd.9-15-6018300S-H Inv. Co.9-29-601950Wm. J. Suitts2-10-612050S-H Inv. Co.2-10-61TRANSFERREDCTFE.NO. ORIG.NO. ORIG.NO. SHARESNO.FROM WHOMDATECTEF.SHARESTRFD.C-1-----C-1-Orig. Issue---C-2-Orig. Issue---C-3ISSUE FROM STOCK SUBSCRIBED BY S AND H BUILDERSNEW CLASS "A" PER PUC AUTHORIZATION 4-16-591 -S-H STOCK SUB.2 S-H STOCK SUB.--3 ORIGINAL EXCHANGE4 REISSUANCE IN ACCORDANCE WITH AUTHORIZED TRANSFERDEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OF APRIL 16, 19595 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OF APRIL 16, 19596 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OF APRIL 16, 19597 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OF APRIL 16, 19598 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OF APRIL 16, 19599 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OF APRIL 16, 195910DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OF APRIL 16, 195911Princeton, Ltd.10-17-59---12E. A. Cronberg10-21-59---13-----14Vorgelsand, Inc.10-31-59---15D. H. Simon10-17-596161616Original issue from S & H BLDRS. INC. SUBSCRIPTION OF 4-17-6017Original issue from S & H BLDRS. INC. SUBSCRIPTION OF 4-17-605505018Princeton, Ltd.4-20-60161009-15-601720030019Orig. Issue----20Wm. J. Suitts2-10-61195050*199 RECEIVEDCTFE.CTFE.NO.NO.NO.SHARESDATENOTATIONSC-1----C-1C-11194-5-56178.50 Par. 19.64 Rev.C-2---57.00 Par. 6.27 Rev.C-3ISSUE FROM STOCK SUBSCRIBED BY S AND H BUILDERSNEW CLASS "A" PER PUC AUTHORIZATION 4-16-591 2 ---3 4 REISSUANCE IN ACCORDANCE WITH AUTHORIZED TRANSFER- CONVERSION OF AUTHORIZEDDEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OFAPRIL 16, 19595 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OFAPRIL 16, 19596 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OFAPRIL 16, 19597 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OFAPRIL 16, 19598 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OFAPRIL 16, 19599 DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OFAPRIL 16, 195910DEBENTURES AND EXCHANGES PURSUANT TO PUC ORDER OFAPRIL 16, 195911----12----13----14----15----16Original issue from S & H BLDRS. INC. SUBSCRIPTION OF4-17-6017and CTFE. #518Plus 150 New18--------19----20---- The stock record book of Northwest reflects the issuance of old Class "B" preferred stock and old Class "A" common stock as follows: STOCK RECORD BOOK NORTHWEST WATER CORP. CLASS "B" PREFERRED - OLD SHARES CTFE.NO.SHARESISSUED TODATEB-1100John Doe-B-130R. Daughenbaugh2-18-56B-220R. Daughenbaugh3-12-57B-310H. J. von Earenkrock3-11-58B-430E. E. Shaw4-1-58B-5100R. Daughenbaugh8-29-58B-611A. C. Kiarner9-23-58B-713D. H. Simon10-15-58B-815E. A. Cronberg10-16-58B-915L. Robuck10-25-58CLASS "A" COMMON - OLD SHARES-50Wm. J. Suitts2-10-61A-1100E. E. Shaw10-3-55A-2100I. J. Hayutin10-3-55A-3100A. B. Hayutin10-3-55TRANSFERREDCTFE.NO. ORIG.NO. ORIG.NO. SHARESNO.FROM WHOMDATECTFE.SAHRESTRFD.B-1-----B-1Orig. Issue----B-2Orig. Issue----B-3Assignment of right from S and H Builders, Inc.-B-4Assignment of right from S and H Builders, Inc.B-5-----B-6-----B-7Original----B-8Reissue (Partial) of Cert # B-4--B-9Reissue of Balance of Cert. # B-4--CLASS "A" COMMON - OLD SHARES------A-1Original----A-2Original----A-3Original----*200 RECEIVEDCTFE.CTFE.NO.NO.NO.SHARESDATENOTATIONSB-1----B-1B-1304-5-564" Rev.B-2----B-3B-3103-11-58-B-4B-4304-1-58-B-5B-5100--B-6----B-7B-71310-15-58/s/ David H. SimonB-8----B-9----CLASS "A" COMMON - OLD SHARES----Class "A" Com. $1.00 parA-1---Class "A" Com. $1.00 ParA-2----A-3----On or about March 3, 1955, Russell Daughenbaugh entered into a contract with Builders to purchase a tract of unimproved land measuring between 133 and 136 acres. On or about March 1, 1955, Daughenbaugh entered into a contract with Northwest Water Development Corporation (former name of Northwest) which provided that Daughenbaugh would purchase 500 shares of Class B nonvoting stock at a price of $150 per share, which in effect represented the installation of one metered unit per home to be constructed. The contract further provided that the subdivider would install laterals, meters, hydrants and other necessary water connections to the main line to be turned over to the water company pany free and clear of all encumbrances, with payment to the subdivider by the water company for said improvements to be made on actual cost basis to the subdivider in Class C common stock of the water company, limited to $300 *201 of cost to the water company per housing unit metered. On March 3, 1955, Builders, with the approval of Daughenbaugh, agreed to assume the obligations of Northwest Water Development Corporation to furnish water as reflected in the contract dated March 1, 1955. In an instrument dated February 1956, Daughenbaugh agreed to deliver to Investment, stock certificates of Northwest issued to him, endorsed in blank, at a price to be paid on delivery of 5 cents per share for each share of Class B stock and 25 cents per share for each share of Class C Stock. On January 2, 1959, Daughenbaugh entered into a contract with Northwest modifying the contract entered into earlier so as to bring the yet unfulfilled terms of the earlier contract into line with a proposed modification of the capital stock structure of the water corporation. The new contract provided that 1,700 shares of the new common stock, if approved, would be subscribed at a price of $40 per share, or to substitute five shares of new common stock for each old share of Class B common stock at the rate of $30 per share of the new stock. The contract also provided that the subscription price of the new stock would be at the rate of $40 *202 per share with respect to the installation of lines, laterals, meters and hydrants, in lieu of the old Class C stock subscribed for. On January 2, 1959, by letter contract, Daughenbaugh agreed, for the consideration of 50 cents per share, to deliver to Investment, new shares of Northwest stock which might be issued to him pursuant to the modified subscription agreement with all such stock certificates endorsed in blank for disposition by Investment. In the latter part of 1961, Daughenbaugh installed water mains, laterals, and hydrants, which were to become part of Northwest's system, and he advised Northwest of the installation in a sworn statement, dated December 15, 1961. These installations had an aggregate cost of $46,085.22. The statement was submitted in accordance with the agreement Daughenbaugh had with Northwest. In 1961, the petitioners became aware of proposed assessments by the Internal Revenue Service. In April, 1962, Northwest, in its books, set up the amount of $46,085.22 as a note payable to Russell Daughenbaugh. The books further indicate that the note was canceled on December 31, 1966. The same amount was set up as a debt in January of 1967 and during that same *203 month was canceled again. Elsewhere in Northwest's books, a note payable to Daughenbaugh in the amount of $46,085.22, at 6 percent interest, is listed in connection with the "purchase" on "5/5/62" of meters and meter equipment with a 20-year life and water lines and laterals with a 50-year life. In March of 1962, the following document was signed by Irving, Arthur and Daughenbaugh: Mr. Russell Daughenbaugh Denver, ColoradoDear Sir: In recognition of the fact that S and H Builders, Inc. has, of necessity, provided much of the financing for Northwest Water Corporation, and because it is desirous of extending and providing additional help both to the water company and the addressee hereof (both as an individual and officer and stockholder in North Grove, Ltd.) it is hereby understood that you, in your dual capacity, presently has due to S and H Builders, Inc. in excess of $40,000.00. It is understood and agreed that S and H Builders, Inc. does hereby grant to Daughenbaugh an extension of time for payment of $10,000.00 of the amount due March 10, 1962, said extension to be good until June 10, 1962; In consideration of this extension, Daughenbaugh agrees that, instead of accepting stock *204 for water line and house service installations, Daughenbaugh will execute necessary bills of sale and accept notes for the face amount of his cost, bearing interest at 6 per cent per annum, principal and interest due and payable on or before 40 years from date. If this is in accordance with your understanding, please note your approval below. Yours very truly, S and H BUILDERS, INC.* * * Daughenbaugh's understanding of his relationship with Northwest was that the Public Utilities Commission would not allow him to purchase water taps so that the money could be used to install water utility improvements; and that in order to be able to accomplish this end he had to purchase stock in the water company. To facilitate the charging of these costs as expenses against the houses he constructed, Daughenbaugh arranged to sell the stock back to the "water company" or to Arthur, with whom he personally dealt at all times. It was also Daughenbaugh's understanding that it was the normal procedure in any water company, including Northwest, that one either had to pay a tap fee which was used to install water lines or else he had to install the lines himself and give the lines and other apparatus *205 to the water company, and that this was the practice in the Denver area with other water suppliers in order for customers to obtain water services. When Daughenbaugh bought stock, it was his understanding that as a builder he was getting water services to his house. When Northwest was first formed, Builders initially subscribed for a large quantity of the preferred stock with the understanding that Builders was not interested in obtaining the issuance of the shares at that time, but, in effect, was guaranteeing that Daughenbaugh's subscription would be picked up. Builders was providing the water company with the use of funds, pending payment of the amount obligated by Daughenbaugh. When Builders sold lots or acreage, simultaneously with such sale, the land purchaser also agreed to purchase stock in the water company through Builders. The water company was the moving force; Arthur presented the proposition to the prospective purchaser and explained to such purchasers that it was necessary for the water company to have funds if it were to provide water service to the lots that the builders were purchasing. The building contractors paid funds to Northwest in the same manner as they would *206 pay tap fees to any city or other water or sanitation district; they would have preferred their payments to Northwest also to be classified as tap fees. The building contractors were required to pay for water company stock in order that they might have water service to the land purchased. Builders (the corporation) would not sell land to anyone unless he also agreed to "contribute" to the water company by purchasing stock. There was a simultaneous agreement by the purchasers to return the stock at a nominal price to the individuals through their partnership, Investment. When Daughenbaugh contracted to buy land from Builders, he also contracted with the water company for it to provide water, subject to the issuance of a certificate of convenience and necessity, and he agreed to buy a certain number of shares of preferred stock. In addition, he agreed to install certain facilities and to transfer them to the water company in exchange for other shares of stock, at an agreed value. Daughenbaugh was desirous of being able to expense his investment, and there was an agreement that his stock in the water company would be repurchased at a nominal figure; this second agreement for repurchase *207 was made contemporaneous with the agreement by Daughenbaugh to buy the stock. In general, payments for shares of capital stock of the water company were measured by the number of lots that were purchased; however, there were exceptions, the school district being an example. The funds received from the sale of stock were generally used for facilities such as storage tanks or pumps, but there was no specific allocation. After the recapitalization of Northwest stock in 1959, the same practice was followed in requiring an agreement to return the stock at the same time a contract was entered to purchase it; and it made no difference whether it was old preferred or newly recapitalized common stock. Purchases of water company capital stock by Princeton were similar to those of Builders. When Princeton transferred its lots to other builders (in those instances where it did not build on the lots it had purchased), shares of water company stock, or subscriptions therefor, were transferred to the builders who purchased the lots. These purchasers, in turn, were required to resell the stock back to Investment. In no case did Princeton end up as a permament owner of Northwest capital stock. The *208 only exception prior to 1962 in regard to repurchase of the stock of Northwest was a builder by the name of David Simon. He originally agreed to acquire 16 shares of the water company. With some delay, Simon ultimately resold the shares to Investment at a nominal figure in the same manner as other builders had done. In 1962, Winston contracted to purchase 500 shares of Northwest stock for $125,000 and paid a down payment of $5,000. The stock was ultimately paid for by Winston. The number of Northwest shares Winston purchased was not measured by the number of acres or lots purchased. It took into account Northwest need for capital expansion. There was no agreement to return the stock. This stock subscription by Winston was a permanent investment intended to strengthen Winston's investment in the parcels of land it was purchasing. The stock was voting stock, and the proportionate ownership of Northwest was changed. (Shaw's ownership, direct and indirect, in Northwest increased from 33 1/3 percent to approximately 40 percent.) In his statutory notice to Northwest, dated June 18, 1964, relating to Northwest's taxable years 1955 and 1956 (Docket No. 4627-64), the Commissioner stated *209 the following: It is held that $26,850.00 received during 1955 from Russell Daughenbaugh in money and property was paid for water tap rights and, therefore, ordinary income. [1955] * * * It is held that $10,200.00 received during 1956 from Russell Daughenbaugh in money and property was paid for water tap rights and, therefore, ordinary income. [1956] In his statutory notice to Northwest, dated June 18, 1965, relating to Northwest's taxable years 1958 through 1961 (Docket No. 5432-65), the Commissioner held that the following amounts (in the indicated years), which Northwest received from contractors for its capital stock (in excess of its $1.00 per share par value) was paid for water tap rights and was, therefore, ordinary income: YearAmount1958$37,456195960,373196025,746196115,450in his statutory notice to Northwest, dated June 22, 1967, relating to Northwest's taxable year 1962, (Docket No. 4770-67), the Commissioner stated: It is held that $124,500 received for your capital stock in excess of its $1 per share par value was paid for water tap rights and therefore ordinary income. The stock was sold to Winston Construction Company who thereby acquired 500 water taps. At the conclusion *210 of the trial in this case, the Court granted the respondent's motion to amend the pleadings in Docket No. 5432-65 to increase the deficiencies determined in Northwest's taxable year ended December 31, 1961, based on the evidence adduced at trial. In an "Amendment to Answer" field with the Court on October 4, 1968, the respondent stated: At the trial of this case, evidence was introduced which tends to prove that petitioner received additional ordinary income by virtue of the receipt by petitioners from Mr. Russell Daughenbaugh of water lines, laterals, fire hydrants and related services in December of 1961. Should the Court find that the receipt of the aforementioned assets by petitioner constituted ordinary income for its taxable year 1961, the petitioner's taxable income as determined in the statutory notice should be increased by the amount of $46,085.22 [resulting in a deficiency in 1961 in the amount of $32,602.57]. Builders -- Agent or Principal in the Sale of Capital Stock of Northwest When Northwest was first organized, Builders "subscribed" for a large quantity of the water company's preferred stock, and Builders advanced amounts of money to the new company. Although the *211 term stock "subscription" was used, it was not intended at that time that Builders would acquire any stock or become a shareholder of Northwest, and Builders accordingly did not require that the shares of stock be issued to it at the time of the advances. The basic purpose behind making these advances to Northwest was to provide the water company with the immediate use of needed funds. Russell Danghenbaugh had subscribed for a large quantity of the preferred stock for which he was obligated to pay over a period of time, and it was understood that Northwest would repay Builders for its advances with funds received from Daughenbaugh and from others making payments to purchase Northwest stock. Builders devised a plan for assuring sales of Northwest stock. When Builders would enter into a contract for the sale of its land, it would require the purchaser to agree to purchase shares of the water company stock in order to assure water service. (Builders was interested in arranging for the sale of all shares for which it had "subscribed" to the extent such shares exceeded Daughenbaugh's subscription.) when a land purchaser agreed to buy water company stock, 3Builders would direct that *212 such shares be issued by Northwest to the land purchaser directly. The shares were never issued in the name of Builders. In this manner, Builders served merely as a conduit in the sale of the Northwest stock. The money received from these stock sales was kept by Builders and was not transferred to Northwest. These amounts of money were, in effect, treated as repayments by Northwest of the advances which Builders had made. In the fiscal year ending February 28, 1959, and in the fiscal year ending February 29, 1960, Builders received more money for the shares of Northwest stock it arranged to be sold than Builders had advanced to Northwest to "subscribe" for those shares. On its Federal income tax returns for each of these years, Builders reported a gain from the sale of stock. In the fiscal year ending February 28, 1961, Builders received less money for the shares than it had advanced to "subscribe" for them and the corporation reported a loss on its Federal income tax return *213 for that year. The ledger account of Builders, which reflected the payments made to Northwest had the heading "investments -- 400 shares stock Northwest Water Co. -- 400 prepaid water taps." The account reflects that between March 29, and July 9, 1955, Builders advanced $73,500 to Northwest. The balance sheets of Builders, on Frbruary 29, 1956, February 28, 1957, and February 28, 1958, reflect under the heading "Other Assets" stock "subscribed" in the respective amounts of $73,500, $69,000, and $66,000 (declining balances). Builders included in its income tax returns for its fiscal years ended February 28, 1959, and February 29, 1960, gains of $5,040 and $1,320, respectively. On its income tax return for the fiscal year ended February 28, 1961, Builders reported a loss in the amount of $11,985.26. The gains and the loss related to the "sale of stock" of Northwest. The respondent, in his statutory notice to the petitioner, Builders, dated June 18, 1965, determined with reference to the taxable years ending February 28, 1959, and February 29, 1960, that the gains reported in those years ($5,040 and $1,320, respectively) were not includable in Builders' gross income because Builders*214 "sold this stock as agent for Northwest Water Corporation * * *." With reference to the taxable year ending February 28, 1961, the respondent determined that the $11,985.26 loss reported in that year was not allowable to Builders "since you sold this stock as an agent for Northwest Water Corporation and not on your own account." Curve Tavern, Inc. The capital stock of Curve Tavern, Inc., was owned 25 percent by Investment, 25 percent by Mattew L. Raia, and 50 percent by T. W. Burleson. Investment acquired its shares of the stock in 1951. During 1956, Eugene Petrino offered to purchase all of the capital stock of Curve Tavern, Inc., and the land upon which this retail liquor operation was located. Petrino approached Irving, his attorney, with this offer. Petrino was aware that Irving and his associates did not own all of the stock or the land, but he wanted Irving to arrange a "package deal." After Petrino's offer, Investment during August of 1956, purchased Raia's 25 percent stock interest for $4,600 and Burleson's 50 percent interest for $15,000. Investment also purchased the land from its owner for $50,000. Immediately thereafter, Petrino purchased from Investment, all of the *215 Curve Tavern capital stock and the real estate. The gross sales price was $90,000. Of this amount $40,000 was attributed to the stock and $50,000 was attributed to the land, reflecting the fair market values thereof. In addition to transferring the capital stock and real estate, Investment, as the "consolidating seller," was required to liquidate all corporate obligations outstanding against the corporation. Investment further had to resolve litigation instituted by Burleson. (Burleson agreed to dismiss his suit subject to the payment of $15,000 for his 50 percent stock interest.) Investment liquidated all of the corporate debts of Curve Tavern, Inc. out of the gross sale proceeds. As a result, Investment's net gain on the transaction was $15.027. In its partnership information return for the taxable year ended March 31, 1957, Investment reported no gain relating to the sale in question. In their respective income tax returns for the year 1956, the three partners of Investment (Irving, Arthur and Shaw) reported no gain relating to the sale in question. In his statutory notices to each of the three partners relating to the year 1957 (all notices dated June 18, 1964), the respondent *216 determined that each partner had a long-term capital gain on the sale of onethird of the curve Tavern stock acquired in 1951 (the 25 percent share) and a shortterm capital gain on the sale of one-third of the Curve Tavern stock acquired in August 1956 (the 75 percent share). The respondent treated 25 percent of the $40,000 sales price for the stock (i.e., $10,000) as attributable to the 25 percent interest, and 75 percent of the sales price (i.e., $30,000) as attributable to the 75 percent interest. The respondent determined that there was no gain on the sale of the land because it was sold for a price equal to the partnership's basis in the land. Casualty Loss In 1953, petitioners Irving J. Hayutin and Sima B. Hayutin entered into a contract with Lembke Plumbing and Heating ("Lembke"), a partnership, to furnish and install plumbing fixtures at their home, then under construction located at 4800 East Orchard Road, Littleton, Arapahoe County, Colorado. The house was a one-story brick residence, containing ten rooms with four baths. It had a concrete slab floor with radiant heating pipes encased in the concrete slab. On the westerly side of the house was a pit with 8 inch concrete *217 walls and with a removable cover. In the pit was a water heater and a pressure tank. Water was delivered to the pressure tank from a well on the property, and from the pressure tank the water was piped through the easterly wall of the pit beneath the footings of the house. The pipes then ran beneath the concrete floor and to the various plumbing fixtures in the house. The pipe leading from the well to the pressure tank was protected by a steel casing as it passed through the westerly wall of the pit, and this casing afforded protection against possible movement of the westerly pit wall by providing a space between the water pipe and the protective casing. However, although this protective measure was taken as to the pipe passing through the westerly wall of the pit, no such protection was afforded the copper pipe leading through the easterly wall of the pit and beneath the house, and this copper pipe was snugly set into the easterly concrete pit wall. As installed, if the easterly pit wall moved, pressure would inevitably be applied to this copper pipe encased in it. After the copper pipe passed through the easterly wall of the pit, it ran a short distance beneath the footing *218 of the westerly wall of the house, made a right angle turn vertically, and ran upwards to a point just beneath the concrete slab floor of the house. At this point it turned and ran horizontally beneath the floor of the house. These two right-angle turns in the copper pipe were accomplished by "el" fittings. After a very short horizontal run beneath the slab floor, a tee fitting was installed, with one piece of copper pipe running vertically through the floor of the house and with the horizontal run of the pipe continuing from the other opening of the tee fitting. The location of this tee fitting is beneath a recreation room in the house, and it was at this approximate point that the cracking hereinafter described originated and it was from this approximate point that the cracking radiated throughout the house. From the time of the completion of the house, and for approximately 18 months thereafter, there was no cracking in the floors, and the house appeared to have been well and substantially built. In the spring of 1955, trouble was encountered with the electric elements in the water heaters of the house, and in attempting to correct this difficulty Lembke was employed under *219 oral contract. One of his regular employees came to the house to inspect the water heaters, and in the course of the employment, Lembke's employee entered the pit on the west side of the house. The pressure tank and the water heater in the pit caused the working room inside the pit to be cramped, but Lembke's employee entered the pit and negligently stepped down to the pit floor at a point where a soft copper gauge tube led from a point just above the pit floor from the water line to the pressure tank. In so doing he broke the copper tube. At this time the pit was damp but it was not wet, and there was no water standing in the pit. A few days later, petitioner Irving J. Hayutin encountered further difficulty with the water heaters, and Lembke was again called, and made repairs. Lembke advised Irving to call an electrician, which he did. Upon arrival, the electrician advised Irving that the pit had water in it. Thereafter, Irving called Lembke, and the pit was pumbed. Later, Irving entered the pit and found that the small soft copper gauge tube leading from the water line to the pressure tank had been bent and damaged, and that water was running from the point where the damaged *220 tube entered a fitting attached to the water line. When Irving took hold of the tube fitting, it came out, and water spurted from the tube. The gauge tube was bent and damaged as a result of having been engligently stepped on by Lembke's employee when he entered the pit a few days earlier, and this permitted water to flow from the tube into the pit. During the pumping, it was observed that water was running from beneath the house, into the pit along the copper pipe leading through the easterly pit wall, and the pit wall had moved vertically, inevitably causing pressure to be applied to the copper pipe leading through the easterly pit wall. An excavation was then made alongside and beneath the house adjacent to the pit and piping, and the soil was found to be wet. The excavation was dug to a point which permitted access to the tee fitting beneath the recreation room of the house, and it was found that the vertical section of the pipe and the tee fitting had separated, and that water had been freely flowing from that fitting into the soil beneath the house. This vertical section of pipe was separated from this tee fitting as a result of the movement of the pit wall which applied *221 pressure to the copper pipe snugly encased in the wall, which pressure was transmitted to the tee fitting, and caused the tee fitting and the vertical section of the copper pipe to separate. Ten days to two weeks after the water was discovered in the pit, cracking started in the floor of the recreation room above the tee fitting. The cracking was severe, and over a period of time it radiated outwards from this point throughout the house. The damage was extensive. Throughout the house the floors heaved and cracked; cracks appeared in the walls, and some of the exterior walls of the house developed a tilt readily ascertainable to the eye; interior partitions cracked and warped; some of the doors would not close, and the door frames were far out of square and tilted; some of the open beams of the roof were split and pulled apart; a brick fireplace became cracked; and the windows pulled away from their frames. In a negligence suit by Irving and Sima Hayutin in a local Colorado trial court against Lembke Plumbing and Heating (Henry H. Lembke, Sr., and Henry H. Lembke, Jr., partners), the immediate cause of this damage was not in dispute. Experts for both parties agreed that the damage *222 resulted from the wetting of the soil beneath the house, and the only dispute was as to what caused that soil to be wetted. From all of the evidence, and from the inferences to be drawn from all of the testimony and the physical facts, the state trial court found that the water which flowed into the pit caused movement in the easterly wall of the pit, that the horizontal copper pipe which was snugly encased in this wall of the pit was thereby put under stress, and that this stress was transmitted to and caused a break between the tee fitting and the vertical pipe. This permitted water to flow into the soil beneath the house, causing the soil to swell and heave, and causing damage to the house. Henry H. Lembke, Jr. testified that all requirements of the plumbing code were also required by good and accepted plumbing practice in 1953. Those regulations required that all pipes passing through concrete walls be protected. No protection was afforded the copper pipe leading through the easterly pit wall. Accordingly, the trial court found that the Lembkes were negligent in the installation of the original plumbing in that they failed to protect the copper pipe encased in the easterly wall *223 of the pit against movement of the wall, and that this negligence was a proximate cause of the damages suffered by petitioners. As to the damaged gauge tube discovered in the pit, the trial court found from the evidence that the Lembke employee negligently stepped on the gauge tube, causing it to bend, and permitting water to escape from the fitting attached to the soft copper tube. This negligence was also regarded as a proximate cause of the damages sustained by petitioners. In 1960, the state trial court awarded a judgment to petitioners in the amount of $26,000. 4 This judgment was satisfied in 1962. In that same year, Irving and Sima paid $7,346.40 in attorneys' fees in connection with the suit. In their Federal income tax return for the taxable year 1955, Irving and Sima deducted $26,000 as a "casualty loss on residence caused by broken water pipes, April, 1955." In his statutory notice to Irving and Sima, relating to the year 1955, the respondent stated: The deduction of $26,000 claimed as a *224 casualty loss resulting from damage to your personal residence is disallowed because you have not established you are entitled to such deduction, recovery having been effected in a later year. The parties have stipulated that if there in fact was a deductible loss, it occurred in the year 1962, the year in which Lembke satisfied the judgment. The parties have further stipulated that such loss would be in the amount of $7,346.40. Investment -- Bad Debt Deduction Prior to the formation of Investment, Eugene E. Shaw had deposited sums of money with the law partnership of Hayutin and Hayutin, in trust, with instructions that the funds were to be used to pay such personal bills as were authorized, or to make investments. Investments made at the direction of Shaw were to be without liability on the part of the law partnership of Hayutin and Hayutin, in the event the investment resulted in a loss. If the law partnership of Hayutin and Hayutin made investments for Shaw without his specific authorization, then such law partnership was to be responsible for one-half of any loss that might be suffered. Profits were to be shared 50 percent each beween Shaw and the law partnership. The funds *225 were put either into a general office bank account of Hayutin and Hayutin, or a second account designated as "special." Other than a letter of authorization, dated February 26, 1951, there was no other declaration of trust or trust instrument in respect of the funds transferred by Shaw to the law partnership. Pursuant to the authorization contained in the letter dated February 26, 1951, Hayutin and Hayutin made advances on behalf of Shaw, to a now defunct company known as York Investment Company. The total amount of the advances to York Investment Company came from the funds held in trust by Hayutin and Hayutin for Shaw. The total advanced to York Investment Company amounted to $39,600, for which the law partnership received a note. The note was in the possession of Shaw. For reasons undisclosed by the record, the unrecovered amount of indebtedness totaled $27,012.22. The amounts lent to York Investment Company were made with the consent of Shaw, and as a result the law partnership was not liable for any loss. Investment was formed in 1951 or 1952 pursuant to an oral agreement (later confirmed by a written agreement) by Irving, Arthur, and Shaw. Under the agreement, all profits *226 and losses of Investment would be shared equally by the three. On or about January 8, 1953, Irving, Arthur, and Shaw executed the following document: Mr. Gene E. Shaw, Denver, ColoradoDear Mr. Shaw: Pursuant to our oral understanding of of January 3, 1952, it is hereby understood and agreed that the terms of that certain trust agreement dated February 26, 1950, [sic] and verbal agreement relative to S-H Investment Company are that, from the aforesaid date of February 26, 1950, [sic] the shares of yourself and the undersigned shall be and hereby are declared to be as follows: Gene E. Shaw, One-third of profits and losses Irving J. Hayutin, One-third of profits and losses Arthur B. Hayutin, One-third of profits and losses If this is in accordance with your understanding, will you please note your approval and acceptance below. Yours very truly. HAYUTIN AND HAYUTIN s/ Irving J. Hayutin Irving J. Hayutin s/ Arthur B. Hayutin Arthur B. Hayutin APPROVED AND ACCEPTED s/ Gene E. Shaw Gene E. Shaw During 1952, Irving and Arthur concluded that York Investment Company would not be able to pay its debt to Shaw. Even though Shaw had authorized the loan, Irving and Arthur wished to reimburse *227 Shaw in some way for part of his expected loss since he had advanced the money at their recommedation. The Hayutin brothers thought it would be fair to have the note placed in Shaw's capital account in the full amount on the books of Investment, and Irving and Arthur agreed to make offsetting changes to their respective capital accounts in the amount of one-third of the $27,012.22 indebtedness. Accordingly, prior to the time Investment began keeping formal books in April of 1956, Shaw contributed the note to Investment. In connection with this transfer, no cash payments were made to Shaw. As reflected in the opinion of the Colorado Supreme Court in the case of Byron v York Investment Company, 133 Colo. 418, 296 P. 2d 742 (1956), a default on the part of York Investment was memorialized by a notice deated April 10, 1952. Subsequent negotiations ensued between Byron and York Investment Company, but by October of 1952 there was hopeless disagreement between the parties on the question of whether certain mining equipment had been forfeited pursuant to the terms of a mining leasehold agreement between them. In subsequent litigation under the style of Hayutin v. Byron, 144 Colo. 121, 355 P. 2d 532 (1960), *228 the court determined that the court's action in the earlier litigation was dispositive of the second case, thereby barring the plaintiffs from recovery. In an amended partnership return, Form 1065, filed for the fiscal year ending March 31, 1958, Investment deducted $27,012.22 as a business bad debt. In their respective joint Federal income tax returns for the calendar year 1958, Irving, Arthur, and Shaw deducted their distributive shares (1/3) of the net loss reported by Investment in the above-mentioned Form 1065. In his statutory notices to Irving, Arthur, and Shaw, all dated June 18, 1965, 5 the respondent disallowed the $27,012.22 business bad debt claimed by Investment because "you have not established that you are entitled to such a deduction," and the respondent increased the gross income of Irving, Arthur and Shaw accordingly. Collateral Certificates Collateral certificates were in reality savings accounts in savings and loan associations which were pledged back to such associations. They arose from the conventional *229 financing of homes as opposed to financing which was insured by the Federal Housing Administration or Veterans Administration. In such conventional loans the savings and loan associations were limited to an 80 percent maximum loan by law. However, in order to expedite the sales of homes, a 90 percent loan was the only possible way for many purchasers to acquire a home, thus limiting their down payment to 10 percent of the overall purchase price. Therefore, when the savings and loan association made payments to the selling builder of the home, it held the other 10 percent of the 90 percent figure as collateral security pending repayment of the larger 80 percent loan figure. Thus the builder got 10 percent cash from the purchaser and 80 percent from the borrowed money from the lender, or a total of 90 percent, with the final 10 percent being held as security. Each savings and loan association had its own policy on how the collateral certificate or savings account was to be paid to the builder. Some of the savings and loan associations reviewed them annually to determine how much would be paid out. Other associations permitted one-third of the account to be paid out in relation to *230 the reduction of the principal sum of the 80 percent loan, amounting to the payment of $1 to the builder out of the collateral savings account for every $3 of principal sum reduced on the loan to the purchaser. Other associations permitted a 50 percent annual withdrawal of the collateral account, amounting to the payment of $1 from the account for each $2 of principal sum of loan reduced. Finally, some of the associations permitted payouts only at the discretion of their officers. In the years in which Winston and Princeton received these collateral certificate accounts and pledged them to the lenders, they reported the entire face value amounts as income. But, because it was estimated that the certificates had a fair market value equal to only 50 percent of face value, Winston and Princeton deducted 50 percent of the face value of each certificate as a "discount expense." For its taxable year ended July 31, 1963, Winston claimed a deduction of $5,820 characterized as "Collateral Certificate Discount." Similar deductions were claimed by Princeton for its taxable years ended March 31, 1960 to March 31, 1964, inclusive, in the amounts of $5,692.50, $15,900, $3,950, $2,575, and $300, *231 respectively. (The amounts claimed for the fiscal years ended March 31, 1960, and March 31, 1964, are applicable only in the ultimate determination of possible net operating loss deductions relating to the years at issue for petitioner Princeton.) In 1956, Arthur, Irving, and one Redak purchased collateral certificates from Russell Daughenbaugh.For the face value of approximately $60,000 of certificates, they paid approximately $30,000. Some of the certificates purchased from Daughenbaugh related to housing constructed in the area under development by Builders, and othercertificates related to construction by Daughenbaugh in areas unrelated to the petitioners in the instant case. The payout on the $60,000 face value of collateral certificates purchased in 1956 was excellent. There were periods of time when a number of such certificates were in default, but subsequently these were restored by make-up payments on the defaulted loans and only one of the certificates actually was lost. The certificates purchased in 1956 were in all material respects substantially similar to those certificates subsequently acquired, which are at issue in the cases at bar. Throughout the life of the *232 collateral account which has been pledged, the interest or dividends are payable to the owner of the account who ordinarily would be the builder or home seller. Each collateral account at issue was not tied together with other loans so that default on one loan in the same institution would not cause a collateral account related to a separate loan to be used to make up such default. None of the collateral certificates which are the subject of this action was ever sold by petitioners Winston and Princeton. While exposure to loss from these certificates was technically greater than in the instance of second mortgages, in practice defaults were minimal. During 1961 and 1962, there were no defaults in respect of loans which would have caused collateral certificate accounts to be foreclosed upon. In some instances, withdrawal privileges were suspended due to temporary delinquencies, but the savings and loan association would reinstitute withdrawal privileges to a collateral account if the loan obligor would bring payments up to date. Winston and Princeton used the accrual method of accounting. These petitioners also maintained reserves for bad debts. Winston and Princeton did not employ *233 the bad debt reserves in treating their collateral certificates, but merely wrote down such assets based on their estimated market value. Petitioners Winston and Princeton received interest payments from the subject collateral certificate accounts. In his statutory notice to Winston, dated June 22, 1967, relating to Winston's taxable years ending July 31, 1960, July 31, 1962, and July 31, 1963, the respondent disallowed a collateral certificate discount claimed by Winston in the amount of $5,820 in its return for the taxable year ending July 31, 1963. Such amount was regarded as an "unallowable deduction" by the respondent "because you have not established you are entitled to such deduction." In his statutory notice to Princeton, dated June 22, 1967, relating to Princeton's taxable years ending March 31, 1961, March 31, 1962, and March 31, 1963, the respondent disallowed claimed collateral certificate discounts claimed by Princeton in the amounts of $15,900, $3,950, and $2,575, respectively, in its returns for the three taxable years above-stated. The deductions were disallowed "because you have not established you are entitled to such a deduction." Omission of Sales Income -- Builders *234 During its fiscal year ended February 29, 1956, Builders sold 23 houses having a total sales price of $289,750. During the same fiscal year, Builders, in seven transactions sold raw or partially improved land having a total sales price of $376,740. These figures are reflected on the worksheet records which were prepared by Builders' accountant after the Revenue Service commenced its audit. The accountant reconstructed sales and cost of sales for the three-year period encompassing the fiscal years ending February 28, 1954, February 28, 1955 and February 29, 1956. During that three-year period, Builders had kept no formal books and records, and its Federal income tax returns were prepared from checkbook records. In the fiscal year ended February 29, 1956, Builders' total sales amounted to $666,490, reflecting the $376,740 in land sales and the $289,750 in hourse sales. During the period in question, Builders used only checkbook records. Because Arthur failed to add in all sales in preparing Buildars' tax return, the Federal income fax return which Builders filed for the fiscal year in issue reported gross receipts of only $652,790, which was $13,700 under the correct figure of *235 $666,490. The return in question also listed $586,124.67 as the "cost of operations." In his satutory notice to Builders, dated June 18, 1964, the respondent determined that Builders had understated its gross receipts in the taxable year in question by $13,700 ($666,490 minus $652,790). The statutory notice states: Examination of your books and records discloses that the sale of houses for the fiscal year ended February 28, 1956, totalled $289,750.00. You r tax return reports sales of only $276,050.00. Therefore your taxable income is increased $13,700. Payments Subsequent to Divorce Sylvia and Arthur were married in July of 1945. At the time of the marriage, Arthur's assets were minimal. He had a small amount of cash and some bonds, but he owned no real estate, no automobile, and no stock in any corporation. Sylvia, who had been employed as a case worker with the Wayne County [Micigan] Bureau of Social Aid, had saved approximately $3,000 from her earnings and from gifts from her parents. Upon her marriage, these funds were deposited in a joint account (in her name and in Arthur's). In the fall of 1945, prior to Arthur's release from the Army where he was earning $66 a month, *236 Sylvia began work at the Denver Bureau of Social Welfare at a salary of $125 a month. These earnings went into the couple's joint account and were spent on their support. For two and one-half years, while Arthur was completing his law school education, Sylvia continued to work and her salary increased to $145 per month. She terminated her employment during her first pregnancy. As a housewife, Sylvia performed all normal duties that a woman in such a position would perform. Because of the illness of the couple's second daughter, who was afflicted with cerebral palsy, Sylvia was required to give special care to the child, consisting of therapy and treatment on a continuing basis. A substantial portion of the child's medical care was paid for by Sylvia's parents. At the time of the marriage, Sylvia's father gave $5,000 in Government bonds to Arthur and Sylvia as a wedding present. The money from the bonds was put in a joint account and was used, partially, to purchase the couple's first house. In addition, Arthur used approximately $1,500 of the money to purchase an interest in his brother's law firm (which was to become Hayutin and Hayutin). During the marriage, Sylvia put the *237 money which she earned or was given by her parents in a joint checking account to be spent, largely, on living expenses. While Arthur was attending law school, Sylvia's parents sent her $60 a month to be used in paying the rent. During the years 1945-1960, Sylvia and the children of the marriage with Arthur received over $12,000 in gifts from Sylvia's parents. 6 Some of the money went into a joint account in the name of Arthur and Sylvia. Some of it was put in Arthur's personal bank account or in one of his business accounts. These gifts from Sylvia's parents were spent on living expenses or were put in bank accounts or the trusts for the children. From these funds $2,000 was used by Arthur in an unsuccessful investment. Sylvia did not use any of the money she received from her parents or from her earnings to invest in the various corporations and partnerships in which Arthur had an interest. The *238 only instances in which the parents' gifts were so used were (1) the purchase by Arthur of the partnership interest in the law firm for $1,500, and (2) the unsuccessful investment by Arthur of $2,000. On May 5, 1961, Sylvia instituted divorce proceedings against Arthur. In his answer to Sylvia's complaint, Arthur alleged, inter alia, that he and Sylvia were possessed of various community property, both real and personal, and Arthur requested the court for "an equitable division" of the property. After filing her complaint for divorce, Sylvia moved that the divorce court issue an order permitting her to employ appraisers to value the property which she and Arthur owned (including Arthur's interests in real estate and land contracts, his corporate stock, and his partnership interests). Arthur and Sylvia were divorced by a final decree rendered in October of 1961. On May 7, 1962, Arthur and Sylvia presented to the divorce court an agreement which they had reached that day, encaptioned "Stipulation and Agreement." At that time, Irving, Arthur's attorney, stated to the court that the settlement was "a lump sum property settlement." The provisions of the agreement were as follows: IN THE *239 DISTRICT COURT IN AND FOR THE COUNTY OF ARAPAHOE AND STATE OF COLORADOCivil Action No. 16412 Sylvia. C. Hayutin, Plaintiff, v. Arthur B. Hayutin, Defendant. Stipulation and Agreement Come now the parties hereto, the plaintiff, Sylvia C. Hayutin, hereinafter referred to as wife, in person and through her attorneys, Harrison, Greene, Bernstein and Caldwell, and Earl J. Hower, and the defendant, Arthur B. Hayutin, hereinafter referred to as husband, in person and through his attorney, Irving J. Hayutin Esquire, and with respect to the matter of custody of minor children, child support, permanent alimony, division of property, attorneys' fees and expenses, all pending in the within action, do hereby agree as follows: 1. The permanent care, custody and control of the minor children of the parties hereto, Robyn Dee Hayutin and Marjorie Ellen Hayutin, shall be awarded to the wife; provided nevertheless, that the husband shall have all reasonable visitation privileges. 2. It is understood and agreed that this stipulation and agreement shall represent and be a full and complete settlement of all the claims and demands of the parties hereto, one against the other; it being agreed that the *240 aggregate lump sum total as set out in Exhibit A, attached hereto and made a part hereof, is a fair and equitable settlement of all such claims and demands. The wife agrees to, and does hereby waive any and all claims to alimony which she may have, or had, and agrees to support and maintain the minor children of the parties during their minority. Both parties hereto recognize that the obligation of the husband to support said minor children cannot be abrogated, and that, therefore, any breach by the wife of her agreement to support said minor children, recognizing further that the wife also has a basic duty to support said minor children, would give rise to an action for damages against the wife in the event the husband is hereafter called upon to support said minor children, and provided further that the reason for which he might be called upon for such support is not his default in the monthly payments provided for by this agreement. 3.In this connection, and in order to insure the preservation of the estate being created by virtue of this agreement, it is hereby agreed that this agreement may not be assigned, pledged or alienated in any way, including transfer by will or intestacy, *241 except for the sole and exclusive benefit of the children of the parties, without the husband's consent first had and obtained in writing. 4. It is agreed between the parties that since their marriage, certain properties and things of value have been accumulated by the parties. Exhibit A, above referred to, sets forth the agreed value in dollars as to those items of property to be transferred or set aside to the wife as a part of the settlement being effected by this agreement. In this connection, it is understood and agreed that both parties have made a full and complete disclosure of each and all of the things of value owned by each party, including properties standing in the names of the individuals, in corporations, partnerships and other legal entities, such disclosure having been made by submission and exchange of documents, exhibits, evidence and testimony before the court, and through the use of appraisers and financial consultants, and extensive negotiation and discussion by, through and with attorneys for both parties. 5. It is further understood and agreed that the Internal Revenue Service of the Treasury Department has been investigating husband's business activities *242 over a period of several years; that some tentative assessments have already been made thereon; in order to protect the wife, it is agreed that husband shall be liable for all such claims as finally determined, as may be assessed against both the husband and wife, by either federal or state authorities for any income tax liability for the years 1955 through 1960, inclusive. In consideration of this indemnification, wife agrees to execute such documents and powers of attorney as may be required by the husband for the purpose of contesting and/or settling such claims, before or with the Treasury Department of the United States, the Colorado Department of Revenue, and any state or federal court, of original or appellate jurisdiction before which any such matter may be brought. 6. Husband agrees that to further secure to the wife the payments due under this agreement, he will maintain in full force and effect those insurance policies on his life of which he was the owner on October 10, 1961, (or the equivalent in other policies, at husband's option), and the wife shall be named as primary beneficiary thereunder, and with the children of the parties being designated as contingent beneficiaries. *243 It is understood and agreed that such designation of the wife as primary beneficiary is only for the purpose of partially guaranteeing payment of the obligation assumed by the husband under this agreement, and that any proceeds that amy become payable under such policies or their equivalent, shall become a credit against any remaining unpaid portion of this obligation existing at the time of such payment; and that if such proceeds shall, at the time of payment, exceed such remaining unpaid balance, then such excess shall be paid to the children of the parties hereto, or to husband's estate if said children be dead. 7. Transfers of property from husband to wife as described in Exhibit A, and from wife to husband or his designee as described in Exhibit B, also attached hereto and made a part hereof, shall be made within 15 days after entry of court orders confirming and embodying this stipulation and agreement as an order of court. Such transfer shall be effected by execution of appropriate instruments, whether deed, bill of sale, assignment or endorsement. All other documents required of either party shall also be executed and delivered within said 15 day period. All cash payments *244 to be made shall be made or commence on June 1, 1962, and monthly payments shall thereafter be made on the first day of each month thereafter until the total amount agreed has been paid. Prepayments in any amount may be made by husband; any such prepayments shall apply in inverse order, unless otherwise agreed upon by wife. 8. Upon the execution hereof, this said agreement shall constitute a full and final settlement between the parties, and shall be deemed a mutual release of all rights and claims that either party may have against the other as incident to or growing out of their said marriage. This agreement shall also divest and preclude either party from making any further demands of any nature whatsoever against the other party by virtue of their said marriage. In this connection, it is understood that both parties, by entering into this agreement, have waived and do hereby waive any right of succession or inheritance to the property of the other party. Parties further agree that this stipulation and agreement shall, following execution, be forthwith submitted to the court for entry of appropriate orders confirming and embodying this stipulation and agreement as an order *245 of court. 9. In addition to the principal sum, the husband shall pay unto the attorneys for the wife, as and for attorneys' fees, appraisal fees and fees for the wife's financial consultant the sum of $6,020.00 as set out in Exhibit C, attached hereto and made a part hereof, it being understood and agreed that such services were necessary for the analysis of husband's business, income potential, income producing properties and assets, and for the purpose of resolving disputes concerning and relating thereto. 10. Husband further agrees to institute proceedings to obtain a Jewish divorce from the wife, at his expense within 30 days from entry of court orders above referred to, and to provide as additional security to the wife for the payments rovided for in this agreement, pledges of those items described in Exhibit C, and on the terms and conditions therein specified. 11. It is understood and agreed by the parties that the terms and obligations assumed by the parties hereto shall not in any way be affected by the remarriage of either of the parties, changes in income, property ownership of the parties, nor by the marriage, death, incapacity or emancipation of the children of the *246 parties. 12. By subscribing their names to this instrument, both parties to confirm that said agreement has been explained fully to each of them by their respective attorneys, including the exhibits attached hereto and made a part hereof; that they and each of them fully understand the provisions herein, collectively and singly, and do hereby state that said agreement is fair and reasonable, and that the same has been entered into voluntarily and free of pressure or coercion in any manner or form. Done at Denver, Colorado this 7th day of May, A.D., 1962. /s/ Arthur B. Hayutin, Husband /s/ Sylvia C. Hayutin, Wife Stipulated, agreed and approved this 7th day of May, A.D., 1962. Harrison, Greene, Berstein and Caldwell By /s/ Nathaniel H. Harrison /s/ Earl J. Hower Earl J. Hower Attorneys for Sylvia C. Hayutin /s/ Irving J. Hayutin Irving J. Hayutin Attorney for Arthur B. Hayutin EXHIBIT A Lump Sum Settlement$198,000.00Method of Payment: 1. Transfer of Equity in property located at 6707 E. 5th Avenue, Denver, Colorado, subject to current taxes and first trust deed to Morrison & Morrison, with an unpaid balance after the May payment of $9,098.67. 2. Endorsement without recourse of note *247 dated September 12, 1959 from Benjamin L. Kohen to S and H Builders, Inc., in the face amount of $5,000.00. 3. Assignment of all of husband's right, title and interest in and to the furniture, appliances, silverware, photographic equipment, linens and household miscellany presently in wife's possession. 4. Assignment of husband's right, title and interest in and to the Rambler station wagon presently in wife's possession. The agreed value of the items specified in 1, 2 and 3 above is $35,000.00. Husband further agrees to pay the interest due each month on the encumbrance of $9,098.67 in accordance with the schedule attached hereto, and labeled "Schedule 1, Exhibit A." The first payment due shall be that designated No. 111 in the amount of $34.12. Payments shall be made by separate check payable to the wife and mortgagee jointly. The remaining balance of $163,000.00 shall be payable in monthly installments as follows: All dates are inclusive. 6/1/62- 5/1/63$700.006/1/63- 5/1/64750.006/1/64- 5/1/65800.006/1/65- 5/1/66850.006/1/66- 5/1/67900.006/1/67- 5/1/69 (2 years)950.006/1/69- 5/1/701,000.006/1/70- 5/1/73 (3 years)900.006/1/73- 5/1/74750.006/1/74-10/1/80500.00(6 years and 5 months)11/1/80 (final payment)300.00Income, *248 if any, from the Sylvia C. Hayutin Trust shall be credited against the scheduled payments in inverse order, with any excess after payment in full to to paid over to the husband. EXHIBIT B Transfer from wife to husband: 1. Deed to property located at 15950 Jupiter Lane, Arapahoe County, Denver 32, Colorado, subject only to taxes, the encumbrance of record to Guaranty Bank and Trust Co., and any encumbrances which have been placed thereon by the husband only. 2. Assignment and instructions to the trustee of the Sylvia C. Hayutin Trust to deliver any stock of S and H Builders, Inc. to the husband at such time as any said stock may be withdrawn or distributed in accordance with the terms of said trust; and in addition, instructions to pay to the husband any income accruing from said trust in accordance with the provisions governing income therefrom contained in Exhibit A to this stipulation and agreement. 3. Assignment of all of wife's right, title and interest in and to the furniture, appliances, silverware, guns, tools, linens, and household miscellany presently in husband's possession. EXHIBIT C Payment and Allocation of attorneys' fees, appraisal and financial consultant fees for *249 wife. Attorneys' fees for non-con-tested divorce$300.00Attorneys' fees re alimony,support, division and allocationof income producing property4,700.00Appraisal and financial con-sultant fees1,020.00Total$6,020.00Less credit payment 3/6/62500.00Balance due$5,520.00Security to be pledged by husband to insure compliance by husband with terms of stipulation and agreement. 1. 500 shares Northwest Water Corporation common stock, with agreement by wife to subordinate rights if such is required to be pledged for the purpose of obtaining financing for the water company. In the event husband should desire to sell such stock, wife agrees to release it upon payment to her of 10% of the cash sale proceeds, and to take as substitute security one-half of the security obtained by the husband. Any payments made in this fashion shall apply in inverse order to the installment payments set out in Exhibit A. 2. 12 shares S and H Builders, Inc. common stock. 3. 1,800 shares Country Club Land Co. common stock, subject to same provisions governing subordination, sale and release as for Northwest Water Corporation stock, except relating only to Country Club Land Co. Subsequent to the entry of the divorce *250 decree in October of 1961, Sylvia began employment and became self-sustaining. At the time the agreement was executed, she was living in Detroit with her parents, who supported her. Later she went to work for the Denver Welfare Department at a salary of $350 to $400 per month (plus a mileage allowance.) The negotiations between Arthur and Sylvia, leading up to the May 1962 agreement, reflect an intent by Arthur that he provide to some extent for the support needs of Sylvia and the children. Prior to the execution of their formal agreement, Arthur and Sylvia, through their attorneys, negotiated the amount of temporary alimony that would be paid. They agreed that Arthur would pay Sylvia $500 a month for her support. It was further agreed that Sylvia would support the children from these funds, although no specific portion of the $500 monthly payment was designated for that purpose. Pursuant to this preliminary agreement, Arthur made several $500 payments to Sylvia during 1962. At the time of the divorce, Arthur had indicated to Sylvia that he was worth at least a quarter of a million dollars. However, the book value of Arthur's property and business interests was at that time less *251 than $200,000, of which a considerable portion reflected rights to future income. At the time of the divorce, the value of Arthur's assets was affected by the facts that (1) the Government had proposed certain tax deficiencies which were then in dispute, and (2) Arthur's assets were largely rights to future income. At the time of the divorce, Sylvia had no legal interest in Arthur's business assets (including stockholdings and partnership interests). Sylvia had only (1) her half interest in two residences (one on East Fifth Avenue and one on Jupiter Lane), (2) her interest in miscellaneous items of not too extensive value, (3) her interest as beneficiary of the Sylvia Hayutin Trust, and (4) her interest in a Rambler automobile. 7At the time of the "Stipulation and Agreement," Sylvia conveyed to Arthur all of the property she owned, with the exception of a one-half interest in the East Fifth Avenue residence and the interest she had in the Rambler automobile (which she had received from Arthur when the couple was attempting a reconciliation). *252 The Jupiter Lane property was worth about $40,000 at the time of the divorce settlement. There was an encumbrance on the property of about $25,000. The fair market value of the East Fifth Avenue property was approximately $26,000, with an encumberance thereon of approximately $9,700. At the time of the divorce, the book value of Sylvia's trust, comprised essentially of shares of stock in Builders8 (but not, as had been supposed, rights to future income from land contracts) was thought by Arthur to be $19,449. Sylvia possessed miscellaneous items owned by Arthur with a value of approximately $500. Her interest in various household items held by Arthur had a nominal value. Arthur believed that the Sylvia Hayutin trust had certain substantial rights to future income. In the January 6, 1953 agreement which conveyed undivided portions of the Barnes and Shaw tract, it is stated that the trust for Sylvia was to receive an undivided one-ninth interest in the property. The same agreement provided that the trust for Sylvia would be liable for one-ninth of any *253 indebtedness owing to Honeymoon. (One-ninth of the $144,000 indebtedness is $16,000.) The Barnes and Shaw tract was conveyed to Builders in three separate transactions for a gross contract price of $458,500 (of which one-ninth is approximately $51,000), and the contracts and the addenda thereto provided for interest payments in varying amounts. In 1961, payments on contracts 1, 2, and 4 relating to the Barnes and Shaw tract totaled approximately $121,000 and amounts paid to Honeymoon totaled approximately $62,000 for a net gain of $59,000.(One-ninth of this gain is approximately $6,500.) At the end of 1961, approximately $338,000 remained due on the contracts, and an obligation of approximately $82,000 remained due to Honeymoon. (One-ninth of the net figure of $256,000 is approximately $28,500.) In June of 1962, just one month after the divorce settlement agreement was filed, Builders entered into a contract to sell the remainder of its real estate for $1,000,000. Arthur believed that the trust for Sylvia was legally entitled to the benefit of any profits (after payment of expenses, taxes, and other debts) inuring as a consequence of the sale of all the remaining land, together *254 with other income from the use of funds, to the extent of one-ninth or to the extent of the Builders' shares held by the trust. Pursuant to the "Stipulation and Agreement," Arthur made seven payments of $700 to Sylvia in 1962, and he transferred to her in that year the property listed in Exhibit A of the agreement (such property stated in the agreement to have a total value of $35,000). 9Arthur believed, with reference to the transfers of the property and rights to income listed in Exhibits A and B of the "Stipulation and Agreement" (exclusive of cash payments), that the value of the items owned by Sylvia which she transferred to him exceeded the value of the items which he owned and which he transferred to her. A portion of the cash installment payments made by Arthur, therefore, was in payment for this difference in value. Earlier in the year 1962, as noted above, Arthur made the payment of temporary alimony to Sylvia. Pursuant to the "Stipulation *255 and Agreement," Arthur continued to make payments to Sylvia, without reduction, after her remarriage. On his 1962 Federal income tax return, Arthur deducted as alimony payments the sum of $19,800. 10 Sylvia, on her 1962 Federal income tax return, reported as alimony only the temporary alimony she had received prior to the agreement. In his statutory notice to Sylvia, dated June 22, 1967, in connection with her taxable year 1962, the respondent determined -- that you received taxable alimony of $22,541.32 during 1962 of which you reported only the temporary alimony of $2,500. Accordingly your taxable income is increased $20,041.32. The computation is as follows: Payments under agreement of 6-7-62 [sic]: Agreed net property value$ 35,000.00Interest residential mortgage2,413.20Installment payments163,000.00Total$200,413.20Receipts in 1962: Net property35,000.00Interest234.537 payments of $7004,900.00Total receipts$ 40,134.53Limited to 10% of $200,413.2020,041.32Temporary alimony2,500.00Total alimony$ 22,541.32In his statutory notice to Arthur, dated June 22, 1967, in connection with his taxable year 1962, the *256 respondent determined: The deduction of $19,800 for amounts paid to Sylvia C. Hayutin under agreement of June 1, 1962, [sic] is disallowed because you have not established that this constitutes deductible alimony payments. 11 Opinion The Land Transfers The first question presented for our decision is whether the five land transfers to Builders were contributions to capital, as the respondent claims, or bona fide sales, as the petitioners claim. The resolution of this question is necessary for a determination of what Builders' basis was in the land it acquired and for a determination of whether *257 Builders is entitled to interest deductions for amounts paid pursuant to the land contracts. Also involved is the question of whether amounts received by Irving, Arthur, and Shaw are dividends, as opposed to return of capital and interest. In these cases there are six transfers involved. 12 The first was the transfer of the Barnes and Shaw tract by Honeymoon to the three principal individual petitioners, Irving, Arthur, and Shaw. The next three transfers involved subsections of the same tract transferred by the individual petitioners to Builders. The fifth transfer concerns the acquisition of the Wyse tract by Irving, Arthur, and Shaw, and the transfer of that tract to Builders. The sixth and final transfer concerns the individuals' acquisition of the Keller tract, and the transfer of that tract to Builders. The respondent urges that in each of the above instances, the transfer of the land was motivated by tax saving considerations, directed at obtaining for Builders a stepped-up basis for the land. As a result, Builders would have a higher cost-basis for resale of the property as well as deductions for any interest payments that were made, and the individuals would be able to *258 withdraw corporate profits at capital gains rates at some future date. The respondent maintains that the transfers to Builders were contributions to capital under section 113(a)(8) of the 1939 Code, relating to the transfers prior to June 22, 1954, and section 362(a) of the 1954 Code, relating to the transfers on or after June 22, 1954. These sections provide that the basis of property acquired by a corporation from its shareholders as a contribution to capital shall be the same basis that the property had in the hands of the shareholders. 13*259 The petitioners argue that the transactions were sales. The petitioners also seem to suggest that there cannot have been a contribution to capital in this case unless it can be shown that the transactions in question fell within the scope of *260 section 112(b)(5) of the 1939 Code or section 351 of the 1954 Code. 14*261 These sections provide that in certain situations no gain or loss will be recognized where property is transferred to a corporation solely in exchange for its stock or securities. We do not agree that it is necessary for the transactions in question to be characterized as transfers within the purview of sections 112(b)(5) (1939 Code) or section 351 (1954 Code). Sections 113(a)(8) (1939 Code) and 362(a) (1954 Code) clearly state they apply not only to situations encompassed by sections 112(b)(5) and 351, but also to transactions outside the scope of these sections -- where "property was acquired * * * by a corporation * * * as a contribution to capital." Compare 1939 Code sections 113(a)(8)(A) and 113(a)(8)(B), and compare 1954 Code sections 362(a)(1) and 362(a)(2). We believe it is clear from a reading of the pertinent statutory language that we need not determine whether sections 112(b)(5) and 351 have application on the facts before us. The carryover of basis provisions are not dependent upon such application. *262 Accordingly, our discussion herein will be limited to a consideration of whether the transfers of land to Builders constituted sales or contributions to capital. This is essentially a factual question, and the nature of the transactions at issue is to be determined from a consideration of all of the surrounding circumstances. Burr Oaks Corporation, 43 T.C. 635 (1965), affirmed 365 F. 2d 24 (C.A. 7, 1966); Rowan v. United States, 219 F. 2d 51 (C.A. 5, 1955); Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), affirmed 254 F. 2d 51 (C.A. 7, 1958). The above-cited cases list factors generally considered relevant in resolving the question of whether there is a sale or a contribution to capital. Because we are dealing here with a factual question and our decision herein is necessarily based on the circumstances established by the record presently before us, we do not think it would be fruitful to engage in a prolonged discussion of the many cases cited on brief by both the respondent and the petitioners. Each case of this nature must be resolved by an examination of its unique characteristics, and the result reached in any one of them will not automatically be indicative of the result to *263 be reached herein. We will attempt to point out those elements in the cases at bar which lead us to conclude as we do. The respondent contends that there was no sale by the individuals and the Trusts of the Barnes and Shaw land to Builders. He claims that the transfer constituted a contribution to capital and that Builders took the transferors' basis in that property. That 168 acre tract of land was acquired in early 1952 from Barnes and Shaw for a contract price of $30,000 by Honeymoon, a corporation owned equally by Irving, Arthur, and Shaw. Because efforts by Honeymoon to dispose of the land were unfruitful, this land was transferred in January, 1953, one year later, from Honeymoon to its stockholders for a contract price of $144,000. At that time Arthur and Irving created the trusts for the benefit of their respective wives and children, and they intended to place part of the Barnes and Shaw land in each of the trusts. (Questions relating to the trusts are discussed below.) In March, 1953, Builders was organized with paid-in capital of $108. The Barnes and Shaw land was then divided into three portions. These portions were transferred to Builders in three separate transactions *264 on April 4, 1953, June 17, 1954, and February 14, 1955, for contract prices of $160,000, $172,500, and $126,000, respectively. Thus land acquired in 1952 for a contract price of $30,000 was transferred to Builders in 1953, 1954, and 1955 for a total contract price of $458,500. The respondent also argues that the individuals transferred other land to Builders as contributions to capital, rather than as part of a sale. This land -- the Wyse land (112 acres) and the Keller land (296 acres) -- was acquired by the individuals during the same period for contract prices of $60,000 and $150,000, respectively. The Wyse tract was transferred to Builders on February 18, 1955, for a contract price of $225,000 and the Keller tract was transferred to Builders in September of 1954, for a contract price of $595,000. The respondent regards all of these transfers of land as manipulations by Irving, Arthur, and Shaw to obtain a higher cost basis for the resale of the property by Builders and to obtain deductions for interest payments made by Builders. The respondent contends that, with regard to all of the land transactions involved herein, the petitioners ascribed a much greater value to the parcels *265 of land than they actually had and that the contract prices were inflated far beyond fair market value. The respondent points to this discrepancy as a factor which serves to establish a lack of good faith and an intent to make contributions to capital. See Burr Oaks Corporation, supra.A substantial part of the respondent's case is based upon this contention that the various parcels of land were transferred for prices that were in excess of the parcels' fair market values at the times of the transfers. We have carefully examined the evidence presented by the parties, and we are unable to conclude that the prices set by the petitioners were based upon a good faith appraisal of the value of the land. The testimony offered on behalf of the respondent with regard to valuation we considered to be more credible and realistic, especially in view of the evidence in the record dealing with the difficulty in obtaining suitable water for the subject properties. We believe that at the time of the transfers at issue, the petitioners' contract prices reflected a considerable overvaluation. We are not unaware that it was not unusual in the Denver area during the years in issue for land to be *266 purchased for one price and sold shortly thereafter for a higher price, that in some instances the petitioners were asking third parties to pay fairly high prices for the land, that the petitioners had optimistic expectations concerning the availability of water and annexation to the Town of Westminster, and that they hoped that the subdivision venture would be a most successful one. We nevertheless do not regard these factors as establishing that the contract prices set by the petitioners were based in good faith upon an informed understanding of the land market in the Denver area. Cf. Charles E. Curry, 43 T.C. 667, 693-694 (1965). Furthermore, we cannot conclude that the petitioners' high valuations are justified by the fact that these sales were not cash sales but sales with terms, extended over a period of years. Obviously, in such situations, it is not unusual to find a purchaser paying a higher price than he would have paid had the acquisition been simply for cash. Kingsford Co., 41 T.C. 646, 659 (1964); Charles E. Curry, supra at 694.However, in these cases, we do not find that the excessive valuations can be explained by the fact that the sales were with terms. After a *267 careful scrutiny of the entire record, we hold that the valuations made by the respondent are much more in line with an objective determination of the fair market value of each parcel at the time of its transfer. Our findings of fact reflect this conclusion. Transfer of Barnes and Shaw Land from Honeymoon to Individuals The Barnes and Shaw land, was acquired by Honeymoon at a cost of $30,000 and was later transferred to the individuals for a contract price of $144,000 at a time when the land was worth only $42,000. We believe this transfer to the individuals was designed by them specifically to give them a high basis in the land. To the extent the purchase price exceeded the property's fair market value, the individuals were paying for something other than the acquisition of the land. Under these circumstances, the individuals acquired a basis in the property equal to its fair market value at the time of the transfer. This is because the property was acquired by the individuals "in a transaction not at arm's length for a sum manifestly in excess of its fair market value." Mountain Wholesale Co., 17 T.C. 870, 874-875 (1951); New Hampshire Fire Insurance Co., 2 T.C. 708, 723-724 (1943), *268 affirmed on another point 146 F. 2d 697 (C.A. 1, 1945); Donald McDonald, Jr., 28 B.T.A. 64, 66-67 (1933). 15 We are unable to find adequate indicia of arm's length negotiations.The evidence indicates that the contrary is true. The contract between Honeymoon and the individuals was modified twice, and the terms of payment and interest were made less burdensome on the individuals. In view of the fact that Honeymoon was controlled by the individuals, we can conclude only that the sale of the Barnes and Shaw land was arranged by the individuals at a price and on terms that coincided with their preferences. *269 We therefore hold that the individuals' basis in the Barnes and Shaw land was $42,000, its fair market value at the time of the transfer. Transfer of the First Portion of the Barnes and Shaw Land On April 4, 1953, Builders and the individuals entered into a contract for the sale of 54 acres of the Barnes and Shaw tract for a contract price of $160,000. Builders had been organized in March of 1953 with a paid-in capital of $108, representing 108 shares of common stock to be issued. From its creation, and throughout the years before the Court, Builders was under the complete dominion and control of Irving, Arthur, and Shaw, who were its organizers, promoters, and stockholders. We agree with the respondent that this transfer of the first portion of the Barnes and Shaw tract did not amount to a sale but instead was a contribution by the individuals to the capital of Builders. Various factors lead us to this conclusion. First, the evidence does not show that any further capital was invested in Builders above the $108 advanced for its capital stock. This exceptionally thin capitalization is a factor which must weigh against the petitioners. Burr Oaks Corporation, supra; Foresun, Inc., 41 T.C. 706 (1964), *270 modified 348 F. 2d 1006 (C.A. 6, 1965). Further, the sale contract in question was modified five times apparently in an attempt by the individuals to bring the payment schedule more in line with the earnings of the enterprise. In fact, it is stated in the June 17, 1954 amendment that if the payments were made as scheduled Builders would be caused to operate at a loss. (Despite this fact, Builders committed itself to further land "purchases" from the individuals.) This rescheduling of payments indicates that the individuals were looking to the prospecity of their controlled corporation and were attempting to arrange their dealings to facilitate their participation in the success of the new venture. This is a factor suggesting that the true character of the land transfer by the individuals was equity investment rather than debt. Burr Oaks Corporation, supra; Aqualane Shores, Inc., 30 T.C. 519 (1958), affirmed 269 F. 2d 116 (C.A. 5, 1959). In addition, it appears from the record that the deed of trust relating to the first Barnes and Shaw transfer was subject to releases, at the time specific lots were sold, to the purchasers of homes. While it may be true that such sales enhanced *271 the value of the remaining land, we nevertheless are of the view that such subordination of indebtedness, while not controlling by itself, is a factor which weighs against the petitioners. See Foresun, Inc., supra, and P.M. Finance Corp. v. Commissioner, 302 F. 2d 786 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court. It is also significant that the fair market value of this 54 acre parcel was only $13,500 at the time of the transfer, as compared to the contract price of $160,000. It appears to us from the record that the value of the land in question for residential subdivision was seriously impaired by the absence of water, a troublesome problem that confronted Westminster during 1952 and 1953. While annexation to Westminster would bring water services to the land in issue, such annexation could not have been considered a certainty or even indeed a probability at the time of the transfer because of the water problems in the area and because of the various legal procedures which had to be followed. See the then applicable sections 139-11-1 et seq. of the Colorado Revised Statutes (1953), and see Tanner v. City of Boulder, 377 P. 2d 945 (Colo. 1962), and City and County of Denver v. Miller, 379 P. 2d 169 (Colo. 1963), *272 discussing the protesting of land annexations. We agree with the respondent that the activities of the petitioners, indicating that anticipated annexation and resultant water services, were purely speculative, and that that parcel in question cannot properly be valued with the assumption at that time that water would be available. Accordingly we hold that the transfer of this first portion of the Barnes and Shaw property was a contribution by the individuals to the capital of Builders, and Builders thereby acquired the individuals' basis in that property. Transfer of the Second Portion of the Barnes and Shaw Land In June of 1954, Irving, Arthur, and Shaw transferred 59 additional acres of the Barnes and Shaw tract for a contract price of $172,500. For reasons similar to those discussed in connection with the first transfer of the Barnes and Shaw land, we hold that this transfer of the second portion did not amount to a sale but that it, too, was a contribution by the individuals to the capital of Builders. At the date of the transfer, the fair market value of this parcel was $14,000. No water was available because annexation to Westminster had not occurred. (Northwest was not granted *273 its certificate of convenience and necessity until the following year). Further, the sale contract was amended much as was the contract relating to the first transfer. Payments under the contract were irregular. And, under the contract, there was no provision made for late payments or for default. (See R.C. Owen Co. v. Commissioner, 351 F. 2d 410 (C.A. 6, 1965), affirming a Memorandum Opinion of this Court, certiorari denied, 383 U.S. 967 (1960)). Therefore, for the reasons given in our discussion of the first Barnes and Shaw transfer to Builders, we hold, in connection with this transfer as well, that the transaction amounted to a contribution to capital and that Builders acquired the individuals' basis in this second parcel of land. Transfer of the Third Portion of the Barnes and Shaw Land On or about February 14, 1955, Irving, Arthur, and Shaw transferred the last remaining acreage of the Barnes and Shaw land to Builders for a contract price of $126,000. At that time, water was not available on this land because, as was the case with the previous parcels, annexation to Westminster had not occurred nor had Northwest been authorized to provide water by the Public Utilities Commission. *274 The fair market value of this third portion in February of 1955 was $29,500. Again, we conclude that the transfer of this parcel by the individuals was a contribution to the capital of Builders. Our conclusion is supported, inter alia, by (1) the disparity between the contract price and the market value of the land, (2) the failure of the individuals to receive as security a deed of trust, giving priority to subsequent liens (cf. Henderson v. United States, 245 F. Supp. 782 (M.D. Ala. 1965)), and (3) the failure of Builders to keep up with scheduled payments, even after the contract terms were modified (see Sayles Finishing Plants, Inc. v. United States, 399 F. 2d 214 (Ct. Cl. 1968)). As in the case of the previous transactions, the individuals and their controlled corporation arranged the contracts to suit their preferences and to permit participation in the subdivision venture. The true nature of the transaction was an equity investment, and we hold that Builders acquired the individuals' basis in this third parcel of Barnes and Shaw land. Transfers of the Wyse Tract and the Keller Tract The individuals transferred the Wyse tract to Builders in February of 1955 for a contract *275 price of $225,000 at a time when its fair market value was $67,000, and they transferred the Keller tract to Builders (through a nominee) in September of 1954 for a contract price of $595,000 at a time when its fair market value was $148,000. Based on the evidence as discussed in our findings, we regard these transactions as contributions to Builders' capital by the three principal petitioners, Iriving, Arthur, and Shaw. In particular we come to this conclusion because of the disparity between the contract prices and the fair market value of the parcels at the time of the transfers, because of the absence of security, and because of the absence of default provisions and the failure to take any action upon default. In addition to the authorities cited above, see Gooding Amusement Co., 23 T.C. 408 (1954), affirmed 236 F. 2d 159 (C.A. 6, 1956), certiorari denied, 352 U.S. 1031 (1957); Jewell Ridge Coal Corporation v. Commissioner, 318 F.2d 695 (C.A. 4, 1963), affirming a Memorandum Opinion of this Court; and Motel Company v. Commissioner, 340 F. 2d 445 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court. As in the previous instances, Builders acquired the transferors' bases *276 in the properties in question. In accordance with the preceding discussion, we conclude that -- (1) the five land transfers to Builders were contributions to capital; (2) the aggregate basis to Builders in the Barnes and Shaw tract is $42,000, the fair market value of that tract when it was received by the individuals; (3) the basis to Builders in the Wyse tract is $60,000, and the basis to Builders in the Keller tract is $150,000, the transferors' bases in the two tracts; (4) the interest deductions claimed by Builders relating to the land contracts are not allowable; and (5) the receipts of the individuals relating to the land contracts are dividends. The TrustsThe next issue for our consideration involves the question of whether income from the trusts involved in this case is taxable to the grantors, Arthur and Irving. The brothers set up these trusts for the benefit of their respective wives and children. Arthur was appointed trustee of Irving's trusts, and Irving was appointed trustee of Arthur's. The petitioners claim to be surprised by the respondent's assertion that income from the trusts is taxable to the grantors. They believe that this assertion conflicts with the determination *277 made by the respondent in the statutory notices. In the notices for the years at issue, the respondent determined that the amounts paid (including interest) on the notes relating to the land purchases were not in fact payments to the trusts but were "dividends" to Irving and Arthur. On brief, the respondent no longer asserts that the amounts in question were dividends but claims that they constitute income to the Hayutin brothers either because the land was never transferred to the trusts or because the trusts' income was taxable to the grantors under the doctrine of Helvering v. Clifford, 309 U.S. 331 (1940), and section 671 et seq. of the 1954 Code. Under either approach (the position taken in the statutory notice or the position taken on brief), Irving and Arthur would be taxable on income reported by the trusts and the trusts, of course, would be disregarded in this respect. As a result, if the petitioners are surprised at all, it is only by the specific argument being made to support the contention of taxability made in the statutory notices. We believe that the statutory notices adequately advised the petitioners that the respondent considered the income in question to be *278 taxable. If the respondent in fact changed the theory under which he determined such taxability, his action in no way put the petitioners at a disadvantage. "The reasons given in the notice of deficiency do not constitute the issues and the presumption of correctness of the respondent's determination is not destroyed by the reason given, even if it be unsound or badly expressed." Estate of Peter Finder, 37 T.C. 411, 423 (1961), appeal dismissed (C.A. 7, 1962). The respondent initially contends that no portion of the Barnes and Shaw tract and no stock in Builders16 was ever placed in trust by the grantors. With reference to the land, he argues that, in Colorado, "there must be an irrevocable delivery or possession of a deed in order to effectuate a transfer of property in trust." The petitioners do not claim that any deeds were delivered but insist that the agreement and declaration of trust executed on January 6, 1953, by Irving and Arthur operated between the parties as a "present conveyance" of the land. 17 In addition, the petitioners argue that "the question is not the validity of the transfers * * * under Colorado law, but the effect of those transfers actually made and recognized *279 for federal tax purposes." Addressing ourselves first to the petitioner's last point, we think it is quite clear from the authorities that the question of whether property is transferred into trust, making the trustees legal owners thereof, is resolved by an examination of local law; the application of the Federal tax law is determined only after the property rights under the state law are ascertained. Morgan v. Commissioner, 309 U.S. 78, 80 (1940); Commissioner v. Siegel, 250 F. 2d 339, 344 (C.A. 9, 1957), affirming 26 T.C. 743 (1956); Mertens, Laws of Federal Income Taxation *280 (1970 Rev. Vol. 10), secs. 61.04 and 61.05. The general rule in this country is that, in order for property to be transferred into trust, title in the trust property must vest in the trustee, and that "[e]ven though the owner of property manifests an intention to make a present transfer of it to another as trustee, the transfer may be ineffective for lack of the formalities necessary to vest the title in the transferee." 1 Scott, Trusts (3d ed., 1967), section 32.2. See also 89 C.J.S., section 63. We shall apply this rule in the instant case (see Bank of America Nat. Trust & Savings Ass'n v. Scully, 92 F. 2d 97 (C.A. 10, 1937), reversing 18 F. Supp. 182 (D. Colo. 1937)); irrevocable delivery of a deed appears to be required in Colorado. Richard v. James, 292 P. 2d 977 (Colo. 1956). The petitioners have cited no authority in support of their view that the January 1953 instrument operated between the parties as a present conveyance of the land. The only Colorado authority we have found remotely touching upon this point is Colorado Revised Statutes (1953), section 118-1-13, which provides a "short form" for deeds executed in that state. The January 1953 instrument does not meet the *281 requirements enumerated therein, and we hold that it did not act to convey the Barnes and Shaw land to the trusts. Cf. Clark v. Bouler's Estate, 163 P. 965 (Colo. 1917). In view of the fact that no deed was delivered to the trustees in the instant case, and in view of the fact that Irving and Arthur expressly stated that they and Shaw were retaining title to the land in their January 1953 agreement, we must agree with the respondent that the Barnes and Shaw land was never transferred into trust. The income from the notes relating to the land purchases (including interest) is therefore properly taxed to the petitioners. Cf. W. H. Easley, 8 T.C. 153 (1947). Because of the conclusions reached herein, we do not discuss the respondent's alternative contentions concerning the applicability of Helvering v. Clifford, supra, and section 671 et seq. Northwest: Oridinary Income v. Capital Contributions This issue involves the question of whether the amounts which Northwest received from contractors ostensibly for shares of stock in Northwest constituted ordinary income from the sale of water taps under section 61 of the 1954 Code, 18 as the respondent contends or whether these amounts were *282 capital contributions, as the petitioners contend. 19The respondent points out that, as a practical reality, building contractors were required to "purchase Northwest stock" in order to acquire water taps and obtain needed water services and that, under a simultaneous contract, the contractors agreed to resell the same stock back to the promoters of the water company at a nominal price. In net effect, the respondent believes, the contractors were paying *283 amounts to Northwest in order for the water company to render water service. Accordingly, the respondent argues that this case is controlled by Teleservice Co. of Wyoming Valley, 27 T.C. 722 (1957), affd. 254 F.2d 105 (C.A. 3, 1958), certiorari denied 357 U.S. 919 (1958), and that a result similar to the one reached therein should obtain in the instant case. The petitioners' position is that the payments by the contractors were contributions to the capital of Northwest by nonshareholders 20 and that, as such, the payments were not income to Northwest under section 118 of the 1954 Code. 21*284 Basically, the petitioners' argument is that the Teleservice case has no application to a regulated public utility like Northwest and that the status of the payments in question as contributions to capital is established by Revenue Ruling 58-555, 1958-2, C.B. 25; Fairfax County Water Authority v. United States, 223 F. Supp. 620 (E.D. Va., 1963), and Commissioner v. Offutt, 336 F. 2d 483 (C.A. 4, 1964), affirming George W. Offutt, III, T.C. Memo. 1963-126. In Teleservice Co. of Wyoming Valley, supra, the taxpayer corporation promoted and constructed a community television antenna system. The construction of the system was financed essentially through the contributions of prospective customers of the cable service. While a contribution was a prerequisite to the use of the system, such contribution alone did not entitle the customer to receive television signals.The customer had to make monthly payments in order to receive the signals. A customer who had made the required contribution could not transfer his eligibility to receive television transmissions, but he remained eligible for the service if he moved to another part of the area in which the company operated. The new resident of the customer's old home was required to make a contribution if he wished to use the system. We held in Teleservice that the contributions were not contributions to capital but were part of the payment for services rendered and were therefore includable in the taxpayer's gross income. We stated (at pages 728-730); The Commissioner contends *285 that the contributions are includible in the petitioner's gross income under section 22(a) of the Internal Revenue Code of 1939. His position is that section 22(a) taxes all gains constitutionally taxable except those specifically exempted, and he cites as authority Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955), and Gen. Investors Co. v. Commissioner, 348 U.S. 434 (1955). He contends that such contributions are constitutionally taxable and that they are not specifically exempted from taxation since they are neither gifts nor contributions to capital. We agree with the Commissioner. * * * * * * We are unable, in substance, to distinguish between the facts of the Detroit Edison case [319 U.S. 98 (1943)] and the case at bar. * * * [W]e feel bound to make an ultimate finding consistent with that of the Detroit Edison case, and what in our view appears to be a gradually but persistently broadening concept of taxable income as exemplified by the Glenshaw Glass Co. and Gen. Investors Co. cases, supra. * * * Paraphrasing the dissent in Liberty Light & Power Co., supra, [4 B.T.A. 155 (1926)] there was nothing altruistic in the motive which prompted the petitioner's prospective *286 customers to finance the television antenna system; they wanted television service and they were willing to pay for it. If the system had already been constructed and available they would have paid a larger monthly charge and this unquestionably would have been within the petitioner's gross income.Since the facilities were not available and due to the risk involved, the only way that the petitioner could be induced to give service was by the receipt of something in addition to the monthly charge, namely, contributions to enable it to construct extensions of the antenna system. Contributions received in this manner are within the gross income of the petitioner. * * * We hold that the contributions in this case are not gifts or contributions to the petitioner's capital, but are the price of services rendered or to be rendered and accordingly they are includible in the petitioner's gross income under section 22(a). The petitioners, in arguing that the Teleservice case has no application on the facts presently before us, have cited Revenue Ruling 58-555, supra, to support their position. In that ruling, the Revenue Service distinguished the Teleservice case from a line of cases beginning *287 with Liberty Light & Power Company, 4 B.T.A. 155 (1926). In the Liberty Light line of cases, the courts held, with the Revenue Service's subsequent acquiescence, that contributions by customers or prospective customers to public utilities in aid of construction of facilities to provide service to the contributor, at rates subject to regulation by a public regulatory body, did not constitute taxable income to the recipient utility company. The revenue ruling lists various characteristics which the Service feels distinguishes these cases from the Teleservice decision, and the ruling states that the Service will continue to litigate cases which are factually similar to Teleservice. The petitioners herein believe that the instant case is more factually similar to the Liberty Light line of cases and that Northwest should therefore not be regarded as having received taxable income. Even if the petitioners are correct, however, that this case is more a Liberty Light type of case than a Teleservice type of case, a point which the respondent disputes, we do not agree that it necessarily follows that the amounts Northwest received would not be taxable to it. Our Teleservice opinion does not *288 contain the distinction between public utility cases and non-public utility cases that is contained in Revenue Ruling 58-555. To the contrary, we observed in Teleservice (at page 729) that the Liberty Light line of cases was inconsistent with more recent decisions of the Supreme Court. See Detroit Edison v. Commissioner, 319 U.S. 98 (1943). Cf. Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955), 22 and General American Inv. Co. v. Commissioner, 348 U.S. 434 (1955). On the appeal of Teleservice, the Court of Appeals for the Third Circuit in affirming us, stated: As to [the Liberty Light line of cases] * * * we can only say we are not in accord. We agree with the Tax Court that these cases cannot be distinguished factually. We regard the case at bar as sufficiently similar to the Teleservice case to warrant a similar result. 23 In that case we regarded as significant (1) the fact that cable service could not be obtained *289 unless the "contributions" were made by the recipient of the service 24 and (2) the fact that the customers were not altruistically motivated to finance the cable system but made the payments solely to obtain the desired service. Much the same situation exists in the instant case. The building contractors were not able to acquire the needed water service connections unless they went through the motions of making a stock purchase. Obviously, no stock purchase took place since the contractors simultaneously agreed to resell their stock to Investment at a nominal price. Such retransfers subsequently took place. What the contractors did in fact was to make payments to Northwest in return for the water connections. They were not altruistically motivated to assist Northwest financially. The only reason they made the payments was to assure the acquisition of the desired water service. The payments were part of the price of the service. In addition, *290 an examination of Northwest's income tax returns indicated that there are no assets acquired by the corporation which are carried on its books at a zero basis. This fact tends to establish the lack of an intent to treat the "stock purchases" as capital contributions since assets acquired with nonstockholder money contributions are required to have a zero basis. Section 362(c)(2) of the 1954 Code. See also Revenue Ruling 58-555, supra, and Revenue Ruling 66-353, 1966-2 C.B. 111 Cf. Denver & Rio Grande Western Railroad Co., 32 T.C. 43, 45-46 (1959), affd. on other issues 279 F. 2d 368 (C.A. 10, 1960). Although the Colorado Public Utilities Commission permitted Northwest to collect the expense it incurred in providing water main extensions from its customers (in excess of the free footage which Northwest was required to provide), there is no evidence to suggest (and the petitioners do not contend) that the payments it received were requested or utilized for constructing these extensions. As can be seen from our findings, Northwest used the funds for various purposes such as the acquisition of storage tanks or pumps, and no specific allocation was made of the funds. Clearly then, *291 the payments in question cannot be regarded as contributions in aid of construction. We are able to conclude from the record only that the funds paid to Northwest were necessary for obtaining water service. In these circumstances, we hold that Northwest could not treat, as capital contributions, payments from the direct beneficiaries of the services which Northwest rendered. See the Third Circuit's opinion in the Teleservice case, 254 F. 2d at 112-113, and see the Committee Reports accompanying sections 118 and 362 of the 1954 Code. 25 See also section 1.118-1, Income Tax Regs. The payments in question were for services rendered or to be rendered by Northwest and therefore are includable in Northwest's income. We uphold the respondent's determination. The petitioners cite Fairfax County Water Authority v. United States, supra, a district court opinion, to support their position. In Fairfax, the district court held that service and frontage charges collected from customers by a regulated water utility constituted contributions to the capital of the water company. The *292 court concluded that the Fairfax case was "sufficiently different" from the Teleservice case to warrant a different result. In our view, Fairfax is not distinguishable from Teleservice in the follow-lowing significant respects. The payments which the customers of the Fairfax County Water Authority made to the company were directed at obtaining water service and were not motivated by a desire to finance the company. Furthermore, it appears that the water company would not have provided the service unless the payments were made. For these reasons, we do not regard Fairfax as sufficiently authoritative to support the argument advanced by the petitioners herein. We adhere to the views expressed in Teleservice, which we regard as controlling here on this issue. The petitioners further rely on Commissioner v. Offutt, supra, a Fourth Circuit opinion, affirming a Memorandum Opinion of this Court. While Offutt does not squarely deal with the issues that are presently before us, and does not discuss our holding in the Teleservice case, some of the language employed in the Offutt opinions can be construed to suggest a result in the instant case which would be inconsistent with the conclusions *293 we feel are dictated by our opinion in Teleservice. We adhere to our view, based on the Teleservice case, that Northwest received compensation from its customers.The evidence before us strongly indicates that sales of water taps were intended and were carefully arranged, and we do not believe, even in view of Offutt, that a contrary result should obtain under these circumstances. Two additional points merit our consideration in connection with this issue. On brief, the petitioners argue that, regardless of what we might hold regarding the issue discussed above, Winston must be considered "a permanent and bona fide stockholder" of Northwest since Winston had no agreement to return the stock. The petitioners insist that Winston invested in Northwest to strengthen Winston's investment in the land it was purchasing. As a result the petitioners believe that Northwest received no income from Winston from the sale of water taps. The respondent contends that this argument is refuted by the fact that Winston did not object to the respondent's treatment of the amount paid for the stock as part of the cost of goods sold. However, we do not regard this fact as necessarily controlling. We agree *294 with the petitioners that the amounts paid by Winston to Northwest were not paid to purchase water taps but actually amounted to the purchase of stock. We feel that this conclusion is warranted in view of the facts that -- (1) the stock which Winston received was voting stock and, as a result of the transaction, Shaw's ownership interest in Northwest, direct and indirect, increased from 33 1/3 percent to approximately 40 percent; (2) there was no agreement to return the stock, and the investment was permanent; and (3) contrary to the situation that existed with most other stock purchasers, Winston's stock purchase had no relationship to the number of lots Winston purchased but instead took into account considerations of Northwest's needs for capital expansion. In light of the foregoing, we cannot uphold the respondent's determination that Winston's payments to Northwest were for water services, and decide this issue for petitioner. The other point which we now consider concerns the question of whether Northwest had additional income in the amount of $46,085.22 in its taxable year ending December 31, 1961. This issue was raised in amended pleading filed by the respondent subsequent *295 to the trial of this case. 26The respondent observes that Russell Daughenbaugh installed equipment including water mains, laterals, and hydrants which, in 1961, he turned over to Northwest at no cost to the water company. The respondent contends that this action by Daughenbaugh resulted in the receipt of income by Northwest. He argues that these items were transferred to the water company in payment for water taps. The petitioners characterize the transfer as a sale. They say "it was agreed that [Northwest] would purchase such items from Daughenbaugh, and [Northwest] set up this item as a payable to Daughenbaugh." If there in fact was a sale, the receipt of these items would not result in income to Northwest. The record supports the respondent's position. As can be seen from our findings, Daughenbaugh regarded the transferring of installed equipment as payment for water services to be rendered by Northwest, and this conclusion is bolstered by the initial agreements between Daughenbaugh and Northwest in which it is stated that payment for the equipment will be in *296 returnable stock. It is apparent that after the Revenue Service's initial examination, Northwest attempted to change the arrangement by setting up an account payable to Daughenbaugh. The lack of economic reality to this obligation is shown by the subsequent unexplained canceling, reentering, and recanceling of the "debt" in question. We further agree with the respondent that the instrument of March 9, 1962, which muddles not only the arrangement in question but also the parties involved, was merely an attempt to create some evidence that Daughenbaugh's transfer of equipment was not payment for the services of Northwest. We give no evidentiary weight to that document. Taken as a whole, the evidence, including the testimony of Daughendaugh, himself, establishes simply that Daughenbaugh was making payment for water services. We hold that the respondent has carried his burden as to matters raised in his amended answer and that Northwest had additional income in the amount of $46,085.22 in its taxable year ending December 31, 1961. Because of our conclusions with respect to this issue it is not necessary for us to consider the alternative arguments that have been advanced by the respondent. *297 Builders -- Agent or Principal in the Sale of Capital Stock of Northwest This issue concerns whether Builders was merely an agent or a conduit in the disposition of Northwest's capital stock and whether it thereby sustained neither gain nor loss upon such disposition. 27 It arises under section 61(a)28 of the 1954 Code. As can be seen from our findings, it was necessary for purchasers of land from Builders to buy stock in Northwest in order to assure water service. Builders kept the money from such stock sales in order to reimburse itself for advances it had made to Northwest. Although these advances were referred to as a stock "subscription," it was never intended that Builders acquire stock in Northwest, and the stock in question was issued only when a sale was arranged by Builders, at which time the appropriate number of shares would be issued by Northwest directly to the purchaser. *298 In two of the years before us, Builders received from the stock purchasers more money for the Northwest shares than Builders had advanced to Northwest to "subscribe" for the shares. In those years, Builders reported a gain from the "sale of stock" on its Federal income tax returns. In one of the years before us, Builders, received less money than it had advanced and reported a loss from the "sale of stock" on its return. The respondent argues that Builders was merely an agent or conduit for the sale of the Northwest stock. As such, the respondent contends that Builders could sustain no gain or loss upon the sale of the stock. The respondent states that such gain or loss should properly have been reported by Northwest and not by Builders. On brief, the petitioners depart from their position in the petition and agree with the respondent that Builders was in fact an agent or conduit. But the petitioners aver that the tax result suggested by the respondent is not one that automatically follows from an agent/conduit status. They urge that Builders could still sustain a gain or loss from the stock sales. However, the petitioners' briefs do not offer much in the way of elaboration. In *299 their original brief, the petitioners state that the gains and losses on the sale of the Northwest stock were income and expense in connection with Builders' land sales, but they fail to support this assertion with either evidence or argument. In any event, the petitioners have apparently withdrawn this theory on reply brief. There it is contended that the gains and losses on the stock sales were similar to the "commission income" and "unreimbursed expense" of a broker. Again, the petitioners have not offered evidence or argument to support their contention. The record does not suggest that Builders was acting as Northwest's broker in the stock sales under some kind of commission arrangement. What the record does suggest is that Builders lent Northwest certain amounts of money which was to be repaid to Builders with funds received from the sale of stock. The funds which Builders received from the sales in question were properly payable to Northwest; and, in retaining Northwest's funds, Builders was reimbursing itself for the loans it had made to the water company. In short, Builders did not receive the amounts in questions as compensation for the sale of stock but merely as repayment *300 of the advances it has made. It therefore cannot be said -- and the petitioners have not demonstrated -- that Builders sustained either a gain or loss upon the disposition of the stock. We hold that the respondent correctly determined, with reference to Builders' taxable years ended February 28, 1959, and February 29, 1960, that the gains reported in those years ($5,040 and $1,320, respectively) were not includable in Builders' gross income; and we hold that Builders' "loss" of $11,985.26 claimed in the taxable year ended February 28, 1961, was correctly disallowed. Curve Tavern, Inc. We next consider the issue of whether the gain from the sale by Investment of the capital stock of Curve Tavern, Inc., was (1) entirely a long-term capital gain or (2) partly a long-term capital gain and partly a short-term capital gain. In August, 1956, Investment (a partnership in which Irving, Arthur, and Shaw were equal partners) owned 25 percent of the outstanding capital stock of Curve Tavern, Inc. In that month, Irving was contacted by Petrino, who offered to buy all of the outstanding shares of Curve Tavern stock for $40,000 and the real estate on which the business was situated for $50,000. *301 Investment then purchased the other 75 percent of the shares of stock and the real estate; it immediately concluded the transaction with Petrino. The realty was resold at cost, but a profit was realized in connection with the transfer of the stock. The petitioners maintain that all gain from the sale is allocable entirely to Investment's original 25 percent stock interest, thus resulting in a long-term capital gain with reference to all of the profits. It is the respondent's position that the sales proceeds must be allocated ratably to the 25 percent stock interest and the 75 percent stock interest, thus resulting in taxing the gain partly as a long-term capital gain and partly as a short-term capital gain. The petitioners believe that the acquisition of the 75 percent stock interest and the realty "was simply a step in an integrated plan to effect the sale of the taxpayers' [25 percent stock interest]." In effect, they argue that the 75 percent stock interest, just like the real estate, was resold at cost. The petitioners also advance the argument that Investment was merely a conduit in the sale of the 75 percent interest. The respondent's contention is simply that the petitioners *302 "held" the 75 percent stock interest in Curve Tavern, Inc., for less than six months and that with respect to that interest, their capital gain must be considered short-term. See section 1222 of the 1954 Code subsections (1) and (3), which define short-term and long-term capital gains, respectively, as gains from the sale or exchange of capital assets "held" for not more than six months (short-term gains) and of capital assets "held" for more than six months (long-term gains). 29*303 The respondent points out that the word "held," as used in the statute, means "owned" ( Ted F. Merrill, 40 T.C. 66, 73 (1963), affirmed per curiam 336 F. 2d 771 (C.A. 9, 1964), quoting from McFeely v. Commissioner, 296 U.S. 102 (1935)), and the respondent observes that the petitioners "owned" the shares of stock comprising the 75 percent interest in Curve Tavern for less than six months.It is clear that the respondent's determinations are prima facie correct and that the burden of proof rests with the petitioners. Welch v. Helvering, 290 U.S. 111 (1933); Rule 32 of the Rules of Practice of this Court. After a careful scrutiny of the record before us in this case, we are unable to see how the evidence establishes that Investment was serving as a conduit in the sale of the 75 percent stock interest. What the petitioners have shown is that they acquired ownership of those shares at a set price which was not at all dependent on what was to be obtained from Petrino. Evidence of this nature is not consistent with a finding that Investment's role in the sale was that of a conduit. Nor does the record establish, as it does in the case of the real estate, that the 75 percent interest was being sold separately for a specifically stated price. Instead the evidence establishes that $40,000 was being paid for a 100 percent interest *304 in Curve Tavern, Inc., which interest Investment owned in its entirety at the time of the sale. There is absolutely no evidence that the parties understood that the $40,000 was to be broken down so that a spedivied amount was being paid for a 25 percent stock interest and a specified amount for the 75 percent interest. Furthermore, there is no apparent logical reason, other than tax avoidance, why such a breakdown would be necessary or desirable 30 since Investment was to receive all of the proceeds in any event, and Petrino was to receive all of the stock. The record dies not support the petitioners' position on this issue, and we must uphold the respondent's determination. The petitioners have not carried their burden of proof and, accordingly, have failed to sustain their interpretation of the facts herein -- an interpretation which appears to be contrary to both the form and substance of the transaction. The petitioners cite in support of their position Arrowsmith v. Commissioner, 344 U.S. 6 (1952), and *305 Duveen Brothers, Inc. v. Commissioner, 197 F. 2d 118 (C.A. 2, 1952), affirming per curiam Duveen Brothers, Inc., 17 T.C. 124 (1951), certiorari denied 344 U.S. 884 (1952). The petitioners regard these cases as holding that the tax treatment of a loss is dependent upon the factors present in earlier related transactions, and the petitioners conclude that, under the authority of these decisions, the gain to Investment was long-term because the partnership's acquisition of the 75 percent stock interest was part of an integrated plan of sale. Even assuming that the Arrowsmith and Duveen cases are apposite to the case at bar, we have closely examined all factors relating to the entire transaction before us and are unable to conclude from the evidence that the partnership was a conduit in the sale of the 75 percent stock interest or was reselling that interest at cost. We reject the petitioners' argument relating to an integrated plan of sale. We hold that the gain on the sale of the outstanding capital stock of Curve Tavern, Inc., was partly a long-term capital gain and partly a short-term capital gain, and we uphold the respondent's determination. Casualty Loss The next issue for our *306 consideration involves a casualty loss claimed by Irving in connection with damages sustained to his residence in 1955 as a result of water seeping from a broken pipe. Section 165(a) of the 1954 Code allows "as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(c)(3) permits the deduction, "in the case of an individual," for "losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft." Irving seeks to take his deduction as an "other casualty" under section 165(c)(3). The parties have stipulated that Irving's residence was damaged in 1955 to the extent to $26,000. On his 1955 Federal income tax return, Irving deducted the full $26,000. In his statutory notice to Irving, the respondent disallowed this deduction for 1955 on the grounds that Irving effected full recovery in 1962, as a result of litigation arising from the damages in question. Prior to the trial, the parties stipulated (1) that if there in fact was a loss which Irving suffered, it occurred in 1962, the year of Irving's recovery in his suit, (2) that such loss would be in *307 the amount of $7,346.40, and (3) that the only issue to be decided herein is "the character of the loss." Apparently, Irving's position is based on his view that since he suffered $26,000 in damages in 1955, and since he actually recovered only $18,653.60 in 1962, the difference between the two figures must be the measure of his loss (i. e., the extent to which his $26,000 loss was not reimbursed). The respondent, on brief, views Irving as having, in effect, recovered the full $26,000 and then having paid out the $7,346.40 in court costs and attorney fees, and the respondent contends that such costs and fees are not deductible under section 165 of the 1954 Code. 31However, at the trial, the respondent agreed that "the sole question we will litigate is whether the nature of the [1955] damage is such as to fit the definition of casualty loss * * *." The respondent, in thus conceding that only "the character of the loss" is at issue, cannot now argue for the first time after trial that, even if Irving actually suffered an allowable "casualty loss," the $7,346.40 *308 is not deductible. The issue before us, as framed by the parties and as tried, is whether the injuries which Irving suffered as a result of the damage to his house in 1955 constitute a deductible "casualty loss" within the meaning of section 165(c)(3) of the 1954 Code. Pursuant to these stipulations, if we decide this issue in Irving's favor, he will be able to deduct in 1962 the full $26,000 loss, reduced by the $18,653.60 he received in satisfaction of his judgment against the plumbing company; he was compensated only to that extent. The respondent argues that the real cause of the damage to Irving's residence was faulty construction and not a subsequent negligent act on the part of the plumbing company and that a loss occasioned by faulty construction does not fall within the scope of the term "casualty loss," no matter how rapidly the damage becomes manifest. The evidence convinces us that the damage to Irving's house occurred when an employee of Lembke Plumbing and Heating negligently stepped on a pipe, which in turn had been improperly installed by the same company. This negligent act by the employee was the primary cause of the damage.As reflected in our findings, the faulty *309 installation of the pipes would not have resulted in the extensive heaving of the entire house if were it not for the subsequent act of the Lembke employee who placed his weight on the pipe and broke it. The resultant flooding brought on the damage in question. We therefore reject the respondent's argument that the loss at issue is not a deductible one because it was caused by faulty construction. 32 In the present case, faulty construction was merely an element in the causative chain and was not a proximate cause of the heaving damage.Irving argues that, even though a loss is triggered by a negligent act, it may still properly be deducted under section 135(c)(3). See John P. White, 48 T.C. 430, 435 (1967), and Harry Heyn, 46 T.C. 302, 308 (1966). The respondent does not dispute this, nor does he raise any other arguments to rebut Irving's contention that he suffered a deductible "casualty loss." We conclude that the damage to Irving's residence resulted from a sudden, unexpected, accidental force *310 exerted on the property which proximately caused a loss which is similar to losses arising from the causes specifically enumerated in the statute. John P. White, supra at page 435. Consistent with the stipulations of the parties, we hold that Irving may deduct $7,346.40 in 1962 as a loss under section 165(c)(3) of the 1654 Code. Investment -- Bad Debt Deduction The next issue is whether Investment, the equal partnership of Irving, Arthur, and Shaw, is entitled to deduct in its fiscal year ending March 31, 1958, the amount of $27,012.22 as a business bad debt. The year or the amount of the debt is not at issue. The parties have stipulated as follows: S-H Investment Co. The bad debt subsidiary adjustment of $27,012.22 is at issue.Respondent concedes that to the extent basis is established, the deduction is allowable. Petitioner concedes that to the extent basis is not established, the deduction is not allowable. This issue involves sections 166(a)(1), 166(b), 1011, 1012, and 723 of the 1954 Code. Section 166(a)(1) allows a deduction for "any debt which becomes worthless within the taxable year." Section 166(b) provides that "the basis for determining the amount of the deduction *311 for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." Under sections 1011 and 1012, the basis of property is its cost (unless otherwise provided in the Code), adjusted as provided in section 1016. And section 723 provides that "the basis of property contributed to a partnership by a partner shall be the adjusted basis of such property to the contributing partner at the time of the contribution." Our findings disclose that, pursuant to Shaw's authorization, Irving and Arthur lent $39,600 of Shaw's money to York Investment Company. Of this total amount, Shaw was not repaid $27,012.22, and Shaw received a note from York. Prior to April of 1956, Shaw contributed this note in its face amount to Investment. Because Irving and Arthur felt that Shaw would not collect on the note and also felt morally responsible for Shaw's having made the loan, the two brothers agreed to subtract one third of $27,012.22 from their respective capital accounts in Investment and credit Shaw's capital account with these amounts. On brief, the respondent contends that Irving, Arthur, and Shaw should not be allowed to take *312 their proportionate share of the partnership's bad debt deduction because the petitioners have not established what the partnership's basis was in the note. 33 Under the sections quoted above, it follows that Investment's basis in the note would be Shaw's basis in the note at the time of the contribution, which in turn would be the cost of the note to Shaw. Our findings disclose that Shaw was not repaid $27,012.22 of the amounts he lent to York Investment Company and that this amount represented Shaw's basis in the indebtedness. Under the stipulation quoted above, it would appear that $27,012.22 is an allowable partnership deduction. The respondent argues that the decision to contribute was not made until the collectibility of the note was substantially in doubt. He suggests that Irving and Arthur knew the note *313 was worthless when they arranged to have it transferred to the partnership and that under these circumstances no deduction would be allowed under section 166. He cites Nathan Fink, 29 T.C. 1119 (1958), and Raymond R. Bill and Co., 15 B.T.A. 320 (1929). The respondent does not suggest that a partnership receiving a note with no value can have no basis in the note. Respondent appears to be arguing that, regardless of Investment's basis in the debt, the partnership is not entitled to a bad debt deduction because the note was worthless when it was acquired. This argument is inconsistent with the respondent's concession that "to the extent basis is established, the deduction is allowable." Although the respondent does not advance any argument to show that the value of the note at the time of its contribution is a relevant factor in making a determination of basis, there may be some merit to a contention that, assuming the note to be worthless at the time of its transfer to Investment, there was no "contribution" in the true sense of the word since nothing of value was transferred to the partnership. Cf. Seaboard Commercial Corporation, 28 T.C. 1034, 1054-1055 (1957). In such event, *314 it might be argued that, without a "contribution," no basis could carry over from Shaw to the partnership. The respondent makes no such argument. In fact, the respondent does not even dispute the conclusion that the note became worthless in 1958; in his stipulation he impliedly accepts that fact by eliminating the year of worthlessness as an issue in this case. He therefore cannot now consistently argue that the note became worthless in a prior year, the year of the transfer. The only observation that the respondent makes specifically in reference to basis is that checks introduced in evidence to verify the total amount of Shaw's funds lent to York Investment Company total only $19,426.22, and the respondent indicates that Investment's basis in the note cannot exceed that amount. However, as can be seen from our findings of fact, it is our view that the evidence of record, considered in its entirety, establishes that Shaw lent York $39,600, of which $27,012.22 was not repaid. On brief, the respondent, himself, has made a requested finding of fact to that effect. We conclude that the record establishes that Shaw had a basis of $27,012.22 in his York note and that this basis carried *315 over to the partnership, Investment, when Shaw contributed it. In accordance with the stipulation of the parties, we hold that Investment properly deducted $27,012.22 as a bad debt on the partnership's information return for the fiscal year ending March 31, 1958. Collateral Certificates We next consider whether the corporate petitioners, Winston and Princeton, must include collateral certificates in income at face value rather than at 50 percent of face value. Purchasers who bought houses from Winston and Princeton financed their homes through savings and loan associations. Such loans were limited by state law to 80 percent of the purchase price, and home buyers, as a result, were required to make a cash down payment of 20 percent of the purchase price. To accommodate those purchasers who had only sufficient cash to make a 10 percent down payment, the lender would provide 90 percent of the purchase price. However, the lender would put a portion of the 90 percent loan -- an amount equal to 10 percent of the purchase price -- in a savings account in the name of Winston or Princeton, and the lender would require the named corporation to pledge that savings account as collateral security *316 in the event the borrower defaulted on the loan. For each such loan, a "collateral certificate" was issued to Winston or Princeton. In the years in which Winston and Princeton received these collateral certificate accounts and pledged them to the lenders, they reported the entire face value as income but deducted 50 percent of these amounts as a "discount expense" because it was believed that the certificates had a fair market value equal to only 50 percent of face value. The respondent argues that the full face amounts of the collateral certificate accounts, without discount, must be included in the income of Winston and Princeton. The petitioners admit that the authorities are not in their favor. Both Winston and Princeton kept their books and reported their income on their returns using the accrual method of accounting and are governed by section 451 of the 1954 Code 34*317 and section 1.451-1(a), Income Tax Regs. The latter section provides that "[u]nder an accrual method of accounting, income is includible in gross income when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." In Western Oaks Building Corp., 49 T.C. 365 (1968), we held that collateral certificates like those involved in the instant case were includable in the income of an accrual basis taxpayer at their unadjusted face amounts. We observed in that case that the Supreme Court had held "it is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues." Spring City Co. v. Commissioner, 292 U.S. 182, 184 (1934). We pointed out that "it is the face amount of the right, not its fair market value, which must be treated as received and includable in income," and we stated (at page 373): In the first place, it is immaterial how, or from whom, the petitioners in this case acquired the unconditional right to receive future payments. In any event, they acquired *318 such a right at the time of the sale of the property, and under the accrual method of accounting which they used for tax purposes, the face amount of the obligation must be treated as income at that time. The facts that the funds could not be withdrawn until some future time and that they would not become available if the purchaser failed to perform his obligation would not alter the accruability of the right if it had been received directly from the purchaser, and do not change the tax consequences merely because the right is acquired from the lending company. There are no substantive differences between the collateral certificate accounts involved in the present case and those involved in Western Oaks. In both instances the lending companies released amounts to the sellers as the purchasers made payments on the principal of their loans. We fail to see any meaningful distinction between this case and Western Oaks, and none has been called to our attention by the petitioners. Accordingly, we conclude and hold that the respondent correctly included the full face amount of the collateral certificate accounts in the gross income of Winston and of Princeton. Western Oaks Building Corp., supra; *319 Key Homes, Inc. 30 T.C. 109 (1958), affirmed per curiam, 271 F. 2d 280 (C.A. 6, 1959). 35In the alternative, the petitioners argue that they should be permitted deductions for reasonable additions to their reserves for bad debts, based upon the conditions that existed in the years the certificates were acquired and their exposure to loss. The same argument was made by the taxpayers in the Western Oaks case. There we pointed out that section 166(g) of the 1954 Code, which was enacted in 1966, provides the exclusive right of a guarantor to deduct additions to a reserve for bad debts. 36*320 We also observed that, in the case of taxable years ending before October, 22, 1965, a guarantor is entitled to such a deduction only if he made a claim for the deduction before that date. 37*321 Western Oaks Building Corp., supra at pages 375-376; H. Rept. No. 2157, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 905, 912. In their reply brief, Winston and Princeton recognize the restriction of section 166(g)(2) but insist that their deductions on their returns for the years in issue of a "discount expense" was the equivalent of increasing the bad debt reserve. The petitioners therefore believe that they made *322 a claim for the section 166(g)(1) deduction before October 22, 1965. We do not agree. Congress has specifically referred to a claim "under section 166(c) of the Internal Revenue Code of 1954 for an addition to a reserve for bad debts * * *." 38 We do not see how the attempted deductions by Winston and Princeton as discounts to reflect market value satisfies this specific requirement, especially in view of the fact that the two companies did maintain bad debt reserves in connection with other transactions. Under the rules which have been laid down by Congress, it is clear that the petitioners are not entitled to the deduction which they seek. Western Oaks Building Corp., supra.39In any event, even if Winston and Princeton were not restricted by section 166(g)(2), it is apparent that they would not be allowed to deduct additions to their bad debt reserves. As can be seen from our findings of fact relating to Arthur's experience with substantially *323 similar collateral certificates, the payout on these certificates was excellent and the default rate practically nonexistent. It appears that an anticipatory reserve deduction would have been unnecessary. In summary, we conclude and hold that Winston and Princeton must include the collateral certificates in their gross income at face value and cannot take any deduction in connection therewith as an addition to a reserve for bad debts. Omission of Sales Income -- Builders We next consider whether Builders had additional income during the fiscal year ending February 29, 1956, in the amount of $13,700, which the company omitted from its Federal income tax return for that year. Builders does not dispute that $13,700 in sales income was omitted from its return, and, based on the evidence of record, we have found that such an omission occurred. However, Builders argues that it "should not be charged with $13,700 in omitted sales unless costs of approximately 90 per cent are matched against sales." Builders states that if all sales during the fiscal years ending February 28, 1954, February 28, 1955, and February 29, 1956, are totaled and all costs during that three-year period are subtracted *324 from the total sales figure, the resultant income figure will be only $68.00 less than the total income figure for the three-year period. Builders bases its assertion on its accountant's worksheets, which were prepared after the Revenue Service began its audit. Builders urges that the respondent should not be able to determine that the corporation had additional income without matching that additional income with offsetting cost deductions. If there were such an offset, Builders argues that there would be no understatement of income on its return for the year in question. We are unable to agree that Builders has not understated its income for the fiscal year at issue. It is clear that the omission of the $13,700 sales figure resulted from Arthur's failure to add in that amount when he was preparing the return for the fiscal year ending February 29, 1956. The evidence dies not show, and the petitioner does not suggest, that Arthur made a similar error when he was calculating the costs relating to the year at issue. There has been no showing whatsoever of any specific costs incurred during the fiscal year in excess of the $586,124.67 reported on the return. 40*325 The petitioner does not cite any authority which would permit us to pool all of its income and costs over a three-year period in order to determine the corporation's tax liability in any one of those years, and we are aware of no authority which would allow such a procedure. In fact, we would regard such pooling as inconsistent with the annual account concept on which much of the Federal income tax law is based. See section 441 of the 1954 Code and section 1.441-1, Income Tax Regs. While it may be possible to depart from normal accounting practices in certain situations (see section 442 of the 1954 Code and section 1.441-1(b)(4) and section 1.446-1(c)(2)(ii), Income Tax Regs.), such variance is permissible only with the approval of the Commissioner, and the record does not show that such approval has been obtained in the instant case. Builders' failure to keep adequate records during the year at issue does not require us to overlook these principles and accept a pooling or bunching arrangement merely because it *326 strikes the petitioner as fair. Such deficiencies in the "books" of the petitioner and the resultant deficiencies in the record before us can work only to the petitioner's detriment. We hold that Builders omitted $13,700 in sales income from its return for the fiscal year in question and that the respondent correctly determined that this amount was includable in Builders' income in that year. In the absence of any evidence of additional costs for fiscal 1956, respondent's determination for that year on this issue is sustained. Payments Subsequent to Divorce The last issue is whether certain amounts paid in 1962 by Arthur to his ex-wife, Sylvia, pursuant to a "Stipulation and Agreement," dated May 7, 1962, were deductible by Arthur and includable in Sylvia's income under sections 215 and 71 of the 1954 Code. Section 215 permits a husband to deduct amounts he has paid to his wife during the taxable year if such amounts are "includible under section 71 in the gross income of his wife * * *." Section 71(a)(1) provides that, where a husband and wife have been divorced by court decree, the wife must include in her income amounts paid to her by her husband (1) if such amounts are "periodic *327 payments (whether or not made at regular intervals) received after such decree," and (2) if these "periodic payments" are "in discharge of * * * a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce * * *." In the instant case, Arthur and Sylvia agreed in their settlement, inter alia, that Arthur would pay Sylvia $163,000 in installments over a period of more than 18 years. In this connection, section 71(c)(1) provides that installment payments discharging part of an obligation, the principal sum of which is specified in terms of money in the decree or agreement, shall not be treated as "periodic payments" under section 71(a). However, section 71(c)(2) provides that if the principal sum is to be paid over a period longer than 10 years, then, notwithstanding section 71(c)(1), the installment payments will be treated as "periodic payments" under section 71(a) (to the extent payments do not exceed 10 percent of the principal sum in any one taxable year of the wife). Arthur argues that his installment payments extending over an 18-year period fall within *328 the scope of section 71(c)(2) and are therefore "periodic payments." Sylvia argues that, because of Arthur's reserved prepayment option, the principal amount could be paid in less than 10 years. Therefore, Sylvia believes that section 71(c)(2) does not apply and the payments cannot be considered "periodic" by virtue of the provisions of section 71(c)(1). We do not agree with Sylvia that the scope of section 71(c)(2) is restricted in such a manner. In our view, that section has application any time installment payments May extend over ten years. Section 71(c)(2) begins as follows: If, by the terms of the decree, instrument, or agreement, the principal sum * * * is to be paid or may be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement * * * [Emphasis supplied.] And section 1.71-1(d)(2), Income Tax Regs. contains similar language: An exception to the general rule * * * is provided, however, in cases where such principal sum, by the terms of the decree, instrument, or agreement may be or is to be paid over a period ending more than 10 years from the date of such decree, instrument, or agreement. [Emphasis supplied.] See also S. Rept. *329 No. 1631, 77th Cong., 2d Sess., 1942-2 C.B. 504, 568-569. Under these provisions, it is the terms of the agreement which are controlling (cf. Robert D. Stecker, 31 T.C. 749 (1959), and Richard T. Daniel, Jr., 56 T.C. 655 (1971), and under the terms of the agreement involved in the instant case, it is obvious that the payments may be paid over more than a 10-year period. It is not necessary for there to be absolute assurance that the payments will continue for more than ten years. 41The payments in question will not fall within the scope of section 71(a)(1) unless the payments were "in discharge of * * * a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce * * *." It is clear that section 71(c)(2) cannot serve to make a payment includable in the wife's gross income (and deductible by the husband) where the payment is not in discharge of such a legal obligation, but is instead in satisfaction of the wife's property rights. Edith M. Gerlach, 55 T.C. 156, 165-167 (1970), (on appeal to C.A. 6, Jan. 27, 1971); Wilma Thompson, 50 T.C. 522, 525 (1968); *330 Blanche Curtis Newbury, 46 T.C. 690, 697 (1966). See also McCombs v. Commissioner, 397 F. 2d 4, 7 (C.A. 10, 1968), and Lambros v. Commissioner, 459 F. 2d 69 (C.A. 6, 1972), affirming Memorandum Opinions of this Court, and see section 1.71-1(c)(4), Income Tax Regs.The resolution of this issue therefore turns on the question of whether or not the stipulation and agreement signed by Arthur and Sylvia was in the nature of a property settlement; that is, whether Sylvia received Arthur's installment payments of a principal sum in exchange for rights which she had in property. If that is true, then section 71(a)(1) does not apply and Arthur's payments, even if periodic, and neither deductible by him or includable in Sylvia's income. In making our determination, we are, of course, not bound by the labels that were employed in the stipulation and agreement or by the characterization of the payments under state law. See William M. Joslin, Sr., 52 T.C. 231, 236 (1969), affd. 424 F. 2d 1223 (C.A. 7, 1970), and the cases cited in the Tax Court opinion. See also Enid P. Mirsky, 56 T.C. 664 (1971).The question of whether Arthur's payments were in the nature of support payments incurred because *331 of the marital relationship or whether his payments were made because of Sylvia's ownership in the property is essentially a factual question, resolved by an examination of all of the surrounding facts and circumstances. Edith M. Gerlach, supra at page 167; Lewis B. Jackson, Jr., 54 T.C. 125, 129-130 (1970); William M. Joslin, Sr., Supra at page 236; Blanche Curtis Newbury, supra at page 694: Anne Hairston Ryker, 33 T.C. 924, 929 (1960). See also Bardwell v. Commissioner, 318 F. 2d 786 (C.A. 10, 1963), affirming 38 T.C. 84 (1962). The provisions of local law may become pertinent in this connection, not for the purpose of labelling Arthur's payments, but for the purpose of determining whether the payments were made for Sylvia's property or in satisfaction of her marital rights. Various factors give the transaction in question the appearance of a property settlement, and we list them below: 1. Under the divorce agreement, Arthur's obligation to continue the payments continued after his death and could be charged against his estate. Similarly, the insurance policy on his life could be used to fulfill Arthur's obligation under the agreement. 2. Under the agreement, Arthur's obligation *332 was not affected by the remarriage of Sylvia or by changes in her income or property ownership. Nor was his obligation affected by the marriage, death, incapacity, or emancipation of any of their children or by changes in Arthur's income or property ownership. 3. Language used in the agreement, as well as the language used by Irving, Arthur's attorney, at the hearing in the Colorado district court, create the strong impression that the agreement was regarded as a lump sum property settlement. 4. At no time was there any attempt in the settlement agreement or by the divorce court to determine the extent of the dollar value of Arthur's obligation to support Sylvia or to pay alimony. Arthur's payments of a fixed sum bore no relationship to his income, and Arthur could pre-pay the total amount in full. 5. At the trial of this case, Arthur, a Colorado lawyer, testified, in connection with the payments to Sylvia under the settlement agreement which he and his brother had drafted, that his "only intention" was that the payments be "periodic payments" and that he did not intend that the payments constitute alimony under Colorado law. Arthur appears to have been under the mistaken impression *333 that the payments needed only to be "periodic payments" to be deductible under section 215 (in conjunction with section 71). As will be seen in the discussion which follows, we do not regard these factors as necessarily controlling in resolving the issue before us. Sylvia believes that, under Colorado law, her interest in property acquired by Arthur during the marriage rose to the level of coownership and that Arthur's payments were made to purchase her ownership rights. We do not agree with her conclusions as to Colorado law. In a different divorce context, the Supreme Court of the United States in United States v. Davis, 370 U.S. 65 (1962), considered the question of whether a given transaction amounted to a division of co-owned property of the spouses as opposed to a transfer in satisfaction of the wife's marital rights (including support rights). In Davis, pursuant to an agreement incorporated in a divorce decree, a transfer was made by the husband to the wife which the wife accepted "in full settlement and satisfaction of any and all claims and rights against the husband whatsoever * * *." The Supreme Court exaimed the applicable local law (Delaware) and observed that the wife's *334 rights in the husband's property did not "even remotely reach the dignity of coownnership." The Court held: * * * Delaware seems only to place a burden on the husband's property rather than to make the wife a part owner thereof. In the present context the rights of succession and reasonable share do not differ significantly from the husband's obligations of support and alimony. They all partake more of a personal liability to the husband than a property interest of the wife. The Court concluded that the transaction in question was not a division of co-owned property and that the transfer by the husband was, therefore, made for the relinquishment of the marital rights of the wife. The Tax Court and the Court of Appeals for the Tenth Circuit, to which an appeal would lie in the instant case, have applied the rationale of Davis in a case involving Colorado law. See David R. Pulliam, 39 T.C. 883 (1963), affd. 329 F. 2d 97 (C.A. 10, 1964), certiorari denied 379 U.S. 836 (1964). The same Court of Appeals discussed Colorado law in some detail in another case involving the application of Davis. See Collins v. Commissioner, 388 F. 2d 353 (C.A. 10, 1968), affirming 46 T.C. 461 (1966). 42*336 *335 From these decisions, it is apparent that the Tenth Circuit Court of Appeals is in accord with the view expressed above that we cannot look to the labels and characterizations that Colorado law would place on the payments and question but that we can look to Colorado law to determine whether the payments were made for the wife's property or in satisfaction of a marital obligation. See also Collins v. Commissioner, 412 F. 2d 211 (C.A. 10, 1969), discussed in footnote 42, supra. It is also apparent from the discussion in the Tenth Circuit cases discussed above, as well as from our own examination of the applicable Colorado authority (and see Sollins v. Oklahoma Tax Commission, 446 P. 2d 290 (Okla. 1968), discussed in footnote 42, supra) that, under the law of Colorado, transfers made to a wife by her husband in a divorce context, even though such transfers are characterized by a local court as a property settlement or division, can in fact be payments in satisfaction of a marital obligation and not part of a division of marital property. This is because (1) a Colorado wife, by virtue of her marital status, is not vested *337 with an ownership in any part of her husband's property acquired during the marriage, and (2) the court of that state, upon divorce, may make any division of the husband's property they regard as equitable.Such division is not necessarily based on the wife's ownership rights, and may in fact be made in lieu of alimony. In addition to the authorities cited above, see Colorado Revised Statutes (1963), section 46-1-5; Kraus v. Kraus, 411 P. 2d 240 (Colo. 1966); Greer v. Greer, 130 P. 2d 1050 (Colo. 1942); Lay v. Lay, 425 P. 2d 704 (Colo. 1967). Sylvia argues that the law of Colorado is similar to the law of Oklahoma, as set forth in Collins v. Oklahoma Tax Commission, supra, and that a Colorado wife, like an Oklahoma wife, has substantial ownership rights in her husband's property acquired during marriage by virtue of the wife's marital status. See Ernest H. Mills, 54 T.C. 608, 615-616 (1970), affirmed 442 F. 2d 1149 (C.A. 10, 1971), and Lewis B. Jackson, 54 T.C. 125, 129-130 (1970), cases involving the application of Oklahoma law. We find Sylvia's argument as to the Colorado law to be inconsistent with the authorities which we have discussed herein. Sylvia's rights under Colorado*338 law to an equitable division of Arthur's property were "more of a personal liability of the husband than a property interest of the wife." United States v. Davis, supra, at page 70. Obviously, then, we cannot regard the installment payments in question as payment for Sylvia's interests in Arthur's property since her interests did not rise to the level of property rights. Compare Ernest H. Mills, supra.On the other hand, as is apparent from our Findings of Fact, Sylvia did have actual ownership rights in some items of property, and, to a certain extent, Arthur's payments to her were made to acquire those rights. It follows, therefore, that to the extent that Arthur's payments to Sylvia were made other than to acquire such rights, they were made "in discharge of * * * a legal obligation which, because of the marital or family relationship, is imposed or incurred by the husband under the decree or under a written instrument incident to such divorce * * *." Soltermann v. United States, 272 F. 2d 387 (C.A. 9, 1959); Brantley L. Watkins, 53 T.C. 349, 360 (1969); Grant R. Bishop, 55 T.C. 720, 725 (1971). It was the intention of Arthur and Sylvia, in executing their "Stipulation and Agreement" *339 that Arthur should make adequate provisions for the support needs of Sylvia and the children. We believe that the installment payments at issue were made both to pay Sylvia for certain property rights and to provide Sylvia and the children with support. That portion of each installment payment which is attributable to support is deductible by Arthur and includable in Sylvia's income. 43*340 In this connection two points should be made. First, the fact that the installment payments would continue on Sylvia's remarriage does not affect our conclusion that they were partially support payments. Such payments, in Colorado, may properly continue on remarriage if the parties so agree. Colorado Revised Statutes (1963), section 46-1-5(5). Compare Martha K. Brown, 50 T.C. 865 (1968), affirmed per curiam 415 F. 2d 310 (C.A. 4, 1969), and Allen Hoffman, 54 T.C. 1607 (1970), affd. per curiam 455 F. 2d 161 (C.A.D.C. 1972). Second, we are aware that if any part of the support payments made to Sylvia are for the support of the minor children, section 71(a) does not apply to that portion if either the decree or the agreement fixes an amount for child support. See section 71(b). However, since neither the decree nor the agreement in this case specifices an amount for child support, we need not be concerned with the application of section 71(b). Commissioner v. Lester, 366 U.S. 299, 302 (1961). Pursuant to the "Stipulation and Agreement," Sylvia transferred the following property to Arthur in 1962: (1) Her half interest in the Jupiter Lane property; *341 (2) Her interest in the income of the Sylvia C. Hayutin trust and in the Builders stock held therein; and (3) Her interest in the miscellaneous household goods held by Arthur. Pursuant to the "Stipulation and Agreement," Arthur transferred the following property to Sylvia in 1962: (1) His half interest in the East Fifth Avenue property; (2) His interest in a note from Benjamin L. Kohen to Builders in the face amount of $5,000; and (3) His interest in miscellaneous household items held by Sylvia. 44The valuation of these items is difficult as the record is not completely clear on this question. Indeed, it appears that at the time of the settlement even Arthur and Sylvia were not certain of the valuation of the various items. In our view, the record does clearly establish, however, that (1) Arthur agreed to make the transfers to Sylvia in order to acquire her interest in the items which she agreed to transfer to him, and (2) the parties believed, when they executed their agreement, that the property which Sylvia was to *342 transfer to Arthur exceeded in value the property which Arthur was to transfer to Sylvia in return. This understanding as to relative values was based largely on the couple's belief that the Barnes and Shaw land had been transferred to the trusts and that the income from the several land contracts was properly payable to the trusts. Given these factors, we have concluded that a portion of each installment payment called for in the agreement was intended by the parties to be in payment for the items which Sylvia transferred to Arthur. The remaining portion of each payment, as we have indicated above, was intended by the parties to be for support. Since each installment payment had a dual character, it is necessary for us to make an allocation to ascertain the amount which is includable under section 71 and deductible under section 215 (i.e., the extent to which each installment payment was made for support). Soltermann v. United States, supra; Brantley L. Watkins, supra; Grant R. Bishop, supra. Although the May, 1962 agreement between Arthur and Sylvia does not make such a segregation, we believe there is adequate evidence in the record to establish the extent to which the payments *343 were intended for support. Prior to the execution of their formal agreement, Arthur and Sylvia negotiated the amount of temporary alimony that would be paid. They agreed that Arthur would pay $500 a month to Sylvia for her support, and Arthur proceeded to make such payments. 45 This preliminary agreement between the husband and wife provides us with convincing evidence of what they considered was essential for Sylvia's support, and we hold, accordingly, that a similar monthly amount was paid for Sylvia's support under the payment arrangement adopted by Arthur and Sylvia in their May, 1962 agreement. See Grant R. Bishop, supra at page 728; Thomas E. Hogg, 13 T.C. 361, 367 (1949); and Julia Nathan, 19 T.C. 865, 871-872 (1953). It follows, therefore, and we hold that out of the $4,900 (seven $700 monthly payments) paid by Arthur to Sylvia during 1962 under their formal divorce agreement, $3,500 of this amount (7 X $500) was paid for Sylvia's support, and $1,400 (7 X $200) was paid by Arthur to acquire Sylvia's interest in property. 46*344 As a result, only $3,500 of the payments in question was deductible by Arthur and includable in Sylvia's income on their 1962 returns. The remainder of the installment payments was part of a property settlement, and, under the provisions of section 71 (in conjunction with section 215), was neither deductible by the husband nor includable in the wife's income. Cf. Grant R. Bishop, supra; Brantley L. Watkins, supra.47*345 *346 Conclusion In accordance with the concessions of the parties and the discussion herein, Decisions will be entered under Rule 50. Footnotes1. Proceedings of the following petitioners are consolidated herewith: Arthur B. Hayutin and Sylvia C. Hayutin, 4624-64; Eugene E. Shaw, 4625-64; Honeymoon Manor, Inc., a Colorado Corporation, 4626-64; Northwest Water Corporation, a Colorado Corporation, 4627-64; S and H Builders, Inc., 4628-64; S and H Builders, Inc., 5415-65; Eugene E. Shaw, 5428-65; Northwest Water Corporation, 5432-65; Irving J. Hayutin and Sima B. Hayutin, 5433-65; Arthur B. Hayutin, 5434-65; Sylvia C. Harrison, (formerly Sylvia C. Hayutin), 5524-65; Sylvia C. Harrison, (formerly Sylvia C. Hayutin), 4720-67; Arthur B. Hayutin, 4759-67; Irving J. Hayutin and Sima B. Hayutin, 4760-67; Eugene E. Shaw and Nelda B. Isbell, (formerly Nelda B. Shaw), 4761-67; Winston Construction Company, 4763-67; Princeton, Ltd., 4765-67; Northwest Water Corporation, 4770-67; Eugene E. Shaw, 4771-67 and S and H Builders, Inc., 4784-67.↩*. Docket No. 5524-65, the petition of Sylvia C. Harrison for the taxable years 1958, 1959, and 1960, is a separate petition based on a statutory notice of deficiency issued jointly to petitioner Arthur B. Hayutin and Sylvia C. Harrison, the former Mrs. Hayutin. Arthur B. Hayutin's separate petition for those same years is identified as Docket No. 5434-65. ** In Dockets 4759-67 (Arthur B. Hayutin) and 4720-67 (Sylvia C. Harrison, the former Mrs. Arthur B. Hayutin) the respondent has taken inconsistent positions on a financial agreement incident to petitioners' divorce, the question being whether transfers in 1962 constitute periodic payments or a property settlement.↩2. In the Supplemental Stipulation of Facts submitted to the Court, the petitioners Arthur B. Hayutin and Irving J. Hayutin, Docket Nos. 4759-67 and 4760-67, agreed that the decision of this Court in the case of one Hyman Redak, Docket No. 4850-66, would be dispositive of a similar issue now before us. That case has been decided in favor of the Commissioner (see Hyman Redak [Dec. 29,148(M)], T.C. Memo. 1968-213↩), and we accordingly approve the respondent's adjustments with regard to that issue.*. Receipt signed by named individual. ** In connection with his divorce settlement, discussed below, Arthur pledged as security 12 shares of the common stock of Builders.↩3. We refer to sales of stock in these findings merely to facilitate presentation of the issue. Actually, as will be seen in our opinion, infra, it was Northwest's services and not its stock which was being sold.↩4. The Lembkes appealed the case to the Colorado Supreme Court, which affirmed the judgment, as set forth in Lembke Plumbing and Heating v. Hayutin, 148 Colo. 334, 366 P. 2d 673↩ (1961).5. A separate statutory notice relating to the calendar year 1958 was also sent to Sylvia Hayutin. By June of 1965, she had been divorced from Arthur and had remarried.↩6. In 1945, four checks in the total amount of $266 were made out to both Sylvia and Arthur by Sylvia's father. All of the amounts in question were paid by check made out to Sylvia or to one of the children, and they were signed by Sylvia's father, the more usual case, or by her mother.↩7. Sylvia received this automobile when the couple was attempting a reconciliation, and, at the time of the divorce, Arthur had no interest in the car.↩8. At the time of the divorce agreement, Arthur and Sylvia believed that the Sylvia Hayutin trust held 12 shares of Builders' stock.↩9. There is some indication in the record that the $35,000 figure was agreed upon by the parties as the value of the East Fifth Avenue property. We have found that the East Fifth Avenue property had a fair market value of only about $26,000.↩10. In addition, Arthur deducted temporary alimony in the amount of $2,000.↩11. In his petition, Arthur stated that "[a]lthough payments made during petitioner's first taxable year under the agreement exceeded 10% of the principal sum, the deduction claimed by the petitioner is limited to 10% of the principal sum." Note that Arthur regards the principal sum as the amount stated in the agreement -- $198,000. In Sylvia's statutory notice, the Commissioner regarded $200,413.20 as the principal sum. See in this connection sec. 71(c)(2)↩ of the 1954 Code, providing that a deduction under that subsection is allowed "only to the extent of 10 percent of the principal sum."12. At one point in his brief, the respondent appears to suggest that in reality no transfers took place -- that the transfers in question were "sham transactions" without substance. We are unable to conclude that the transfers did not in fact occur. We view the evidence as establishing the validity of the transfers and find the record devoid of substantial factors establishing a contrary view.↩13. Section 113(a)(8) of the 1939 Code provided: * * * If property was acquired after December 31, 1920, by a corporation -- (A) by the issuance of its stock or securities in connection with a transaction described in section 112(b)(5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or (B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.Section 362(a) of the 1954 Code provides: * * * If property was acquired on or after June 22, 1954, by a corporation -- (1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or (2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.↩14. Actually, the petitioners make this argument only with reference to the transfer falling under the 1939 Code provisions (the ones prior to June 22, 1954), apparently conceding that those transfers falling under the 1954 Code provisions are within the scope of section 351. Section 112(b)(5) of the 1939 Code stated: * * * No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.15. At one point in his brief, the respondent states that it is his "position that the basis of the Barnes and Shaw tract in the hands of the individuals is its original cost of $30,000.00." The respondent may base this argument on his view that the transfers in question were "sham transactions" without substance, a point with which we do not agree. Later in his brief the respondent states that "in all events, [the basis of the Barnes and Shaw property] could be no more than $42,000.00, its fair market value when received from Honeymoon Manor, "Inc." On this latter point, we are in agreement.↩16. As can be seen from our findings of fact in connection with the land transfers, we believe the record adequately establishes that the Builders stock was properly transferred into trust. Our discussion as to the present issue shall therefore be limited to a consideration of whether the land was placed in trust. ↩17. At one point in their reply brief, to explain why no gift tax was paid on the transfers in question, the petitioners suggest that the trusts were substituted for the individuals as purchasers of land from Honeymoon. The petitioners do not develop this contention, and the record does not support it.↩18. Section 61↩ of the 1954 Code provides that "gross income means all income from whatever source derived * * *." 19. The petitioners argue on brief that these amounts constituted nonshareholder contributions. This represents a change from their argument in the petitions that the amounts in question were paid for the purchase of Northwest stock. In a supplemental brief, the respondent has conceded that, if the amounts in question were in fact nonshareholder contributions to Northwest's capital, "inasmuch as [Northwest] is a regulated public utility, no taxable income should be deemed to have been realized by reason of the nonshareholder contributions." The respondent bases his concession on Revenue Ruling 58-555↩, which we discuss below.20. The petitioners concede that no increase to basis of Northwest's property results from such contributions. ↩21. Section 118 of the 1954 Code provides that "in the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."22. In Glenshaw, the Supreme Court pointed out that the term "gross income" permitted Congress to exert "the full measure of its taxing power," and the Court recognized that it was "the intention of Congress to tax all gains except those specifically exempted."↩23. The enactment of sections 118 and 362 of the 1954 Code do not compel a different result on the facts of the Teleservice case. See Warren Television Corp., T.C. Memo. 1958-211↩. 24. See also Northeast Coal & Dock Corp., T.C. Memo. 1961-199↩.25. H. Rept. No. 1337, 83d Cong., 2d Sess. 17 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess. 18, 271-272 (1954).↩26. The burden of proof as to this issue rests on the respondent. See Rule 32 of the Rules of Practice of this Court.↩27. We refer to sales of stock in the instant discussion merely to facilitate presentation of the issue. It is clear from the preceding portion of this opinion that there were no actual sales of stock. ↩28. Section 61(a)↩ provides that "gross income means all income from whatever source derived * * *."29. SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES. For purposes of this subtitle -- (1) Short-Term Capital Gain. -- The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income. * * * (3) Long-Term Capital Gain. -- The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.↩30. In fact, the petitioners' argument on this issue appears to be an afterthought since they did not report this transaction on their income tax returns in the year in question.↩31. See our recent opinion in Alexandre R. Tarsey, 56 T.C. 553↩ (1971), decided after the briefs in this case were submitted.32. See also Brooks W. Rountree, T.C. Memo. 1968-165 and Vladimir Dvorkovitz, T.C. Memo. 1966-11. And see also William J. Matheson, 18 B.T.A. 674 (1930), affd. 54 F. 2d 537↩ (C.A. 2, 1931).33. In the petitioners' brief, there is some discussion of "the three individuals' basis" in the note. However, judging from the respondent's briefs and the language of the above-quoted stipulation, we conclude that the respondent's determination was based on his contention that the parntership's basis has not been established, and our discussion is limited to that question.↩34. SEC. 451. GENERAL RULE FOR TAXABLE YEAR OF INCLUSION. (a) General Rule. -- The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.↩35. See also Samuel S. Steele, T.C. Memo. 1969-177, and Poplar Hills Development Corp., T.C. Memo. 1968-208↩.36. Section 166(g) provides, in part: (g) Reserve For Certain Guaranteed Debt Obligations. -- (1) Allowance of Deduction. -- In the case of a taxpayer who is a dealer in property, in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) for any taxable year ending after October 21, 1965, a deduction -- (A) for a reasonable addition to a reserve for bad debts which may arise out of his liability as a guarantor, endorser, or indemnitor of debt obligations arising out of the sale by him of real property or tangible personal property (including related services) in the ordinary course of his trade or business; and * * * (2) Deduction Disallowed In Other Cases. -- Except as provided in paragraph (1), no deduction shall be allowed to a taxpayer for any addition to a reserve for bad debts which may arise out of his liability as guarantor, endorser, or indemnitor of debt obligations. ↩37. Section 2 of Public Law 89-722 (Act of November 2, 1966) provides: Sec. 2. (a) Except as provided in subsections (b) and (c), the amendments made by the first section of this Act shall apply to taxable years ending after October 21, 1965. (b) If -- (1) the taxpayer before October 22, 1965, claimed a deduction, for a taxable year ending before such date, under section 166(c) of the Internal Revenue Code of 1954 for an addition to a reserve for bad debts on account of debt obligations described in section 166(g)(1)(A) of such Code (as amended by the first section of this Act), and (2) the assessment of a deficiency of the tax imposed by chapter 1 of such Code for such taxable year and each subsequent taxable year ending before October 22, 1965, is not prevented on December 31, 1966, by the operation of any law or rule of law, then such deduction on account of such debt obligations shall be allowed for each such taxable year under such section 166(c) to the extent that the deduction would have been allowable under the provisions of such section 166(g)(1)(A) if such provisions applied to such taxable years. (c) Section 166(g)(2) of the Internal Revenue Code of 1954↩ (as amended by the first section of this Act) shall apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954. [80 Stat. 1152]38. See section 2 of the Public Law 89-722, quoted in the previous footnote. Note that the need to file a claim under section 166(c)↩ is repeated in the Committee reports cited above.39. See also Poplar Hills Development Corp., supra, fn. 35↩.40. Builders used the accrual method of accounting, and under that method expenses are deductible only if they are incurred during the taxable year. Section 1.446-1(c)(1)(ii), Income Tax Regs.↩41. See Alice Grabowski, T.C. Memo. 1962-43↩.42. The Collins case involved the application of Oklahoma law. The Tenth Circuit Court of Appeals regarded Oklahoma law as similar to that of Colorado. Subsequent to that Court's 1968 opinion in Collins, the Oklahoma Supreme Court in Collins v. Oklahoma Tax Commission, 446 P. 2d 290 (Okla. 1968), made it apparent that the Tenth Circuit's Collins opinion had misconstrued Oklahoma law. The United States Supreme Court in Collins v. Commissioner, 393 U.S. 215 (1968), thereupon remanded the case to the Court of Appeals for further consideration in light of the Oklahoma Supreme Court opinion. Following the mandate of the Supreme Court, the Court of Appeals for the Tenth Circuit in Collins v. Commissioner, 412 F. 2d 211 (C.A. 10, 1969), observed that the "previous attempt to discern a trend [in Oklahoma law] was unavailing" and revised the previous opinion to present the Oklahoma law enunciated in Collins v. Oklahoma Tax Commission, supra.In so doing, the Court of Appeals reversed the Tax Court. Nothing in any of the cases cited in this footnote suggests that the interpretation of Colorado law by the Tenth Circuit in the Pulliam and Collins cases was inaccurate. (To the contrary, Collins v. OklahomaTax Commission supports the Tenth Circuit view.)43. There is nothing in the record to suggest that the payments to Sylvia, in excess of those made to acquire her interests in property, were made for any other purpose than to provide support (e.g., to repay a loan).See Ruth E. Kern, 55 T.C. 405, 408 (1970). In addition, it should be noted that no suggestion has been made by any of the parties in this case that the result of United States v. Davis, supra, should apply on the facts before us and that (1) Arthur should be taxed on the accretion in value of property transferred to Sylvia in satisfaction of her marital rights (to the extent appreciated property was transferred for such purpose), and (2) Sylvia should not be taxed on such transfers (see Davis, 370 U.S. at page 73, footnote 7, and see Rev. Rul. 67-221, 67-2 C.B. 63). We therefore give no consideration to this question.44. Arthur also agreed to transfer his interest in the Rambler automobile to Sylvia, but we have found that at the time of the agreement the car was owned by Sylvia.↩45. It was also agreed that Sylvia would support the children from these funds, although no portion of each $500 payment was designated for that purpose.↩46. It is apparent from their preliminary agreement and negotiations that Arthur and Sylvia intended that part of the $3,500 payment be expended for child support. However, as we pointed out in our discussion above, we need not be concerned with section 71(b). Commissioner v. Lester, supra.↩47. One additional point merits comment. Sylvia has filed a motion with the Court in which she states that the respondent acted in violation of the Constitution in assessing the deficiencies against her in this case. She points out that, had she been a resident of a community property state, the respondent would have treated Sylvia as owning one-half of the property accumulated by her and her husband during their marriage. Since the respondent failed to put her on an equal footing with a wife in community property jurisdiction, Sylvia believes that he has acted in violation of various provisions of the Constitution and its amendments. The respondent has not addressed himself to these contentions. We have in part based our conclusion relative to the divorce issue herein on the fact that Sylvia had limited property rights and that she did not have the substantial rights possessed by a wife in a state with community property laws. Compare the instant case with Ernest H. Mills, supra, involving Oklahoma law. Since our conclusion is based on the rights which Sylvia possessed, we are unable to agree that she was treated in an unconstitutional manner simply because a wife in a state like Oklahoma has greater property rights and would be taxed differently in a divorce situation. If Sylvia had the same property rights that a wife in a community property state has, then she would be entitled to the same tax treatment. Possibly it is the existence of community property laws themselves that Sylvia finds constitutionally objectionable. If so, we are not prepared to agree that such laws are violative of constitutional provisions. See Warburton v. White, 176 U.S. 484 (1900), and Poe v. Seaborn, 282 U.S. 101 (1930). Sylvia further suggests in her motion that the respondent acted in an "arbitrary, capricious and inequitable manner" in determining the tax consequences to Arthur and Sylvia in an inconsistent manner. If this accusation in fact has merit, a point which we do not here decide, any arbitrariness, capriciousness, or inequity has been remedied by this opinion in which we take into account all factors weighing in favor of both spouses and resolve the question in a fully consistent manner. It is therefore a moot question (insofar as it affects the result we reach today) whether or not the respondent acted improperly.↩